UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ANNIE L. NORMAND, DON A. CAROFANO,    :
and DAVID FEIGE, individually and on behalf of  :
all others similarly situated,                            :
                                                                      :            16-CV-212 (JPO)
                                            Plaintiffs,       :
                                                                      :          OPINION AND ORDER
                        -v-                                       :
                                                                      :
THE BANK OF NEW YORK MELLON,          :
                                                                      :
                                            Defendant.      :
----------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiffs Annie L. Normand, Don A. Carofano, and David Feige (collectively

"Plaintiffs") bring this putative class action alleging that The Bank of New York Mellon

("BNYM" or the "Bank") breached the contracts that govern the relationship between BNYM

and the holders of its American Depositary Receipts ("ADRs").  This case centers on BNYM's

practice of receiving dividends or other cash distributions from foreign companies and

converting them into U.S. Dollars ("USD") for class members, who are beneficial owners or

holders of ADRs ("ADR Holders").  Plaintiffs allege that BNYM converted the proceeds at one

rate and then used a less favorable rate to remit the proceeds to ADR Holders, capturing a

substantial spread and breaching its contractual obligations to class members.  Plaintiffs assert

claims for breach of contract, breach of an implied covenant of good faith and fair dealing, and

conversion.  (*See* Dkt. No. 1 ("Compl.").)

      BNYM now moves to dismiss Plaintiffs' complaint for failure to state a claim, in whole

or in part, pursuant to Rules 12(b)(l) and 12(b)(6) of the Federal Rules of Civil Procedure or

pursuant to the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb(f)(l)

("SLUSA").

For the reasons that follow, the motion to dismiss is granted in part and denied in part.

## I.     Background

The facts discussed below are taken from the Complaint, unless otherwise indicated, and

are presumed true for the purposes of BNYM's motion to dismiss.

From January 1, 1997, to present (the "Class Period"), Plaintiffs purchased and held

twelve ADRs for which BNYM acted as the depositary.  (Compl. ¶¶ 14–15.)  Plaintiffs seek to

represent a class of similarly situated "holders of American depositary receipts for which BNYM

served as the depositary bank and converted dividends or other cash distributions into USD."

(*Id.* ¶ 45.)  BNYM is a New York state charted bank and the successor entity to The Bank of

New York.  (Compl. ¶ 19.)  It acts as a depositary bank for foreign companies, converting

foreign currency into USD via a foreign exchange ("FX") transaction, and distributing the funds

in USD to ADR Holders.  (*Id.* ¶ 21–23.)  BNYM serves as a depositary for more than 1,200

sponsored ADRs from over 65 countries.  (*Id.* ¶ 19.)

ADRs are negotiable U.S. securities that represent ownership of publicly traded shares in

a non-U.S. corporation.  (*Id.* ¶ 3.)  Because ADRs are bought and sold domestically in USD,

ADR Holders can purchase shares of foreign companies without having to navigate the

complexities of the foreign market.  (*Id.* ¶ 21.)  Furthermore, "ADRs are subject to the

protections and many of the reporting requirements provided by U.S. laws and regulations."

(*Id.*)  Because of these features, BNYM markets ADRs to domestic investors as a "convenient

and cost effective" way to purchase and own shares in foreign companies while avoiding

2

impediments that "may discourage U.S. investors from venturing outside their local market." (*Id.* (citations omitted).)

When ADR Holders purchase ADRs, they become parties to "Deposit Agreements." Deposit Agreements are contracts that establish the obligations between (1) the foreign company whose shares are being deposited with the Bank for purpose of creating the ADRs, (2) the Bank itself, and (3) ADR Holders.  (*Id.* ¶ 5.)  While there are multiple Deposit Agreements at play, the terms of each are substantially similar.  (*Id.* ¶ 25.)[1]

The Deposit Agreements govern, among other things, BNYM's distribution of USD to ADR Holders.  (*Id.* ¶¶ 27–32.)  When BNYM receives foreign currency dividends or cash distributions from foreign companies, BNYM is required, under its Deposit Agreements, to convert the foreign currency to USD and distribute that amount to ADR Holders.  (*Id.* ¶¶ 27–28.)

Plaintiffs argue that three provisions of the Deposit Agreements are central here.

First, the Agreements contain a section entitled "Charges of the Depositary," setting forth the "fees, reasonable expenses and out-of-pocket charges" that BNYM may charge under the ADR Agreements for its services as depositary.  (*Id.* ¶ 29.)  In particular, the Bank may charge for "such expenses as are incurred by the Depositary in the conversion of foreign currency," as well as a flat per-share fee for the issuance of Cash Distributions.  (*Id.*)

Second, the Agreements provide that, "[w]hen [BNYM] receive[s] any cash dividend or other cash distribution on any Deposited Securities, the [Bank] shall, as promptly as practicable . . . convert such dividend or distribution into Dollars and shall, *as promptly as*

---

[1]     In general, this Court refers to the Toyota Deposit Agreement (Dkt. No. 1-1) as exemplary since the parties refer to it most frequently.  (*See* Dkt. No. 22 at 10 n.6.)

*practicable*, distribute the amount thus received (net of the fees and expenses of [the Bank] as provided in Section 5.09) to the Owners entitled thereto." (*Id.* ¶ 6, 27–28.)

Third, BNYM is obligated to perform its duties "without negligence or bad faith." (*Id.* ¶ 30.) Plaintiffs allege that BNYM breached the Deposit Agreements because it did not charge "rates on the [FX] transactions necessary for the ADR FX Conversions in good faith and in a manner that reflected a prompt conversion of Cash Distributions into USD." (*Id.* ¶ 7.) Instead, Plaintiffs allege that BNYM waited one or more days in order to select an FX conversion rate that was most favorable to BNYM. (*See id.*) And while the rates selected were, according to Plaintiffs, within the range of rates available during the waiting period, they were "at or near the worst" available. (*Id.* ¶ 8 (citations omitted).) In that way, BNYM profited from the difference between the FX rates applied to purchases and those rates applies to sales of foreign currency to ADR Holders. (*See id.* ¶ 7.) Plaintiffs allege that BNYM does not deny this practice and has publicly admitted to using different FX rates to price its purchases and sales of foreign currency in this context in order to profit. (*See id.* ¶ 8.)

In addition to their breach of contract claim, Plaintiffs plead two claims in the alternative: breach of the implied covenant of good faith and fair dealing (*id.* ¶¶ 74–79) and conversion (*id.* ¶¶ 80–86).

This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

## II.   Discussion

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court "must take all of the factual allegations in the complaint as true, we are not

bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.     Breach of Contract

To make out a viable claim for breach of contract, a complaint must allege four elements: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted). Defendant's motion depends on whether Plaintiffs have adequately alleged that BNYM's conduct breached the terms of the Deposit Agreements because "a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002). BNYM argues that Plaintiffs fail to identify any provision of the contract breached by BNYM. (Dkt. No. 22 at 11.)

Plaintiffs point to three alleged breaches: (1) that BNYM did not remit dividends to Plaintiffs "as promptly as practicable," (2) that the Bank did not carry out its obligations under the Deposit Agreements "without negligence or bad faith," and (3) that the spread BNYM collected by way of its selective application of FX rates to the purchase and sale of foreign currency was not an "expense" contemplated by the agreements. (*See* Compl. ¶ 68.) Each is discussed in turn.

First, as discussed above, the Agreements provide:

Whenever [BNYM] shall receive any cash dividend or other cash distribution on any Deposited Securities, the [Bank] shall, as promptly as practicable . . . convert such dividend or distribution into Dollars and shall, *as promptly as practicable*, distribute the amount thus received (net of the fees and expenses of [the Bank] as provided in Section 5.09) to the Owners entitled thereto.

5

(Dkt. No. 1-1 § 4.01 (emphasis added).)  Plaintiffs allege that "BNYM waited one to two days to price the FX trades."  (Compl. ¶ 70.)  This delay, Plaintiffs contend, constitutes a breach of the contract because BNYM's conversion and distribution was not as "prompt[] as practicable."

In seeking to dismiss this allegation, BNYM points to contractual language in one of the Deposit Agreements that provides that BNYM "makes no representation that the exchange rate used or obtained in any currency conversion under this Deposit Agreement will be the most favorable rate that could be obtained at the time or that the method by which the rate will be determined will be the most favorable to Owners."  (Dkt. No. 1-12 § 4.05)  Thus, BNYM argues, it was under no obligation to provide a more favorable rate for ADR Holders or utilize a different method to determine which rate to use.

But even assuming that this language supports BNYM's position generally—a point which Plaintiffs contest since this passage, they argue, is not present in any other Deposit Agreement (*see* Dkt. No. 26 at 9)—it does not undermine the allegation that BNYM did not act in a manner consistent with the contract as alleged by Plaintiffs.  (*See. id.* at 8–9.)  That is, the propriety of the FX rate used and the method used to determine that rate present a separate question from the haste with which the Bank acted.

BNYM further argues that Plaintiffs' allegations are insufficient because, while the "Deposit Agreements require BNYM to *convert* and to *distribute* the currency 'as promptly as practicable . . . [t]he agreements say nothing about when or at what rate the conversion must be *priced*."  (Dkt. No. 22 at 13.)  Plaintiffs allege that BNYM priced the conversions at or near the worst FX rates selected over a one or more day period (*see* Compl. ¶ 8), and if the Bank waits for a longer period, it will have a larger number of rates from which to select when remitting the money to Plaintiffs.  Plaintiffs allege that BNYM waited an impermissibly long time, selected

6

the worst rate from that period, and then remitted the money to Plaintiffs, breaching the contract by failing to act "as promptly as practicable." This allegation is sufficient to survive at the motion to dismiss stage as Plaintiffs have satisfied the pleading requirement for breach of contract and "identif[ied] the specific provision of the contract that was breached as a result of the acts at issue." *Wolff*, 210 F. Supp. 2d at 494.

Second, Plaintiffs allege that BNYM breached the contract to the extent that the spreads captured by BNYM constitute neither an "expense" nor "fee" under the charge provision of the Deposit Agreements. That provision provides:

> <u>Charges of Depositary</u>. The [foreign issuer] agrees to pay the fees, reasonable expenses and out-of-pocket charges of the Depositary . . . only in accordance with agreements . . . .
>
> The following charges shall be incurred by any party . . . to whom Receipts are issued . . . (4) such expenses as are incurred by the Depositary in the conversion of foreign currency pursuant to Section 4.05 . . . .

(Dkt. No. 1-1 § 5.09.) This provision allows the Bank to impose a "charge" to the extent it is an "expense . . . incurred by the [Bank] in the conversion of foreign currency." (*Id.*) BNYM argues that this provision does not preclude it from performing FX conversions at the rate of its choosing and points to § 4.05 of the Deposit Agreement—explicitly referenced by § 5.09— which allows BNYM to convert currency "by sale or in any other manner it may determine." (*Id.* § 4.05.)

At this early stage of these proceedings, construing the allegation as true and resolving ambiguities in favor of Plaintiffs, they have pleaded enough to survive a motion to dismiss, though there remain significant unresolved issues of interpretation. For example, the Court cannot conclude whether the complained-of spread is a "charge" imposed on Plaintiffs as an

"expense[] . . . incurred by [BNYM] in the conversion of foreign currency." (*Id.* § 5.09.) As Judge McMahon recently explained in an analogous case, "the alleged spread is not literally a 'charge' or an 'expense incurred;' but . . . the business of converting funds in the FX market is not costless." *Merryman v. Citigroup, Inc., et al.*, No. 15 Civ. 9185, at 11 (S.D.N.Y. Aug. 15, 2016). Determination of whether the spread is an "expense" contemplated by the contract will require additional discovery and litigation and is not appropriate to resolve at the motion to dismiss stage. *See Burns v. Delaware Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12, 23–24 (S.D.N.Y. 2011) ("[T]he interpretation of ambiguous contract provisions [is] inappropriate for resolution on a motion to dismiss, where allegations are taken as true and read in a light most favorable to plaintiffs."). Here, Plaintiffs have alleged the existence of an agreement and identified a particular provision that was allegedly breached by BNYM; this is sufficient to survive a motion to dismiss. *See Eternity Global Master Fund*, 375 F.3d at 177.

Third, Plaintiffs point to the Deposit Agreement's express covenant of good faith and fair dealing, which provides: "The Depositary assumes no obligation nor shall it be subject to any liability under this Deposit Agreement to any Owner or Beneficial Owner . . . except that it agrees to perform its obligations specifically set forth in this Deposit Agreement *without negligence or bad faith*." (Dkt. No. 1-1 § 5.03 (emphasis added).) Plaintiffs contend that this provision requires the Bank "to act with good faith, honesty and the observance of reasonable commercial standards of fair dealing" (Compl. ¶ 30), and that "[t]he Bank breached its contractual duties . . . by intentionally applying prices to FX trades in connection with ADR FX Conversions that were grossly unfavorable to Plaintiffs and the Class" (*id.* ¶ 70).

The allegation that BNYM performed its obligation in "bad faith" is redundant with Plaintiffs' first and second allegations for breach of contract. That is, the relied-upon provision

8

applies only to those "obligations specifically set forth in th[e] Deposit Agreement," including BNYM's obligation to act "as promptly as practicable" and to "charge . . . such expenses as are incurred by the Depositary in the conversion of foreign currency." Plaintiffs argue that this "bad faith" provision required BNYM to act in accordance with reasonable commercial standards of fair dealing. (*See* Dkt. No. 26 at 9–10.) While, at this stage, this Court cannot determine whether BNYM's practices were in keeping with commercial standards of fair dealing and in accordance with the contract as interpreted by Plaintiffs, BNYM has not demonstrated that Plaintiffs fail to state a claim for relief.

In sum, Plaintiffs have pleaded enough to state a claim for breach of contract arising out of BNYM's deduction and retention of amounts to which it may not be authorized under the literal terms of the governing contract. For these reasons, the motion to dismiss Count I is denied.

### B.    Implied Duty of Good Faith and Fair Dealing and Conversion Claims

In addition to their claims for breach of contract, Plaintiffs allege breach of the implied covenant of good faith and fair dealing (*id.* ¶¶ 74–79) and conversion (*id.* ¶¶ 80–86). BNYM moves to dismiss both counts, arguing that the Complaint fails to state a claim for either. (*See* Dkt. No. 22 at 15–17.)

Plaintiff's claim for breach of the implied duty of good faith and fair dealing is redundant with their claim for breach of contract. "[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Louisiana Mun. Police Employees' Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659, 2013 WL 3357173, at *9 (S.D.N.Y. July 3, 2013)

9

(quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)) (internal quotation marks omitted).

Plaintiffs' implied covenant claims arise out of precisely the same facts as their breach of contract claims.  (*See* Compl. ¶ 74–79.)  Specifically, the complaint alleges that BNYM retained the spread between the rate at which it actually converted FX funds and the rate at which it paid those funds out to the ADR investors, thereby breaching Plaintiffs right to have ADR FX Conversions priced "as promptly as practicable" and "without negligence or bad faith."  (*Id.* ¶ 76.)  The breach of the implied duty of good faith claim is thus dismissed as duplicative.

Plaintiffs' claim for conversion (Compl. ¶ 80–86), is also dismissed for failure to state a claim upon which relief may be granted.  "A cause of action for conversion cannot be predicated on a mere breach of contract."  *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 761 N.Y.S.2d 22, 24 (1st Dep't 2003).  Similarly, a conversion claim cannot be "based only on the allegation that a defendant received money and failed to remit payment to the plaintiff."  *Interstate Adjusters, Inc. v. First Fid. Bank, N.A.*, 675 N.Y.S.2d 42, 44 (1st Dep't 1998); *see also Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 416 (S.D.N.Y. 2013) (a conversion claim must be "qualitatively different from" and "stem from a wrong independent of an alleged breach").  But that is all Plaintiffs allege here.

Counts II and III are dismissed, with prejudice.

**C.   Plaintiffs' Breach of Contract Claim Under SLUSA**

The Securities Litigation Uniform Standards Act of 1998, 16 U.S.C. § 78bb(f)(l) ("SLUSA") prohibits class actions asserting state law claims based on a misrepresentation or omission that "coincides" with the decision to purchase, hold, or sell a security.  Enacted in response to a perceived flight of securities fraud class actions from federal to state courts to

avoid the stringent pleading requirements of the Private Securities Litigation Reform Act of 1996, 15 U.S.C. § 78u-4, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81–82 (2006), SLUSA "forbids the bringing of large securities class actions based upon violations of state law," *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1062 (2014).

SLUSA mandates dismissal of a class action where the action is (1) a "covered class action" (2) based on state statutory or common law (3) involving a "covered security" (4) that alleges a "misrepresentation or omission of a material fact" or the use of a "manipulative or deceptive device or contrivance" (5) in connection with the purchase or sale of that security.  15 U.S.C. § 78bb(f)(1)(A)–(B); *see Romano v. Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010) (quoting 15 U.S.C. § 78bb(f)(1)).

Here, Defendants have not demonstrated that element (4) is present.  Plaintiffs' breach of contract claim does not depend on any misrepresentation or omission.  Whether or not BNYM misrepresented or omitted a material fact is simply separate and apart from whether BNYM's actions breached the terms of the contract.  *See Merryman*, No. 15 Civ. 9185, at 17–21.  Any allegation of misrepresentation is "extraneous to the complaint's theory of liability," and thus "cannot be the basis for SLUSA preclusion."  *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 142–43 (2d Cir. 2015).

As such, Plaintiffs' action survives Defendants' motion to dismiss the breach of contract claim as preempted by SLUSA.

### D.   Standing

#### 1.   Contractual Standing

BNYM argues that Plaintiffs do not have contractual standing to pursue their breach of contract claim because they are "Beneficial Owners of ADRs" and not "Owners."  (Dkt. No. 22

11

at 22–25.)  As support for this argument, BNYM points to § 2.01 of the Deposit Agreements,

which states:

> [T]he Depositary . . . , notwithstanding any notice to the contrary,
> may treat the Owner [of the ADRs] as the absolute owner thereof
> for the purpose of determining the person entitled to distribution of
> dividends or other distributions through the Depositary . . . and for
> all other purposes, and *neither the Depositary nor the Company
> shall have any obligation or be subject to any liability under this
> Deposit Agreement to any holder of a Receipt unless such holder is
> the Owner thereof.*

(Dkt. No. 1-1 § 2.01 (emphasis added).)  "Owner" is defined as "the person in whose name a

Receipt is registered on the books of the Depositary."  (*Id.* at § 1.11.)  But, as Plaintiffs argue,

§ 2.01 concerns the "[t]ransferability" of ADRs.  (Dkt. No. 26 at 13.)  Its import is to prevent any

liability under the Deposit Agreement to an entity in possession of a Receipt received by means

of a *transfer* from an Owner—not, as BNYM argues, to prevent Beneficial Owners (who are

otherwise clearly contemplated as parties to the agreement) from seeking redress for alleged

breaches of the agreement.

Indeed, giving broad effect to the language in § 2.01 would run counter to the language of

§ 7.04, which provides: "The Owners *and Beneficial Owners* of Receipts from time to time shall

be parties to this Deposit Agreement and shall be bound by all of the terms and conditions hereof

and the Receipts by acceptance thereof."  (Dkt. No. 1-1 § 7.04 (emphasis added).)  Section 5.03

of the Deposit Agreement similarly indicates that Beneficial Owners are parties to the agreement.

(*See id.* § 5.03 ("The Depositary assumes no obligation nor shall it be subject to any liability

under this Deposit Agreement to any Owner or Beneficial Owner . . . except that it agrees to

perform its obligations specifically set forth in this Deposit Agreement without negligence or bad

faith.").)

12

In response, BNYM cites *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 1 Civ. 2946, 2004 WL 1926090 (S.D.N.Y. Aug. 31, 2004), and *Repsol, S.A. v. The Bank of New York Mellon*, No. 652653/2012, 2014 WL 468910 (N.Y. Sup. Ct. Feb. 4, 2014), to demonstrate that similar contracts have been interpreted to foreclose Beneficial Owners from pursuing breach of contract claims.  But these cases are factually distinguishable: their holdings were based on contractual language that unambiguously foreclosed the plaintiffs in those cases from bringing suit under the particular provisions invoked.  *See Kingdom 5-KR-41*, 2004 WL 1926090, at *3 (finding the Deposit Agreement "clear and unambiguous" in that "BNY was required to give notice . . . to the Owner, and had no 'obligation' and was not 'subject to any liability' under the Agreement to give notice to a beneficial owner" under § 2.01); *Repsol, S.A.*, 2014 WL 468910 (dismissing the claims for lack of standing where the plaintiff was merely a "holder" of a receipt—and neither an owner nor a beneficial owner—and where plaintiff relied on an agency relationship theory to establish standing).  Here, in contrast, the contract in question contains provisions that explicitly include Plaintiffs, as Beneficial Owners, as parties to the agreement.

BNYM's motion to dismiss the claims on the ground that Plaintiffs lack contractual standing fails.

### 2.    Class Standing

BNYM argues that Plaintiffs do not have class standing to represent all holders of ADRs for which BNYM was the depository.  But this argument is premature.

In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), the Second Circuit held that a named plaintiff can sue on behalf of a class only upon a showing that (1) the named plaintiff has "suffered some actual . . . injury as the result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates 'the same set of

concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* at 162 (citations and internal quotation mark omitted). "When this standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 161 (2d Cir. 2014).

BNYM argues that Plaintiffs cannot satisfy the second criterion. In particular, it argues that "Plaintiffs identify only 12 ADRs in which they invested," while they "presume to represent the interests of all holders, over a nearly 20-year class period, of at least 600 ADRs." (Dkt. No. 22 at 25 (citing Compl. §§ 14–16, 25).) As the Second Circuit held in *Retirement Board*, Plaintiffs' standing to bring suit on behalf of the class depends on whether "the plaintiff had the right incentives," which largely depends on whether "the proof contemplated by all [plaintiffs'] claims would be sufficiently similar." 775 F.3d at 161; *see also In re Harbinger Capital Partners Funds Inv'r Litig.*, No. 12 Civ. 1244, 2013 WL 7121186, at *3 (S.D.N.Y. Dec. 16, 2013) ("In a pre-certification class action, a named plaintiff brings both her own claims and those of other members of her putative class, and her standing to bring the absent class members' claims ultimately depends on whether she has the proper incentives to litigate the issues involved.").

As Judge McMahon explained in *Merryman*: "[t]he Second Circuit distinguished [*Retirement Board*] from *NECA* because in *NECA*, 'the defendants' alleged Securities Act violations inhered in making the *same* misstatements across multiple offerings," whereas [in *Retirement Board*], the defendants' 'alleged misconduct must be proved loan-by-loan and trust-by-trust.'" No. 15 Civ. 9185, at 23 (citations omitted). BNYM argues, accordingly, that "[p]roof

14

of [Plaintiffs' claims] will require Plaintiffs to demonstrate the Bank's expenses—both fixed

costs and the cost of the currency it obtained to distribute to ADR Holders—for each dividend

payment, for each ADR issue, over the course of the nearly 20-year proposed class period" and

"[t]hat proof for the 12 ADRs the Plaintiffs do hold will necessarily differ from the proof for the

600+ ADRs that they do not."  (Dkt. No. 22 at 26–27.)

Plaintiffs disagree.  They allege that their claims are "typical of the claims of other

members of the Class" (Compl. ¶ 50), and that Plaintiffs will not be "required to prove the

Bank's expenses on each ADR FX Conversion in order to prevail on their claims (Dkt. No. 26 at

17–18).  Plaintiffs here allege that the Deposit Agreements, including those held by Plaintiffs and

held by the Class, "contained substantially similar language."  (Compl. ¶ 6.)  Plaintiffs allege that

all the Deposit Agreements required BNYM to act "without negligence or bad faith" and to

"perform all conversions of Cash Distributions from foreign currency into USD 'as promptly as

practicable.'"  (*Id.*)  They allege that all the Deposit Agreements "expressly enumerate BNYM's

permissible fees and charges as the depository."  (*Id.*)  And they argue that, to the extent BNYM

breached its contractual obligations to Plaintiffs, it breached them in the same way with respect

to the Class.

Given the parties' arguments, this an issue best resolved on a motion for class

certification, not a motion to dismiss.  *See Merryman*, No. 15 Civ. 9185, at 24; *see also Fort*

*Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 341 (S.D.N.Y.

2012) ("To the extent that there are material differences among the different classes of

purchasers . . . , those differences may be addressed at the class certification stage.").  At this

stage, Plaintiffs have alleged the existence of a common contractual obligation and common

conduct with respect to each ADR.  This is enough to survive a motion to dismiss.  As long as

15

the terms of the ADRs and their corresponding Deposit Agreements are as alleged, the proof

necessary for each class member will be substantially the same, and Plaintiffs can adequately

represent the interest of the entire purported class.  Full consideration of this aspect of the motion

is thus deferred until class certification, when the objection may be renewed as to the adequacy

of Plaintiffs' representing so broad a group.

### E.     Statutes of Limitation

BNYM argues that the applicable statute of limitations bars most of the Plaintiffs' claims

in this action.  The Class Period extends back to January 1, 1997.  (Compl. ¶ 45.)  Under New

York's borrowing statute, N.Y.C.P.L.R. § 202, the four-year California and five-year Virginia

limitations periods apply to the named Plaintiffs' claims, based on their respective residency (*id.*

¶ 14–16).  Cal. Code Civ. Proc. § 337; Va. Code § 8.01-246.  Accordingly, California-based

Plaintiffs Carofano and Feige can bring claims based on FX Conversions occurring in 2012 or

later (four years before suit was filed), and Virginia-based Plaintiff Normand's only timely

claims are those based on FX Conversions occurring in 2011 or later (five years before suit was

filed).

These statutes of limitation do not apply, however, if BNYM's alleged active fraudulent

concealment of its breaches of the Deposit Agreement tolls them.  And at this stage, Plaintiffs

"need only plead, not prove, fraudulent concealment," as the ultimate determination whether the

doctrine applies "is intimately bound up with the facts of the case and is thus not properly

decided on a motion to dismiss."  *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378,

400 (S.D.N.Y. 2010).

To toll the statute of limitations under the fraudulent concealment doctrine, Plaintiffs

must allege (1) BNYM intentionally concealed the causes of action; and (2) Plaintiffs were

16

unable to discover the causes of action with reasonable diligence.[2]   Accordingly, Plaintiffs allege

that the statutes of limitations at issue were tolled by BNYM's affirmative acts of concealment.

(*See* Compl. ¶¶ 57-64.)  Plaintiffs contend that ADR Holders were made aware of the rates used,

but were kept in the dark as to the "the date or time when the ADR FX Conversions were

executed."  (*Id.* ¶ 58.)  Plaintiffs also allege that it was only after BNYM's recent

acknowledgement of its pricing practices that it became aware of the alleged breach and that

reasonable diligence could not have led to this discovery any sooner.  (*Id.* ¶ 60.)  Plaintiffs thus

make sufficient allegations to avoid a motion to dismiss even though determination of the truth

of these allegations is premature at this stage.  *Hinds Cty.*, 700 F. Supp. 2d at 400.

BNYM's motion to dismiss all claims asserted for the period prior to 2012 (for the

California Plaintiffs) and 2011 (for the Virginia Plaintiffs) is denied without prejudice to

renewal, either on summary judgment after discovery, or at trial.

---

[2]     *See Herremans v. BMW of N. Am., LLC*, No. 14 Civ. 2363, 2014 WL 5017843, at \*5–6
(C.D. Cal. Oct. 3, 2014) ("In order to establish fraudulent concealment, the complaint must
show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered;
and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive
knowledge of facts sufficient to put him on inquiry."); *Zumpano v. Quinn*, 6 N.Y.3d 666, 674
(2006) ("[E]quitable estoppel will apply 'where plaintiff was induced by fraud,
misrepresentations or deception to refrain from filing a timely action' and the plaintiff is able to
"demonstrate reasonable reliance on the defendant's misrepresentations."); *Patterson v. Bob
Wade Lincoln-Mercury, Inc.*, No. 98 Civ. 223, 1999 WL 33727566, at \*3–4 (Va. Cir. Ct. Apr.
20, 1999) ("The character of fraud necessary to toll the statute must be of a variety involving
moral turpitude. A defendant must intend to conceal the discovery of the cause of action by trick
or artifice and must have thus actually concealed it from the plaintiff in order for the exception to
apply."); *see also* Va. Code § 8.01-229(D).

**III.    Conclusion**

For the foregoing reasons, the Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is directed to close the motion at Docket Number 21.


SO ORDERED.


Dated:  September 29, 2016
        New York, New York

                                        _____
                                                   J. PAUL OETKEN
                                               United States District Judge