**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:  THE BANK OF NEW YORK MELLON ADR FX LITIGATION | 16-CV-00212-JPO-JLC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>ECF Case |
| This Document Relates to:<br><br>ALL CASES | |

Plaintiffs Annie L. Normand, Don A. Carofano, David Feige, and International Union of Operating Engineers Local 138 Pension Trust Fund ("Local 138") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following against Defendant The Bank of New York Mellon ("BNYM" or the "Bank") based on information and belief and the investigation of counsel, except as to the allegations pertaining specifically to Plaintiffs, which are based on personal knowledge.

## I.    INTRODUCTION

1.    This is an action for injunctive relief and to recover damages on behalf of Plaintiffs and members of the proposed class defined below (collectively, the "Class") for harm suffered as a result of BNYM's conversion during the Class Period (as defined below) into U.S. Dollars ("USD") of dividends or other cash distributions ("Cash Distributions") by foreign companies to holders of American Depositary Receipts ("ADRs"), a process referred to in this Complaint as "ADR FX Conversions," in a manner that breached BNYM's contractual obligations to beneficial owners or holders of those ADRs ("ADR Holders").

2.    This is not a fraud case. To be sure, BNYM did not disclose its improper actions, and its failure to do so caused Plaintiffs and other Class members to remain unaware that the Bank was breaching its contracts with them. But none of the claims asserted by Plaintiffs or the Class turn on fraud or misrepresentation by the Bank.

3.    ADRs are negotiable U.S. securities representing ownership of publicly traded shares in a non-U.S. corporation. ADRs are purchased and sold in U.S. dollars ("USD") and provide ADR Holders the benefits of being able to invest in foreign companies without the complexities and costs associated with direct ownership of foreign company shares. Further,

ADRs are subject to the protections and many of the reporting requirements provided by U.S. laws and regulations.

4.      A depositary bank, like BNYM, is an institution that holds foreign securities and issues ADRs to investors on behalf of a foreign company.  Under the ADRs themselves and agreements relating to them (the "ADR Agreements," and with the ADRs, the "Contract Documents"), BNYM holds shares issued by foreign companies on behalf of, and for the benefit of, U.S. investors in the ADRs (i.e., ADR Holders), and is charged with converting Cash Distributions received on any deposited securities into USD.  BNYM holds itself out as "the leading depositary bank, with a market share of 58%, for one main reason: we add value to [Depositary Receipt issuers'] DR programs."[1]

5.      BNYM's obligations to Plaintiffs and other Class members, as ADR Holders, were set forth in the Contract Documents entered into between (i) the foreign company whose shares were being deposited with BNYM for the purpose of creating ADRs representing ownership of those shares, (ii) BNYM, and (iii) owners and beneficial owners (i.e., holders) of the subject ADRs.  *See, e.g.*, September 27, 1999 Deposit Agreement for Toyota Motor Corporation ("Toyota Agreement") (attached as Exh. 1 (with accompanying Exh. A)) at § 7.04; March 28, 2003 Amended and Restated Deposit Agreement for HSBC Holdings PLC ("HSBC Agreement") (attached as Exh. 2 (with accompanying Exh. A)) at § 7.05; August 1, 2005 Amended and Restated Deposit Agreement for National Grid PLC ("2005 National Grid Agreement") (attached as Exh. 16 (with accompanying Exh. A)) at § 7.4; May 16, 2013 Amended and Restated Deposit Agreement for National Grid PLC ("2013 National Grid Agreement") (attached as Exh. 17 (with accompanying Exh. A)) at § 7.4; and November 8, 2006

---

[1] http://www.adrbnymellon.com/dr_why.jsp. ("Why Choose BNY Mellon?").

Amended and Restated Deposit Agreement for CRH Public Limited Company ("CRH Agreement") (attached as Exh. 18 (with accompanying Exh. A)) at § 7.4.

6.      Under the Contract Documents governing the ADRs in which Plaintiffs and the Class invested during the Class Period (the "Class ADRs"), which all contained substantially similar language, BNYM was obligated to ADR Holders to act "without negligence or bad faith."  *See, e.g.,* Exh. 1 (Toyota Agreement) at § 5.03 (Obligations of the Depositary, the Custodian and the Company) & Exh. A, § 18 (Liability of the Company and Depositary); Exh. 2 (HSBC Agreement) at § 5.03 & Exh. A, § 18; Exh. 16 (2005 National Grid Agreement) at § 5.3 & Exh. A, § 18; Exh. 17 (2013 National Grid Agreement) at § 5.3 & Exh. A § 18.  The Contract Documents further obligated BNYM to perform all conversions of Cash Distributions from foreign currency into USD "as promptly as practicable" and "on a reasonable basis."  *See, e.g.,* Exh. 1 (Toyota Agreement), §§ 4.01, 4.05; Exh. 2 (HSBC Agreement), §§ 4.01, 4.05; Exh. 16 (2005 National Grid Agreement) at § 4.5; Exh. 17 (2013 National Grid Agreement) at § 4.5; and Exh. 18 (CRH Agreement) at § 4.6.  Finally, the Contract Documents expressly enumerate BNYM's permissible fees and charges as the depositary.  As related to ADR FX Conversions, specifically, the Contract Documents provide that BNYM is permitted only to recoup its actual "expenses."  *See, e.g.,* Exh. 1 (Toyota Agreement) at § 5.09 & Exh. A, § 7; Exh. 2 (HSBC Agreement)  at § 5.09 & Exh. A, § 7; Exh. 16 (2005 National Grid Agreement) at § 5.9 & Exh. A, § 7; Exh. 18 (CRH Agreement) at § 5.9.

7.      On information and belief, throughout the Class Period, rather than charging rates on the foreign currency exchange ("FX") transactions necessary for the ADR FX Conversions in good faith and in a manner that reflected a prompt conversion of Cash Distributions into USD, BNYM utilized the range of FX rates available over a 24-hour (or longer) period (the "Session

Range") in order to charge ADR Holders exchange rates that, while within the Session Range, allowed BNYM to capture a substantial and unauthorized spread between the FX rates charged and the actual rates available to BNYM at the time of the transactions.  In so doing, BNYM breached its contractual obligations to Plaintiffs and the Class to, *inter alia*, perform its duties without negligence or bad faith when converting Cash Distributions by foreign companies that were owed to ADR Holders into USD.  As a result of its practice, BNYM improperly skimmed millions of dollars from distributions owed and payable to Plaintiffs and the Class.

8.      In a recently settled action, BNYM admitted that its Global Markets FX desks knowingly charged the Bank's custodial clients unfavorable rates on FX trades done pursuant to "standing instructions" (or "SI").  As part of the January 17, 2012 Stipulation and Order of Partial Settlement and Dismissal (the "January 17, 2012 Stipulation") related to the Department of Justice's lawsuit (the "DOJ Action"), BNYM publicly admitted for the first time that the Bank "assigns prices to Standing Instruction Service transactions that are ***at or near the high end*** of the range of prices reported in the interbank market ***for currency purchases*** for the relevant pricing cycle, ***and at or near the low end*** of range of prices reported in the interbank market ***for currency sales*** for the relevant pricing cycle."[2]  In other words, as the Bank would later admit as part of a final settlement of the DOJ Action, "***the Bank gave SI clients prices that were at or near the worst interbank rates reported during the trading day or session***."  BNYM also agreed to pay $714 million to resolve the DOJ Action and other actions relating to the Bank's SI FX practices (collectively, the "SI FX Litigation").  As further described below, the fact that ADR FX Conversions were priced in a similar manner to SI FX transactions remained hidden until only very recently.

---

[2] Unless otherwise indicated, all emphases in this Complaint have been added.

9.      By consistently assigning SI FX clients near the worst rate of the day, the Bank was able to reap unauthorized profits believed to be in the hundreds of millions of dollars. Recent disclosures by the Bank indicate that it used virtually the same SI FX practices to price ADR FX Conversions, contrary to its contractual obligations to Plaintiffs and the Class.

10.     On October 1, 2015, just one week after final approval was granted to the settlement of class-action proceedings against BNYM for its SI FX practices, BNYM published a "Depositary Receipts Foreign Exchange Pricing Disclosure" (the "Pricing Disclosure") (attached as Exh. 19) on its ADR-devoted webpage, in which the Bank publicly stated for the first time that, notwithstanding whatever language was contained in its ADR Agreements, the Bank made "***no representations, warranties or guarantees*** as to whether the price or the pricing methodology [it] used to price a [ADR FX Conversion] yields a ***fair market price***." Specifically, BNYM stated it consistently priced ADR FX Conversions so as to take advantage of the range of market rates available during a particular 24-hour (or in some cases longer) trading session (regardless of when, during that session, the trade was actually priced), with the spreads on such trades accruing to the Bank as "revenue."  In other words, on that day the Bank disclosed—for the first time—that it used virtually the same "Session Range" approach to pricing ADR FX Conversions as it used for SI FX transactions.

11.     Throughout the Class Period, BNYM breached its contractual duties owed to Plaintiffs and other Class members by assigning unfavorable rates on ADR FX Conversions to ADR Holders to earn profits at their expense.  Plaintiffs therefore bring this action on behalf of themselves and a Class of similarly situated ADR Holders for injunctive relief and for damages stemming from the Bank's breach of contract.

## II.      JURISDICTION AND VENUE

12.      This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; (ii) there are thousands of potential Class members; (iii) the aggregate amount in controversy exceeds the jurisdictional amount of $5,000,000.00, exclusive of interest and costs; and (iv) BNYM is a citizen of a State different from that of Plaintiffs and the proposed Class.

13.      Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because: (i) pursuant to 28 U.S.C. § 1391(c)(2), BNYM is deemed to reside in this District, which has personal jurisdiction over BNYM with respect to this action; and (ii) a substantial part of the acts or events giving rise to the claims alleged in this Complaint occurred in this District.

## III.     PARTIES

### A.      Plaintiffs

14.      Plaintiffs Annie L. Normand resides in Virginia.  During the Class Period,  Ms. Normand was an ADR Holder with respect to the following entities for which BNYM served as the depositary:  HSBC Holdings Plc ("HSBC"); Swire Pacific Ltd.; and Macquarie Group Ltd.

15.      Plaintiff Don A. Carofano resides in California.  During the Class Period,  Mr. Carofano was an ADR Holder in the following entities for which BNYM served as the depositary:  American  Movil  (Series  L);  Banco  Bradesco  SA;  China  Mobile  Ltd; GlaxoSmithKline PLC ("GSK"); HSBC; Toyota Motor Corporation ("Toyota"); and Vodafone Group Plc.

16.     Plaintiff David Feige resides in California.  During the Class Period, Mr. Feige was an ADR Holder in the following entities for which BNYM served as the depositary: Toyota; Royal Dutch Shell (A Shares); NTT DoCoMo; Lloyds Banking Group; and GSK.

17.     Plaintiff Local 138 is an employee benefit plan.  Local 138 has its principal place of business at 137 Gazza Blvd., Farmingdale, NY 11735. Local 138 provides retirement and survivor benefits to approximately 1,900 members. During the Class Period, Local 138 was an ADR Holder in multiple entities for which BNYM served as the depositary, including GSK, National Grid PLC ("National Grid"), and CRH Public Limited Company ("CRH").

18.     Plaintiffs and the Class members (defined below) purchased and held ADRs for which BNYM acted as the depositary bank and for which BNYM executed ADR FX Conversions attendant to Cash Distributions issued by foreign companies.

19.     During the Class Period, Plaintiffs and the Class received Cash Distributions for which BNYM performed ADR FX Conversions. Plaintiffs and the Class were thus damaged by BNYM's misconduct as alleged in this Complaint.

**B.     Defendant**

20.     Defendant The Bank of New York Mellon, a New York state chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp., a Delaware corporation with headquarters at One Wall Street, New York, NY 10286.  BNY Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York Company, Inc. and Mellon Financial Corporation ("Mellon Financial").  BNYM is the successor entity (post-Merger) to The Bank of New York ("BNY").  According to the BNY Mellon Corp. 2010 10-K (at 4), BNY Mellon "houses [BNY Mellon Corp.'s] institutional businesses, including Asset Servicing, Issuer Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-advised business

of Asset Management."[3]   According to its website, BNYM acts as the globe's "leading depositary bank, managing more sponsored depositary receipt programs than all other depositary banks combined."  The Bank further states it is the depositary for more than 1,200 sponsored programs from over 65 countries, representing 58% of the global market.

21.     BNYM is the successor entity of BNY. As a result, any ADR Agreement that was entered into by BNY (and was not otherwise assigned or amended to substitute a different entity as the depositary) is binding on BNYM and is covered by this Complaint.

### IV.     FACTUAL ALLEGATIONS

22.     BNYM markets ADRs to U.S. investors as a "convenient and cost effective"[4] way to own shares of foreign companies. Further, the Bank states that ADRs provide a mechanism for U.S. investors to avoid "impediments relating to settlements, currency conversions, custody services, information flow, unfamiliar market practices, tax conventions, and internal investment policies."[5]   BNYM claims that these impediments "may discourage U.S. investors from venturing outside their local market."[6]

23.     BNYM has acted as a depositary bank to a large number of foreign companies and has issued ADRs to pension funds, institutional investors and many other parties.  The ADR securities, in turn, trade on major U.S. stock exchanges like the New York Stock Exchange ("NYSE") and NASDAQ as well as over-the-counter ("OTC") markets.

24.     Although ADRs are bought and sold in USD, from time to time, the underlying foreign companies may issue dividends or make other payments (*e.g.*, consideration provided

---

[3] The second of BNY Mellon Corp.'s two principal banks, BNY Mellon, National Association ("BNY Mellon, N.A."), is described by BNY Mellon Corp. as housing its "Wealth Management business," and is not at issue in this case. *Id.*
[4] http://www.adrbnymellon.com/dr_edu_basics_and_benefits.jsp
[5] *Id.*
[6] *Id.*

during a merger or distributing proceeds of a sale) in foreign currency to their shareholders (as defined above, "Cash Distributions").  BNYM, as the depositary bank, is required to convert the Cash Distributions into USD and distribute the funds to the corresponding ADR Holders (as defined above, "ADR FX Conversions").  ADR FX Conversions take place through a FX transaction, whereby foreign currency is exchanged for USD at a particular rate available in the currency market.

> **A.  BNYM Was Required to Act in Good Faith in Exercising Its Depositary Duties to ADR Holders, to Promptly Execute ADR FX Conversions at Commercially Reasonable Rates for ADR Holders, and to Recoup Only its Expenses in connection with Such Activity.**

25.    For each ADR represented by a foreign security, BNYM entered into ADR Agreements that set forth the rights and obligations of BNYM, the foreign companies, and the ADR Holders.  Upon purchasing ADRs, ADR Holders become parties to the ADR Agreements.  *See, e.g.*, Exh. 1 (Toyota Agreement) (cover page stating that the deposit agreement is between Toyota, BNY, and "owners and beneficial owners" of ADRs (i.e., ADR Holders)); *id.* at § 7.04; *see also* Exh. 2, (HSBC Agreement) (cover page stating that the deposit agreement is between HSBC, BNY, and "holders and beneficial owners" of ADRs); *id.* at § 7.05; Exh. 16, (2005 National Grid Agreement) (cover page which states that the deposit agreement is between National Grid, BNY, and "owners and beneficial owners" of ADRs (*i.e.*, ADR Holders)); *id.* at § 7.4.   The ADRs themselves are annexed to and incorporated into the ADR Agreements (as Exhibit A) and contain additional terms that are incorporated by reference into the terms of the respective ADR Agreements.  *See, e.g.*, Exh. 1 (Exh. A to Toyota Agreement (form of ADR));

Exh. 2 (Exh. A to HSBC Agreement (same)); Exh. 16 (Exh. A to 2005 National Grid Agreement (same)).[7]

26.     BNYM serves or has served as the depositary for more than 1200 ADRs that traded in the U.S.  during the Class Period, of which at least 600 paid dividends to ADR Holders in USD at one time or another.  On information and belief, the pertinent language governing BNYM's obligations with respect to ADR FX Conversions in the Contract Documents is substantially similar for each of these dividend-paying Class ADRs.  *See, e.g.*, Exhs. 1-18; Exh. 20 (chart listing relevant provisions of each ADR Agreement).

27.     The ADR Agreements contain choice-of-law clauses providing that the Agreements and the associated ADRs are governed by New York law. *See, e.g.,* Exhs. 1, 2, 8-10 at § 7.06; Exhs. 3-4, 6-7, 16-18 at § 7.6; Exhs. 5, 15 at § 7.7; Exhs. 11, 14 at § 7.8; Exhs. 12, 13 at § 7.08.

28.     The Contract Documents require BNYM to distribute to each ADR Holder, in proportion to the number of deposited securities that correspond to the ADR Holder's ownership of ADRs, any USD resulting from Cash Distributions by the foreign corporation.  *See, e.g.*, Exhs. 1-2, 8-10, 12-13 at § 4.01; Exhs. 3-7, 11, 14-17 at § 4.1; Exh. 18 at § 4.2.  In connection with an ADR FX Conversion, BNYM assumes custody and control over the Cash Distribution for the benefit of the ADR Holders, conducts ADR FX Conversions, and allocates the Cash Distribution among the ADR Holders in proportion to their ownership of the ADRs.  *See, e.g.*, Exhs. 1-2, 8-10, 12-13 at §§ 4.01, 4.05; Exhs. 3-7, 11, 14-17 at §§ 4.1, 4.5; and Exh. 18 at §§ 4.2, 4.6.

---

[7] As defined above, the ADR Agreements and the ADRs are collectively referred to herein as the "Contract Documents."

29.     BNYM had an express obligation to execute ADR FX Conversions under the Contract Documents. Pursuant to the Contract Documents, whenever BNYM received foreign currency by way of dividends or other distributions, or received the net proceeds from the sale of securities, property, or rights, BNYM was obligated to "***as promptly as practicable*** convert or cause to be converted such dividend or distribution into Dollars" and "***promptly*** distribute the Dollars thereby received (net of the fees, expenses and charges of the Depositary as provided in Section 5.09) to Holders of Receipts," or otherwise was obligated to perform the conversion "on a ***reasonable basis***" and "distribute such amount to the Holders of Receipts entitled thereto . . . ." *See, e.g.,* Exhs. 1-2, 8-10, 12-13 at §§ 4.01, 4.05; Exhs. 3-7, 11, 14-17 at §§ 4.1, 4.5; Exh. 18 at §§ 4.2, 4.6.  BNYM thus had an express obligation to execute ADR FX Conversions under the Contract Documents.

30.     The Contract Documents also specifically enumerate the "fees, reasonable expenses and out-of-pocket charges" BNYM may charge under the ADR Agreements. *See, e.g.,* Exhs. 1-2, 8-10, 12-13 at § 5.09; Exhs. 3-7, 11, 14-18 at § 5.9 (substantially similar language). As relevant here, the Contract Documents provide only that BNYM may charge "such ***expenses*** as are incurred by the Depositary in the conversion of foreign currency."  *See, e.g.,* Exhs. 1-2, 8-10, 12-13 at § 5.09(4), (5) or (d); Exhs. 3-7, 11, 14-18 at § 5.9(4) or (5).

31.     The Contract Documents further obligated BNYM to perform its duties "***without negligence or bad faith***," or otherwise in "good faith." *See, e.g.*, Exhs. 1-2, 8-10, 12-13 at § 5.03; Exhs. 3-7, 11, 14-18 at § 5.3 and/or Exh. A, § 18. In other words, the Bank was obligated to act with good faith, honesty and the observance of reasonable commercial standards of fair dealing.

11

32.     In its role as a depositary bank in connection with the Class ADRs, BNYM held the underlying securities and associated Cash Distributions on behalf of Plaintiffs and the Class. Further, BNYM controlled all aspects of FX trades relating to the conversion of Cash Distributions—including the cost, date, and time of the trade.

33.     Thus, pursuant to the Contract Documents, and at all relevant times, BNYM was required to convert Cash Distributions into USD for the benefit of ADR Holders such as Plaintiffs and other Class members.  At no time did Plaintiffs or other Class members authorize BNYM to charge unreasonable FX rates in connection with converting Cash Distributions into USD.

34.     In addition, BNYM is subject to an implied covenant of good faith and fair dealing under the Contract Documents, which obligated the Bank to execute ADR FX Conversions in good faith and in accordance with reasonable commercial standards of fair dealing.

35.     Plaintiffs and other Class members performed their duties under the Contract Documents.

**B.     BNYM Overcharged Plaintiffs and the Class for ADR FX Conversions, in Violation of the Contract Documents.**

36.     Contrary to the obligations expressly or impliedly contained in the Contract Documents, and as further detailed below, BNYM took unauthorized spreads on ADR FX Conversions from Plaintiffs and the Class that were far in excess of the Bank's actual expenses incurred in executing ADR FX Conversions, thereby reaping improper gains at the direct expense of Plaintiffs and the Class.

37.     On October 1, 2015, in a posting on its ADR website entitled "Depositary Receipts Foreign Exchange Pricing Disclosure," (as defined above, the "Pricing Disclosure,"

attached hereto as Exh. 19) the Bank revealed—for the first time—that it employed similar pricing practices when doing ADR FX Conversions as it employed when doing SI FX trades.[8]

38.     This revelation was in stark contrast to the obligations set forth in the Contract Documents during the Class Period, since it (for the first time) indicated that the Bank (in the same manner in which it handled SI FX trades) exploited market fluctuations to assign disadvantageous FX rates (from the ADR Holder's perspective) to ADR FX Conversions at or near the extreme range of the trading period in order to line its own pockets.  Just as with SI FX trades, BNYM profited from these unreasonable and grossly excessive FX conversion rates by keeping the spread between the rate assigned to the client and the rate the Bank actually received when executing an ADR FX Conversion.

39.     In the January 17, 2012 Stipulation (referenced above), BNYM publicly acknowledged for the first time, as related to SI FX trades, that:

> [U]nless BNY Mellon and its Standing Instruction Service client agree to a different pricing arrangement, ***BNY Mellon assigns prices*** to Standing Instruction Service transactions that are ***at or near the high end*** of the range of prices reported in the interbank market ***for currency purchases*** for the relevant pricing cycle, ***and at or near the low end*** of range of prices reported in the interbank market ***for currency sales*** for the relevant pricing cycle.

40.     And in a Stipulation and Order of Settlement and Dismissal entered on April 23, 2015 in the DOJ Action (the "April 23, 2015 Stipulation"), BNYM admitted the following (also as related to SI FX trades):

---

[8] The Pricing Disclosure, in addition to being attached as Exh. 19, can be viewed at the following web address: http://www.adrbnymellon.com/dr_pub_detail.jsp?linkNo=43451&areaId=6.  This web address was obtained by way of a Google search, using the exact title of the Pricing Disclosure.   Curiously, as of the date of filing of the initial complaint in this action, the Pricing Disclosure appeared not to be readily available by navigating directly through the Bank's ADR website.  If one navigated to the suggested directory on the Bank's ADR website (Home > DR University Home > Market Highlights > Publications for DR Issuers) by going through the Bank's ADR website rather than Google, the Pricing Disclosure was not visible.

(i)       "Throughout a trading day or session (which could be as long as 24 hours), as each custodial client's account generated FX transactions to be executed pursuant to SIs, the Bank's practice was to aggregate those FX transactions for all SI clients and group them by currency pair.  Near the end of the trading day or session, the Bank priced those SI FX trade requests it had received throughout that day or session."

(ii)      "To determine the price for each SI FX transaction for most currencies, the Bank examined the range of reported interbank rates from the trading day or session and assigned the rate on SI trades as follows: if the client was purchasing foreign currency, the client received a price at or close to the highest reported interbank rate for that day or session (at or near the least favorable interbank price for the client reported during the trading day or session), and if the client was selling foreign currency, the client received a price at or close to the lowest reported interbank rate of the day or session (also at or near the least favorable interbank price for the client reported during the trading day or session)."

(iii)     "Because SI clients received pricing at or near the high end of the reported interbank range for their currency purchases and at or near the low end of the reported interbank range for their sales, the Bank was generally buying low from, and selling high to, its own clients.  The Bank recorded the difference or 'spread' between the rates it gave clients and the interbank market price at the time the SI transactions were priced as 'sales margin.'"

41.    BNYM's actions in connection with ADR FX Conversions (described above) violated the Contract Documents' requirements that BNYM perform ADR FX Conversions "without negligence or bad faith," and to execute ADR FX Conversions "as promptly as

14

practicable." Further, with BNYM's improper FX practices, ADR Holders were charged amounts far exceeding the Bank's actual expenses incurred for ADR FX Conversions. As a result of such violations, BNYM garnered and continues to garner significant, unauthorized profits at the expense of Plaintiffs and other Class members.

42.     Upon information and belief, BNYM earned similar revenues and profits since at least January 1, 1997 to the present, meaning BNYM reaped significant, unauthorized revenue throughout the Class Period.

### C.     BNYM Continues to Charge ADR Holders Impermissible FX Fees.

43.     Based on information and belief, BNYM continues to charge and retain a spread on the conversion of Cash Distributions for ADR Holders in breach of the Contract Documents.

44.     BNYM's continued collection of FX conversion fees that are not permitted under the Contract Documents (and that are unrelated to its reasonable expenses) is a violation of its contractual and implied duties to Plaintiffs and Class members.

## V.     CLASS ACTION ALLEGATIONS

45.     This action is brought, and may properly be maintained, as a class action pursuant to Rule 23(a) as well as Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure. This action is brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief and/or Rule 23(b)(3) for money damages.

46.     Plaintiffs asserts claims for (i) breach of contract, (ii) breach of the implied covenant of good faith and fair dealing (in the alternative to (i)), and (iii) conversion (in the alternative to (i) and (ii)) on behalf of the following Class:

> All persons or entities who, from January 1, 1997 through the present (the "Class Period"), were holders of American depositary receipts for which BNYM served as the depositary bank and converted dividends or other cash distributions into USD.

15

47.     Excluded from the Class[9] are BNYM and its officers, directors, legal representatives, heirs, successors, corporate parents, subsidiaries, and assigns.

48.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.  Plaintiffs believe there are thousands of Class members.

49.     BNYM continues to breach its contractual and implied duties to Plaintiffs and Class members on grounds that apply generally to the Class so that final injunctive relief is appropriate with respect to the Class as a whole.

50.     There are numerous questions of law and fact common to Plaintiffs and the Class, including:

(a)     whether BNYM owed contractual duties to Plaintiffs and the Class;

(b)     whether the Bank violated the contractual obligations owed to Plaintiffs and the Class by charging FX rates that bore little or no relation to interbank market rates at the time ADR FX Conversions were executed;

(c)     whether the Bank violated the contractual obligations owed to Plaintiffs and the Class to execute ADR FX Conversions "as promptly as practicable," on a "reasonable" basis, and "without negligence or bad faith";

(d)     whether the Bank breached the contractual obligations owed to Plaintiffs and the Class by charging fees for executing ADR FX Conversions far in excess of their actual "expenses";

(e)     whether the Bank breached the covenant of good faith and fair dealing implied in the Contract Documents by charging FX rates that were not reasonable, did not reflect interbank trading rates at the time of execution or the FX rate BNYM actually received, or were in excess of BNYM's reasonable expenses;

---

[9] Unless otherwise indicated, references in this Complaint to the "Class" encompass the Class defined above and members of any subclasses.  Plaintiffs reserve the right to refine this Class definition and add any subclasses after discovery and upon moving for class certification.  The connective "and/or" in any class definition below indicates that certain claims are pleaded in the alternative.

(f)     whether the Bank unlawfully converted assets belonging to Plaintiffs and the Class; and

(g)     whether Plaintiffs and the Class suffered monetary damages as a result of BNYM's improper actions and, if so, the proper measure of those damages.

51.     Plaintiffs are members of the Class, and Plaintiffs' claims are typical of the claims of other members of the Class.

52.     Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity, with all of the obligations such representation entails.  Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to the interests of other members of the Class.

53.     Plaintiffs have engaged the services of the undersigned counsel, who are experienced in complex class-action litigation, will adequately prosecute this action, and will assert and protect the rights of Plaintiffs and absent members of the Class.

54.     Questions of law and fact common to the Class predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

55.     A class action is superior to other available methods for the adjudication of this controversy.  Individualized litigation would increase the delay and expense to all parties and the court system given the complex legal and factual issues of this case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual proceedings.

56.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individualized

actions, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

57.     BNYM has acted, or refused to act, on grounds generally applicable to the Class, thereby rendering final and injunctive relief with respect to the Class appropriate.

## VI.    TIMELINESS OF PLAINTIFFS' AND OTHER CLASS MEMBERS' CLAIMS

### A.     The Statutes of Limitations for Plaintiffs' and Other Class Members' Claims Were Tolled as a Result of BNYM's Affirmative Acts of Concealment.

58.     The applicable statutes of limitations for each of the claims for relief asserted in this Complaint were tolled by BNYM's affirmative acts of concealment, as described below.

59.     BNYM's notices to ADR Holders ("ADR Notices") generally only reported FX conversion rates and did not include the date or time when the ADR FX Conversions were executed.  The ADR Notices thus prevented ADR Holders from discovering that the FX rates they were being charged were extremely unfavorable.

60.     BNYM is in sole possession of records accurately detailing its ADR FX Conversion FX trades and the rates the Bank actually obtained when executing the FX transactions, as well as records accurately detailing when proceeds owed to ADR Holders were actually deposited and thus when they should have been priced.

61.     BNYM thereby prevented Plaintiffs and other Class members from detecting its improper practices relating to ADR FX Conversions.  Plaintiffs accordingly could not, in the exercise of reasonable diligence, have discovered any of the claims for relief pleaded in this Complaint against BNYM prior to BNYM's recent acknowledgement of its FX pricing practices in both the SI FX Litigation and the Pricing Disclosure.

62.    Specifically, Plaintiffs were not aware, and BNYM did not disclose, that in pricing ADR FX Conversions:

- the costs of the reported FX transactions executed by BNYM were not the actual FX costs it incurred and were not consistent with the actual market FX rates at the time Plaintiffs' and other Class members' trades were executed;

- BNYM retained the difference between the actual FX rates it obtained to execute a trade and the less favorable (to ADR Holders) FX rates, selected with as much as 24 to 48 hours' hindsight, that it charged Plaintiffs and other Class members; and

- BNYM took hidden fees or profits from the FX transactions it executed, including markups or markdowns, when executing FX trades on ADR FX Conversions.

63.    Indeed, BNYM admitted in the April 23, 2015 Stipulation (referenced above) that it "**generally did not disclose its SI FX pricing methodology** . . . to its custodial clients or their investment managers," and that it "was **aware that many clients did not fully understand the Bank's pricing methodology** for SI transactions."

64.    Likewise, internal BNYM emails made public show that BNYM attributed much of the success of the Bank's FX business to its lack of transparency. In an email dated July 21, 2010, Robert Near, Managing Director of BNYM Global Markets stated:

While difficult to quantify, and only having a 'couple' of data points, I think BNYM has been more successful in maintaining spreads in the SI [Standing Instruction] space compared to these peers [State Street and Northern Trust]. **Another way to say this is BNYM is 'late' to the transparency space.** We are hearing from our clients that our competitors are offering time stamping and fixed spreads across all currencies.

65.    BNYM's practices affected all ADR Holders whose ADR FX Conversions BNYM executed during the Class Period.

19

## VII.   CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract

66.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.   This claim for breach of contract is asserted by Plaintiffs on behalf of themselves and the Class against BNYM.

67.     Plaintiffs and other Class members purchased ADRs and accepted the contractual terms offered by BNYM in the Contract Documents by agreeing to become a party to the ADR Agreement corresponding to each ADR that was purchased.   The ADRs and their terms were annexed to and incorporated into the ADR Agreements.

68.     The Contract Documents make up a valid and enforceable contract.   BNYM, Plaintiffs, and other Class members are parties to, and are bound by the terms and provisions of, the Contract Documents, and the Contract Documents are substantially uniform across all Class ADRs and Class members.

69.     The Contract Documents require BNYM to convert foreign currency received by way of dividends or other distributions "as promptly as practicable" and "without negligence or bad faith," and to transfer the converted funds to ADR Holders.   Additionally, the Contract Documents provide that BNYM may recoup only its "expenses" in executing ADR FX Conversions.

70.     The Contract Documents are governed by New York law.

71.     The Bank breached its contractual duties imposed by the Contract Documents by intentionally applying prices to FX trades in connection with ADR FX Conversions that were grossly unfavorable to Plaintiffs and the Class.   Rather than pricing and distributing ADR FX Conversions "as promptly as practicable," BNYM waited one to two days to price the FX trades

using unreasonable rates at or near the extreme of the trading range so as to maximize the Bank's profit and diminish the amount of converted money distributed to Plaintiffs and other Class members, as ADR Holders.   BNYM charged Plaintiffs and the Class rates that were unreasonably selected in hindsight to extract maximum profits for BNYM at Plaintiffs' and the Class's expense.  BNYM's failure to apply the prevailing FX rates at a practicably prompt time after the Bank's receipt of the foreign currency distributed by ADR depositors in connection with the Class ADRs was commercially unreasonable and breached the terms of the Contract Documents.

72. The Bank also breached its contracts with Plaintiffs and the Class by charging amounts far exceeding the Bank's expenses incurred in connection with ADR FX Conversions.

73. Plaintiffs and the Class performed all, or substantially all, of the obligations imposed on them under their contracts with BNYM.

74. Plaintiffs and the Class have been and continue to be damaged as a direct and proximate result of BNYM's breaches of contract by being denied the full value of dividends or other distributions owed to them under the terms of the contracts.  BNYM's overcharges for ADR FX Conversions constitute costs or losses that Plaintiffs and the Class otherwise would not have incurred, for which Plaintiffs and the Class seek damages in an amount to be established at trial.

**COUNT II**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

75. Plaintiffs repeat and incorporate each and every preceding paragraph stated above.  This claim is asserted in the alternative to Count I by Plaintiffs on behalf of themselves and the Class against BNYM.

76.     BNYM is subject to an implied covenant of good faith and fair dealing under the Contract Documents.  Under that implied covenant, at all times, BNYM was obligated to execute ADR FX Conversions with good faith and in accordance with reasonable commercial standards of fair dealing.

77.     BNYM breached its implied covenant of good faith and fair dealing by improperly assigning FX rates to ADR FX Conversions in a manner intended to deprive Plaintiffs and other Class members of the benefits of the Contract Documents—specifically, their right to have ADR FX Conversions priced "as promptly as practicable" and "without negligence or bad faith."

78.     BNYM further breached its implied covenant of good faith and fair dealing by charging amounts far exceeding the Bank's expenses incurred in connection with ADR FX Conversions.

79.     BNYM acted deliberately to deprive Plaintiffs and other Class members of their right to receive ADR FX Conversion distributions at reasonable FX rates.  The Bank charged unfavorable rates to Plaintiffs and the Class in order to pocket the spread and reap profits at their expense.

80.     As a direct and proximate result of BNYM's breach of its implied covenant of good faith and fair dealing, Plaintiffs and other Class members have suffered and continue to suffer injury and damages, which they are entitled to recover from the Bank.

## COUNT III
## Conversion

81.     Plaintiffs repeat and incorporate each and every preceding paragraph stated above.

82.     This claim for relief is asserted in the alternative to Counts I and II by Plaintiffs on behalf of themselves and the Class against BNYM.

83.     Prior to the time BNYM distributed foreign currency or its equivalent in USD, which was deposited by BNYM for Plaintiffs and the Class, Plaintiffs and the Class entrusted to the Bank specific and identifiable funds, in the form of foreign currency BNYM received on behalf of Plaintiffs and the Class pursuant to the Contract Documents.

84.     As ADR Holders, Plaintiffs and the Class had ownership or the superior right to possession of the dividends or other distributions they entrusted to BNYM to hold and convert into USD and then distribute to Plaintiffs and the Class.  Under the Contract Documents, the Bank only had the right to charge Plaintiffs and the Class for the reasonable expenses associated with conducting the FX trades in connection with ADR FX Conversions.  Instead, the Bank charged Plaintiffs and the Class far more, in a manner designed to maximize the revenue potential offered by the range of a 24- to 48-hour period.

85.     By their improper FX practices related to ADR FX Conversions discussed above, BNYM exercised wrongful control, dominion over, or deprivation of Plaintiffs' and the Class's funds in derogation or denial of Plaintiffs' and the Class's rights to the full value of their dividends or other distributions reasonably converted into USD, without the consent of Plaintiffs or the Class and without lawful justification.

86.     BNYM's wrongful conduct constituted a conversion of Plaintiffs' and the Class's property.

87.     Plaintiffs and the Class have been and continue to be damaged as a result of BNYM's conduct and are entitled to recover their damages from BNYM in an amount to be established at trial.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against BNYM, and request as follows:

(a)   Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as Class representatives and Plaintiffs' counsel as counsel for the Class;

(b)   An Order enjoining BNYM from any further breach of the Contract Documents and/or its implied duties;

(c)   Compensatory, consequential, and general damages in an amount to be determined at trial;

(d)   Disgorgement or restitution of all earnings, profits, compensation, and benefits received by BNYM as a result of its unlawful acts and practices, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

(e)   Costs and disbursements of the action;

(f)   Pre- and post-judgment interest;

(g)   Reasonable attorneys' fees and costs; and

(h)   Such other and further relief as this Court may deem just and proper.

## IX.   JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:  October 26, 2016                    Respectfully submitted,

KESSLER TOPAZ MELTZER & CHECK          LIEFF CABRASER HEIMANN &
LLP                                     BERNSTEIN, LLP

By: /s/ Sharan Nirmul                   By: /s/ Daniel P. Chiplock
      Sharan Nirmul                           Daniel P. Chiplock

24

Joseph H. Meltzer
Sharan Nirmul
Daniel C. Mulveny
Ethan Barlieb
Jonathan F. Neumann
KESSLER TOPAZ MELTZER & CHECK
LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
Email: jmeltzer@ktmc.com
snirmul@ktmc.com
dmulveny@ktmc.com
ebarlieb@ktmc.com
jneumann@ktmc.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

Frank R. Schirripa
HACH ROSE SCHIRRIPA & CHEVERIE,
LLP
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile (212) 779-0028
Email:  fschirripa@hrsclaw.com

*Counsel for Plaintiff International Union of
Operating Engineers Local 138 Pension
Trust Fund*

Daniel P. Chiplock
Daniel E. Seltz
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592
E-mail: dchiplock@lchb.com
dseltz@lchb.com
mmiarmi@lchb.com

Elizabeth J. Cabraser
Robert L. Lieff (*of counsel*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
Email:  ecabraser@lchb.com
rlieff@lchb.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

## Exhibit Index

| EXHIBIT | DATE | TITLE |
|---------|------|-------|
| Exh. 1 | 9/27/1999 | Toyota Motor Corp. & BNY as Depositary & Owners and Beneficial Owners of American Depositary Receipts – Deposit Agreement |
| Exh. 2 | 3/22/2001<br><br>Amended and Restated as of Mar. 27, 2001 & Mar. 28 2003 | HSBC Holdings & BNY as Depositary & Holders and Beneficial Owners of American Depositary Receipts - Amended and Restated Deposit Agreement |
| Exh. 3 | 7/14/1994 | SWIRE Pacific Limited & BNYM  as Depositary & Owners and Holders of American Depositary Shares - Class B Deposit Agreement |
| Exh. 4 | 2005 | Macquarie Bank Limited & BNY as Depositary and Owners and Beneficial Owners of American Depositary Receipts – Deposit Agreement |
| Exh. 5 | 2005 | América Móvil, S.A. de C.V. & BNY as Depositary & Owners of American Depositary Receipts – Amended & Restated Deposit Agreement (L Shares) |
| Exh. 6 | 10/23/1997<br><br>Amended & Restated as of July 5, 2000 & May 30, 2006 | China Mobile Limited (Hong Kong) & BNY as Depositary and Owners and Beneficial Owners of American Depositary Receipts – Deposit Agreement |
| Exh. 7 | 10/12/1988<br><br>Amended and Restated as of Dec. 26, 1989, Sept. 16, 1991, June 30, 1999, Sept. 29, 1999, and 2006 | Vodafone Group PLC & Vodafone Americas Inc. & BNY as Depositary & Owners and Beneficial Owners of American Depositary Receipts – Deposit Agreement |
| Exh. 8 | 2015 | Vodafone Americas Inc., & BNY as Depositary & Owners and Beneficial Owners of American Depositary Shares – Amended and Restated Deposit Agreement |
| Exh. 9 | 2007 | Glaxosmithkline plc & BNY as Depositary and Owners and Holders of American Depositary Shares  - Amended and Restated Deposit Agreement |
| Exh. 10 | 2015 | Glaxosmithkline plc & BNY as Depositary and Owners and Holders of American Depositary Shares  - Amended and Restated Deposit Agreement |

# Exhibit Index

| EXHIBIT | DATE | TITLE |
|---|---|---|
| Exh. 11 | 2009 | Banco Bradesco S.A. & BNY as Depositary and Owners and Holders of American Depositary Shares  - Amended and Restated Deposit Agreement |
| Exh. 12 | 2015 | Banco Bradesco S.A. & BNY as Depositary and Owners and Holders of American Depositary Shares  - Amended and Restated Deposit Agreement |
| Exh. 13 | 2007 | Lloyds TSB Group PLC & BNY as Depositary and Owners and Beneficial Owners of American Depositary Shares  - Deposit Agreement (Registered – Series) |
| Exh. 14 | 2005 | Royal Dutch Shell plc & BNY as Depositary and Owners and Beneficial Owners of American Depositary Receipts  - Amended and Restated Deposit Agreement (A Shares) |
| Exh. 15 | 10/21/1998<br><br>Amended & Restated June 14, 1999; Jan. 30, 2002; May 21, 2002; and 2013 | NTT Docomo, Inc.,  & BNYM as Depositary and Owners and Holders of American Depositary Receipts - Deposit Agreement |
| Exh. 16 | 8/1/2005 | National Grid PLC & BNY as Depositary and Owners and Beneficial Owners of American Depositary Receipts – Amended and Restated Deposit Agreement |
| Exh. 17 | 2013 | National Grid PLC & BNYM as Depositary and Owners and Holders of American Depositary Shares – Amended and Restated Deposit Agreement |
| Exh. 18 | 2006 | CRH Public Limited Company and BNY as Depositary and Holders of American Depositary Shares – Amended and Restated Deposit Agreement |
| Exh. 19 | 10/1/2015 | BNY Mellon Depositary Receipts Foreign Exchange Pricing Disclosure |
| Exh. 20 | | ADR Agreements: Relevant Provisions |