**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE: THE BANK OF NEW YORK MELLON ADR FX LITIGATION | No. 16-CV-00212-JPO-JLC |
|---|---|

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE APPLICATION OF THE STATUTES OF LIMITATIONS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, and Section 3(F)(iii) of Your Honor's Individual Practices, Defendant The Bank of New York Mellon ("BNYM") respectfully submits this statement of undisputed facts that may be material to its Motion for Partial Summary Judgment on the Application of the Statutes of Limitations, filed concurrently herewith.

## I. PARTIES TO THE ACTION

1. Plaintiffs Annie L. Normand, Don A. Carofano, David Feige, and the International Union of Operating Engineers Local 138 Annuity Trust Fund ("Local 138" and, together with Plaintiffs Carofano and Feige, the "Named Plaintiffs") was each, at different times, an investor in American Depositary Receipts ("ADRs")[1] for which BNYM was the depositary bank ("Depositary"). (Consolidated Amended Class Action Complaint (Oct. 26, 2016) ("Compl.") ¶¶ 14–18, ECF No. 39.)

2. BNYM is one of several Depositaries that issue ADRs. (Declaration of Vincent J. Cahill, Jr. in Support of Defendant's Motion for Partial Summary Judgment on the Application of the Statutes of Limitations ("Cahill Decl.") ¶ 2, filed concurrently herewith.)

3. The Depositaries other than BNYM are Citibank, JPMorgan Chase, and Deutsche Bank. (*Id.*)

[1] The ADR is a receipt—akin to a stock certificate—evidencing ownership of an American Depositary Share ("ADS")—the actual U.S. security. In common parlance, however, the term "ADR" is often used to refer to the actual security it evidences, the ADS, and the Named Plaintiffs use it that way in the Complaint. *See, e.g.*, American Depositary Receipts, Securities Act Release No. 6894, 1991 WL 294145, at *2 (May 23, 1991). Defendant follows that convention here.

## II.     ADRs AND THE DEPOSIT AGREEMENTS

4.       ADRs are U.S. securities through which foreign public companies can access U.S. capital markets without issuing their own stock in the United States.  (*Id.* ¶ 3.)

5.       In many cases, a foreign issuer (the "Issuer") sponsors an ADR program by entering into a deposit agreement ("Deposit Agreement") with a bank in the United States, under which the bank acts as the Depositary for the Issuer's ADR program.  (*Id.*)

6.       The Depositary takes legal ownership of shares of the Issuer's foreign stock (the "underlying shares"), which are generally held in custody by a bank in the Issuer's home country.  (*Id.*)

7.       The Depositary then issues ADRs, which represent an economic interest in the underlying shares of the Issuer held by the Depositary.  (*Id.*)

8.       ADRs offer U.S. investors the opportunity to achieve equity returns from investment in a foreign public company without the inconveniences that direct purchase of foreign securities would typically entail.  (*Id.* ¶ 4.)

9.       Among these inconveniences is that foreign companies typically pay cash distributions (such as dividends) in the domestic currency of their home country.  (*Id.*)

10.      A U.S. investor receiving a cash distribution from a foreign issuer would therefore have to get that foreign currency converted to U.S. dollars ("USD") in order to deposit, invest, or spend it in the United States.  (*Id.*)

11.      Conversion of relatively small amounts of foreign currency is both inconvenient and expensive.  (*Id.*)

12.      ADRs avoid this inconvenience because they are denominated in USD, and ADR holders receive any cash distributions in USD.  (*Id.* ¶ 5.)

13.     If the foreign Issuer declares a dividend or makes a cash distribution on the underlying shares in a currency other than USD and does not make other arrangements for its conversion, the Depositary will receive that foreign currency in respect of the underlying shares it holds.  (*Id.*; *see also id.* ¶¶ 10–11.)

14.     One of BNYM's responsibilities as Depositary under the Deposit Agreements is to effect the conversion of the foreign currency to USD before it is distributed to ADR holders.  (*Id.* ¶ 5; *see also, e.g.*, Compl., Ex. 1, §§ 4.01, 4.05, ECF No. 39-1.)

15.     Under BNYM's Deposit Agreements, BNYM may transact with another bank, such as the bank that holds the shares in custody, to convert the currency, or it may convert the currency through its own foreign exchange ("FX") desk.  (Cahill Decl. ¶ 5; *see also, e.g.*, Compl., Ex. 1, § 4.05.)

16.     In those instances when BNYM converts the currency through its own FX desk, its Depositary Receipts ("DR") Business places an order with its Markets division to perform any necessary FX conversion from foreign currency to USD prior to distribution of the USD to ADR holders.  (Cahill Decl. ¶ 6.)

17.     BNYM's Deposit Agreements do not prescribe how the conversion is to be effected.  (*Id.* ¶ 5; *see also, e.g.*, Compl., Ex. 1, § 4.05.)

18.     Investors may hold ADRs directly as "registered" owners, whose ownership is recorded in a register of ADR holders.  (Cahill Decl. ¶ 6 n.1.)

19.     Investors may also hold ADRs indirectly as "beneficial" owners, whose shares are legally held by a registered owner, often a clearinghouse such as the Depository Trust Company ("DTC").  (*Id.*)

20. Under the circumstances described in paragraph 19, the registered owner, through market participants such as broker-dealers, allocates and conveys to the beneficial owner any cash distributions received from the Depositary for the ADRs in which the beneficial owner has an interest. (*Id.*)

21. BNYM maintains data identifying and describing cash distributions made to the registered owners of ADRs issued by BNYM, including for the time period between January 1997 and October 2017. (*Id.* ¶ 9 & Exs. C–H.)

22. The data described in paragraph 21 includes:

a. the type of cash distribution (for example, a dividend) ("Event Type");

b. the associated Issuer ("CUSIP"/"CUSIP Number," "CUSIP Name," or "DR Name");

c. the date on which each cash distribution was received by BNYM as Depositary from the Issuer ("Local PD");

d. the type of currency in which the cash distribution was declared by the Issuer ("Rcv Currency" or "Receiving Currency Code");

e. the date on which BNYM made the cash distribution in USD to registered ADR owners ("DR Payable Date"); and

f. the FX conversion rate, if any, applied to the cash distribution by BNYM, the Issuer, or a third party ("FX Rate").

(*Id.* ¶ 9 & Exs. C–H.)

23. BNYM does not perform FX conversions for every ADR-related cash distribution. (*Id.* ¶ 10.)

24. In some cases, an Issuer declares and makes a cash distribution in USD. (*Id.*)

25. In some cases, the Issuer announces a cash distribution in local currency, but the conversion to USD is performed not by BNYM, but instead by the Issuer or a third party. (*Id.*)

26.     In either case described in paragraphs 24 and 25, when acting as Depositary, BNYM passes the USD it receives, net of any applicable taxes and fees, to registered ADR owners and performs no FX conversion.  (*Id.*)

27.     América Móvil Sab de CV and Banco Bradesco S.A. are among the Issuers who have performed, or had a third party perform, the FX conversions in connection ADR-related cash distributions.  (*Id.* ¶ 11)

28.     For both América Móvil Sab de CV and Banco Bradesco S.A., BNYM received ADR-related cash distributions in USD, which BNYM passed on to registered ADR owners, net of applicable taxes and fees.  (*Id.*)

29.     Some ADRs are "sponsored"—that is, issued pursuant to a Deposit Agreement between the Issuer and the Depositary.  (*Id.* ¶ 12 & Exs. I & J.)

30.     Some ADRs are "unsponsored"—that is, issued without the participation of the Issuer and governed by agreements to which the Issuer is not a party.  (*Id.*)

31.     There may be more than one Depositary for an unsponsored ADR.  (*Id.* ¶ 11.)

32.     In the case of cash distributions related to an unsponsored ADR, the Depositary that first filed on Form F-6 with the SEC to establish an ADR program for the relevant Issuer—assuming that Depositary has a market position in the underlying shares of the Issuer—sets the FX rate for the ADR conversion, and the other Depositaries must price in respect of any underlying shares they hold at the same FX rate, regardless of market conditions at the time.  (*Id.*)

## III. THE NAMED PLAINTIFFS' ADR HOLDINGS

### A. Annie L. Normand

33. Plaintiff Normand has withdrawn as a Plaintiff in this action. (*See* Declaration of Elizabeth M. Sacksteder in Support of Defendant's Motion for Partial Summary Judgment on the Application of the Statutes of Limitations ("Sacksteder Decl."), Ex. A, filed concurrently herewith.)

### B. Plaintiff Local 138

34. Plaintiff Local 138 is an employee benefit plan with its principal place of business in New York. (Sacksteder Decl., Ex. E, at 23:6-17; Compl. ¶ 17.)

35. Local 138 held ADRs for which BNYM was the Depositary. (Compl. ¶¶ 17–18.)

36. Local 138 [REDACTED] (*See* Sacksteder Decl., Exs. H–K.)

37. Local 138 [REDACTED] (*See id.*, Ex. I.)

### C. Plaintiff Feige

38. Mr. Feige resides in California. (Sacksteder Decl., Ex. F, 70:13–73:14; Compl. ¶ 16.)

39. Mr. Feige owned shares for which BNYM was the Depositary. (Compl. ¶¶ 16, 18.)

40. Mr. Feige's [REDACTED] (*See* Sacksteder Decl., Exs. L & M.)

41. [redacted] Mr. Feige [redacted] (*See id.*, Ex. L, at 46 (reflecting 2012 holding of [redacted]); *see also* Cahill Decl., Ex. E (reflecting Teva Pharmaceutical Industries dividend in 2012)).

**D. Plaintiff Carofano**

42. Mr. Carofano [redacted]. (Sacksteder Decl., Ex. G, at 23:25–24:6.)

43. Mr. Carofano owned shares in ADRs for which BNYM was the Depositary. (Compl. ¶ 15.)

44. Mr. Carofano's [redacted]. (*See, e.g.*, Sacksteder Decl., Ex. N.)

45. [redacted] (*See* Sacksteder Decl., Ex. N, at 7; Ex. O, at 139.)

46. Both of the cash distributions referred to in paragraph 45 were converted from foreign currency to USD by the Issuer or a third party, not BNYM. (Cahill Decl. ¶ 10–11.)

47. [redacted] Mr. Carofano's [redacted] (*See, e.g.*, Sacksteder Decl., Exs. O & P.)

## IV. INFORMATION AVAILABLE TO THE NAMED PLAINTIFFS AT THE TIME OF THEIR CASH DISTRIBUTIONS

48. The Complaint in this action seeks to assert claims for the period from January 1, 1997 to the present (the "putative class period"). (Compl. ¶ 46.)

49. [REDACTED] (*See, e.g.*, Sacksteder Decl. Exs. I, L & O.)

50. At all times since January 1997, BNYM has been required by the U.S. Securities and Exchange Commission ("SEC") and the stock exchanges on which ADRs are listed to announce each ADR-related cash distribution publicly to the market, and has complied with that requirement. (Cahill Decl. ¶ 7.)

51. BNYM's announcements in respect of ADR-related cash distributions indicate, among other things, the "Gross Dividend Rate," which is the amount of USD to be paid per ADR share before the subtraction of any applicable taxes or fees, and the date on which the distribution will be made. (*Id.* & Exs. A & B.)

52. Since at least 2002, BNYM has also made available on its website, as well as through Bloomberg and DTC, the Gross Dividend Rate for ADR-related cash distributions and the date on which such cash distributions will be made. (*Id.* ¶ 7.)

53. At all times since January 1997, Issuers have publicly announced cash distributions made on the foreign securities underlying ADRs, including the date on which the cash distribution will be made (also known as the "local payable date") and the amount of local currency to be distributed per share. (*Id.* ¶ 8 (citing as an example https://www.basf.com/en/company/investor-relations/share-and-adrs/dividend.html).)

54. At all times since January 1997, Plaintiffs and other members of the public had access to FX spot quote data from the interbank market, which can be purchased from financial data firms such as Thomson Reuters, for the time period surrounding the local payable dates. (*See* Declaration of Alexander ("Sasha") Aganin in Support of Defendant's Motion for

Partial Summary Judgment on the Application of the Statutes of Limitations ¶ 9 & n.8, filed concurrently herewith.)

55.     Prior to 2010, BNYM received inquiries by Issuers, broker-dealers, and individual investors concerning the FX conversion rates applied by BNYM to ADR-related cash distributions.  (*See* Cahill Decl. ¶ 13 & Exs. K–M.)

56.     On October 1, 2015, BNYM posted a statement on its website (the "October 2015 statement") concerning its pricing of ADR-related FX conversions.  (*See* Compl., Ex. 19, ECF No. 39-19.)

57.     The October 2015 statement stated that BNYM gave "[n]o assurance that [FX] rate[s] [are] the most favorable available."  (*Id.*)

58.     The October 2015 statement stated that BNYM "earns revenue on [A]DR FX transactions."  (*Id.*)

59.     The October 2015 statement does not indicate the date or time when ADR-related FX conversions will be executed or how BNYM's pricing of ADR-related FX transactions will compare with the rates BNYM itself can obtain.  (*Id.*)

## V.     PLAINTIFFS' DILIGENCE REGARDING THEIR CLAIMS

60.     In discovery, BNYM requested "documents reflecting any effort by Plaintiffs to ascertain, understand, or otherwise consider" (a) "the process (including timing) by which BNYM performed FX conversions in connection with its ADR program"; or (b) "the methodology through which BNYM priced [such] FX Conversions . . . or the rate actually applied to such FX Conversions."  (*See* Sacksteder Decl., Ex. B, at 9 (Requests Nos. 12 & 13).)

61.     No Plaintiff produced any documents responsive to the document requests described in paragraph 60.  (*See id.* ¶ 6.)

62. William Duffy, Jr. was deposed as Local 138's corporate designee pursuant to Fed. R. Civ. P. 3(b)(6). (*Id.*, Ex. E, at 215:24–216:15.)

63. Mr. Duffy testified that Local 138 "had taken no steps to determine how currency was being converted for its ADR-related cash distributions" and "never tried to find out" what rates the fund was being charged for FX conversion as compared to market rates. (*Id.*, Ex. E, at 215:24–216:15.)

64. Mr. Feige testified [redacted] (*Id.*, Ex. F, at 177:16-23.)

65. Mr. Feige testified, [redacted] (*Id.*, Ex. F, at 173:6-12.)

66. Mr. Feige testified [redacted] (*Id.*, Ex. F, at 155:23–156:21, 183:9-25.)

67. Mr. Feige testified [redacted] (*Id.* 178:6-10.)

68. Mr. Carofano testified [redacted] (*Id.*, Ex. G, at 123:5–124:7, 153:16-20.)

69. Mr. Carofano testified [redacted] (*Id.*, Ex. G, at 101:22–102:3, 173:9-14.)

70. Mr. Carofano testified [REDACTED] (*Id.*, Ex. G, at 153:16-20.)

71. Mr. Carofano testified [REDACTED] (*Id.*, Ex. G, at 154:5–155:3.)

Dated: New York, New York
February 12, 2018

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s/ Elizabeth M. Sacksteder
Elizabeth M. Sacksteder
William A. Clareman
Amy L. Barton
Jeremy A. Benjamin

1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
esacksteder@paulweiss.com
wclareman@paulweiss.com
abarton@paulweiss.com
jbenjamin@paulweiss.com

*Attorneys for Defendant The Bank of New York Mellon*