**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:  THE BANK OF NEW YORK MELLON ADR FX LITIGATION | 16-CV-00212-JPO-JLC |
| | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| | ECF Case |
| This Document Relates to:<br><br>CONTRACT CLASS ACTION | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

    A.    The Bank's Obligations to ADR Holders. ......................................... 2

    B.    BNYM Designed and Implemented a Scheme to Breach Its Obligations to ADR Holders, and to Mask Its Conduct. ............................... 5

    C.    BNYM Understood and Intended Its Conduct to Be Concealment. ...................... 9

LEGAL STANDARD ................................................................................................. 12

ARGUMENT .............................................................................................................. 12

I.    BNYM's Motion, Which Seeks "Judgment" Solely Against Claims of Absent Members of an Uncertified Class, is a Nullity .............................................. 12

II.    Genuine Issues of Material Fact Exist Concerning the Bank's Deliberate, Explicit, and Continuing Concealment of Its Conduct. ........................................... 14

    A.    Plaintiffs' Purported Access to BNYM's Pricing Practices Raises Genuine Issues of Material Fact. ...................................... 15

    B.    Plaintiffs Exercised Reasonable Diligence. ....................................... 18

    C.    "Reasonable Reliance" on BNYM's Concealment Is Not Required. ................. 20

    D.    Genuine Issues of Fact Exist as to BNYM's Acts of Concealment. ................... 21

III.    BNYM Improperly Seeks Reconsideration of This Court's Preliminary Ruling on Class Standing and to Preempt This Court's Class Certification Inquiry ....................... 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Baldayaque v. United States,*
  338 F.3d 145 (2d Cir. 2003)........................................................................................... 19, 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................................................ 12

*Dietrich v. Bauer,*
  76 F. Supp. 2d 312 (S.D.N.Y. 1999)............................................................................... 19

*Etheredge-Brown v. Am. Media, Inc.,*
  13 F. Supp. 3d 303 (S.D.N.Y. 2014) (Oetken, J.).......................................................... 12

*Feritta v. Knoedler Gallery, LLC,*
  No. 14-cv-2259, 2015 WL 374968 (S.D.N.Y. Jan. 29, 2015) ........................................ 15

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.,*
  862 F. Supp. 2d 322 (S.D.N.Y. 2012)............................................................................. 24

*Golden v. Scalise,*
  87 A.D.2d 959 (App. Div. 3d Dep't 1982) ...................................................................... 22

*Hinds Cty., Miss. v. Wachovia Bank, N.A.,*
  700 F. Supp. 2d 378 (S.D.N.Y. 2010)....................................................................... 14, 21

*In re WorldCom, Inc. Sec. Litig.,*
  219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................................... 25

*Jackson v. Eddy's LI RV Ctr., Inc.,*
  845 F. Supp. 2d 523 (E.D.N.Y. 2012) ...................................................................... 15, 17

*Jordan v. City of New York,*
  No. 08-cv-1041 (DLI) (LB), 2009 WL 701108 (E.D.N.Y. Mar. 15, 2009) ................... 19

*Lorber v. Beebe,*
  407 F. Supp. 279 (S.D.N.Y. 1976)................................................................................... 13

*M&T Mortg. Corp. v. White,*
  736 F. Supp. 2d 538 (E.D.N.Y. 2010) ............................................................................ 12

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.,*
  No. 13 Civ. 3921 (CM), 2014 WL 3739322 (S.D.N.Y. July 29, 2014)........................... 22

*Marshall v. Hyundai Motor. Am.,*
  51 F. Supp. 3d 451 (S.D.N.Y. 2014)......................................................................... 14, 17

*Mendez v. Radec Corp.,*
  260 F.R.D. 38 (W.D.N.Y. 2009)...................................................................................... 13

*Merryman v. J.P. Morgan Chase Bank, N.A.,*
  No. 15-cv-9188 (VEC), 2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016)........................... 18

*Migliori v. Boeing N. Am., Inc.,*
  114 F. Supp. 2d 976 (C.D. Cal. 2000) ............................................................................ 14

*Mullane v. Cent. Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) ........................................................................................................ 14

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
  693 F.3d 145 (2d Cir. 2012)....................................................................................... 24, 25

*New York ex rel. Spitzer v. Feldman,*
  No. 01-6691, 2003 WL 21576518 (S.D.N.Y. July 10, 2003)............................................ 20

## TABLE OF AUTHORITIES
### (continued)

Page

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................. 25

*Schwarzschild v. Tse*,
   69 F.3d 293 (9th Cir. 1995) ................................................................. 13

*Schweizer v. Trans Union Corp.*,
   136 F.3d 233 (2d Cir. 1998) ................................................................ 13

*Smith v. Bayer Corp.*,
   564 U.S. 299 (2011) ........................................................................... 12

*State of N.Y. v. Hendrickson Bros.*,
   840 F.2d 1065 (2d Cir. 1988) ......................................................... 14, 21

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000) ............................................................... 25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ........................................................................... 13

*Zumpano v. Quinn*,
   849 N.E.2d 926 (N.Y. 2006) ............................................................... 15

### Rules

Fed. R. Civ. P. 56(a) ................................................................................ 12

### Treatises

*Newberg on Class Actions* § 7.10 (2013) ............................................... 13

Plaintiffs respectfully submit this memorandum in opposition to Defendant The Bank of New York Mellon's ("BNYM" or "the Bank") motion for partial summary judgment.

**Introduction**

This case involves BNYM's deliberately deceptive conduct in pricing foreign exchange conversions on dividends and other cash distributions that it was obligated to convert for Plaintiffs and other holders of American Depositary Receipts ("ADRs"). BNYM's pricing practices breached the contracts that govern how BNYM was to effectuate these conversions, as Plaintiffs will show at trial. More important for this motion, however, is that BNYM's executives *wrote down* a scheme of concealment, and then followed through on it for years on end. BNYM designed its scheme based on the understanding, shared among the Bank's executives and reflected in multiple internal documents, that the mechanics and timing of FX transactions were not known or discernible to outside parties, including the plaintiffs in this case, and worked to exploit that lack of transparency. BNYM's scheme is set out in extraordinarily stark detail in its own documents, and is functionally the same one that Judge Kaplan called "an outrageous wrong" at the conclusion of predecessor litigation that resulted in BNYM's payment of $714 million to government entities and private claimants. Exh. 1 (9/24/15 Hearing Tr.), at 17.[1]

Although Plaintiffs set forth below more than sufficient evidence to establish genuine issues of material fact, the Court need not even reach the merits of BNYM's motion, because BNYM's motion is procedurally improper. BNYM's motion seeks to dismiss the claims of absent class members not before the Court and who have not yet had an opportunity to choose whether they will be bound by the outcome of this action. At the same time, it effectively seeks

---

[1] Unless otherwise noted, exhibits are attached to the accompanying Declaration of Daniel P. Chiplock, all emphasis in this brief has been added, and all internal citations and quotation marks have been omitted.

reconsideration of a ruling – concerning class standing – that this Court expressly informed the parties was to be deferred until class certification.

Even if the Court were to reach the merits of BNYM's motion, however, it is clear that BNYM has come nowhere close to carrying its burden to show the absence of fact issues.  Nor could it.  BNYM's concealment of its conduct is in black and white.  BNYM can only concede the conduct alleged in the complaint and then ask this Court, in the face of clear evidence of deliberate and sustained concealment, that those documents do not mean what they say, and that *as a matter of law*, BNYM's conduct was not concealment.  To the contrary, disputed facts pervade BNYM's motion.

For example (even as it concedes that Plaintiffs' claims are timely), the Bank argues that Plaintiffs had sufficient information to detect the Bank's misconduct, contending that Plaintiffs should have hired, as the Bank did for this motion, an $800/hour expert to detect the Bank's conduct as it was occurring.  The Bank improperly urges this Court to draw a series of inferences in the Bank's favor, from the availability of FX trading and ADR-related information to the degree of reasonable diligence required to investigate the Bank's conduct.  The Bank also seeks to characterize its ongoing and intentional concealment, which it repeatedly memorialized and confirmed internally, as a mere failure to disclose its pricing practices, and not as affirmative acts of concealment.  That, too, raises numerous fact issues.

For these and other reasons set out below, BNYM's motion should be denied.

## **Statement of Facts**

### **A.     The Bank's Obligations to ADR Holders.**

ADRs are negotiable U.S. securities representing ownership of publicly traded shares in a foreign corporation.  Plaintiffs, and the class members they represent in this case, are holders of ADRs for which BNYM serves as the depositary bank.  Pursuant to agreements between (a)

BNYM, (b) the foreign issuer whose shares are deposited with BNYM, and (c) the owners and the owners/beneficial owners of the ADRs (Plaintiffs and class members), BNYM holds shares issued by foreign companies on behalf of, and for the benefit of, U.S. investors in the ADRs. Under those agreements, BNYM is to convert into U.S. dollars any cash distributions received from these foreign companies in which ADR holders have invested through ADRs.

Plaintiffs, like other ADR holders, can discern very little about the Bank's ADR FX conversions after the Bank has performed them.  An investor may see, on an account statement, the amount of the dividend, as expressed in US dollars, the settlement date (or just "date"), and little else.  *See* ECF No. 76-9 (Local 138), at 14-16; ECF No.76-13 (Feige), at 14-20, and ECF No. 76-15 (Carofano), at 7.  █████████████████████████, investors do not learn what the prevailing rates were at the time that BNYM executed the transaction (████████ █████████████████████), even the date that actually BNYM executed the FX conversion, or the rate that the Bank actually received, as opposed to what was attributed to a particular conversion.  The amounts at issue, as to each dividend for each individual investor, are typically modest.  *See* ECF No. 76-9, at 14-16; ECF No. 76-13, at 14-20; ECF No. 76-15, at 7.

BNYM breached those agreements in several ways, and actively concealed its conduct from ADR investors for years; indeed, its entire pricing methodology was constructed to avoid detection.  First, the agreements obligated BNYM to  convert "such foreign currency into dollars," and distribute "such dollars . . .  as promptly as practicable from foreign currency into USD to the Owners entitled thereto."  *See* Compl. (ECF No. 39) Exh. 1 §§ 4.01, 4.05.  Second, the agreements expressly enumerate BNYM's permissible fees and charges as the depositary; as related to ADR FX conversions, they provide that BNYM is permitted only to recoup its actual "expenses."  *See id.* § 5.09 & Exh. A, § 7.  Finally, the agreements obligate BNYM to act

"without negligence or bad faith."  *See, e.g.*, *id.* § 5.03 (Obligations of the Depositary, the Custodian and the Company) & Exh. A, § 18 (Liability of the Company and Depositary)). BNYM breached each of these provisions of the agreements.

Rather than charging rates on FX transactions necessary to perform ADR FX conversions in good faith and in a manner that reflected a prompt conversion of cash distributions into USD, BNYM assigned prices to dividend conversions based on the range of at least a 24-hour period (the "range of the day"), thereby retaining a portion of the sum of dollars converted as additional, risk-free profits, over and above any profit the Bank had already secured after managing its own risk.

This scheme was essentially identical to the one that was the subject of prior litigation, brought by both government entities and private plaintiffs, concerning the Bank's pricing of trades done pursuant to its "standing instructions" program for custodial clients.  The Bank paid $714 million to end that litigation.  *See* Exh. 2 (DOJ press release).  When it settled the standing instructions FX litigation, BNYM admitted that its Global Markets FX desks knowingly charged the Bank's custodial clients unfavorable rates on standing instructions FX trades.  As part of the January 17, 2012 Stipulation and Order of Partial Settlement and Dismissal related to a lawsuit brought by the Department of Justice, BNYM publicly admitted for the first time that the Bank "assigns prices to Standing Instruction Service transactions that are ***at or near the high end*** of the range of prices reported in the interbank market for currency purchases for the relevant pricing cycle, ***and at or near the low end*** of range of prices reported in the interbank market for currency sales for the relevant pricing cycle."  Exh. 3.  The Bank would later admit, as part of a final settlement of the DOJ's lawsuit, that "***the Bank gave SI clients prices that were at or near the worst interbank rates reported during the trading day or session***."  Exh. 4. ADR FX

Conversions were priced in a similar manner to SI FX transactions, a fact that remained hidden until October 2015.  Exh. 5.

B.    **BNYM Designed and Implemented a Scheme to Breach Its Obligations to ADR Holders, and to Mask Its Conduct.**

BNYM's scheme with respect to ADR FX conversions dates to early 1997, and it was *explicitly* designed to be self-concealing.  At that time, the then-Bank of New York's Depositary Receipts Group and Global Markets began "a new cooperative effort with the ADR group here at BNY whereby we [Global Markets] are asking our ADR colleagues to wrest back control of ADR dividend conversions from many of the subcustodians, and let our FX desks do it."  Exh. 6.[2]  The objective of this effort was ██████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████

What BNYM came up with violated the terms of its depositary agreements, and was designed with the *express purpose* of concealment.  ██████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ █████████████████████

BNYM memorialized its scheme in what its author, BNYM executive Richard Estes, proudly later referred to as the "Bible" for pricing ADR dividend conversions.  Authored by Mr.

---

[2] This document, along with Exhibit 18, are among 51 documents that were produced by BNYM in the predecessor litigation and ordered to be de-designated as confidential by Judge Kaplan.  *See* ECF No. 47.  The documents also would have become public under the sunset provision of the prior litigation's protective order.  *See* ECF No. 65. BNYM provided these documents without use restriction, allowing public filing. *See* Chiplock Decl. ¶ 6.

Estes in April 1997, the document reflected Global Markets' and the Depositary Receipts Group's "understanding of what guidelines BNY FX needs to follow when pricing these trades," and that they had "agreed upon procedures for maximizing the profitability of ADR dividend conversions." Exh. 6. Mr. Estes testified that ███████████████████████████

███████████████████████████████████████████████████████████████

      The "Bible" explained that while BNY must price its FX trades based on a spot rate that traded during the day, or, during the day's range, "defining the 'day's range' is not cut and dry. In fact, since the outside world does not know at what time during the 24-day trading day we do our ADR dividend trades, or out of which center, we decided that the 'day's range' qualifies as the high and low for GBP/USD from start of trading Wellington at GMT 22.00 to end of day New York at GMT 21.59." Exh. 6. Mr. Estes went on to explain, "As a result, it is in BNY FX's interest to price ADR trades as late in the global trading day as possible, i.e., late afternoon in New York, as waiting allows us to determine what the widest range possible could be." *Id.*

████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

---

[3] Mr. Estes testified that ███████████████████████████████████████
████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████

       BNYM's Bible described how traders could conceal this activity from "any outside party."  Under the heading "Pricing Large v. Small Trades," Mr. Estes wrote, "While we want to maximize the day's range when pricing ADR trades, we cannot consistently price them at or near the day's high/low every time.  Rather, to keep any outside party from detecting a pricing pattern, we should purposely price some trades at the middle of the day's range so that there appears to be no deliberateness in our activity."  *Id.* ████████████████████████

██████████████████████████████████████████████

████████████████  As Mr. Estes testified, █████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███

       ██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

      ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█  In 2004, Mr. Estes boasted that his Bible had been used by the Bank's "well-versed traders on

pricing ADR dividends.  You can see that this process has been running every so smoothly

without incident for over seven years."  Exh. 6.  ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

      ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

## C.       BNYM Understood and Intended Its Conduct to Be Concealment.

The Bank was aware of and exploited the fact that ADR holders could not meaningfully hold the Bank to its contractual promises to execute the trades promptly and/or on a reasonable basis, or detect any unauthorized deductions from the amounts they were owed.  As the Bible's direction to price some trades in a manner that would avoid "detecting a pricing pattern" reflects, the Bank was aware that if investors knew what it was up to, they would object.  Otherwise, there would have been no need to hide the Bank's pricing practices.  Another email exchange makes this plain.  ADR FX conversions were classified within the Bank as "internal FX," or FX transactions that were generated internally within BNYM.  *See, e.g.,* Exh. 18.  In the email, from 2008 and referring to "internal FX," a Bank employee writes, "Though absolutely true, do we want to state in black & white that Global Markets manages Internal FX positions to maximize[] profits?[4]  I know that it is true, but one good subpoena from a standing instruction customer

---

[4] Indeed, John Cipriani, who ran the Bank's FX transaction desk during most of the relevant time period in this case, testified recently (as the Bank's corporate designee) that ███████████████████████████████████████████

*Footnote continued on next page*

could turn our lives around.  One legal challenge regards [sic] how we manage Internal FX could

shut us down if we wish to put our actions into words."  *Id.*  Another Bank employee, Robert

Near, responded to this comment, writing, "I changed the sensitive part," so that rather than

referring to "maximizing profits," the document referred to "optimal execution," as if such trades

were managed for the customer's pecuniary or other benefit (rather than the precise opposite).

*Id.*

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

_____

*Footnote continued from previous page*

███████████████████████████████████

███████████████████████████████████
██   ██████████████████████████████  "Internal FX"
included both ADRs and standing instructions trades that were managed the same way, *i.e.*, to maximize profits,
with customer rates assigned using the "range of the day." *See, e.g.,* Exh. 18.

██████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

      It was not until October 1, 2015, just one week after Judge Kaplan granted final approval of the settlement of the standing instructions FX litigation, that BNYM published a "Depositary Receipts Foreign Exchange Pricing Disclosure" (Exh. 5) on its ADR-devoted webpage.  In that document, the Bank publicly stated for the first time that, notwithstanding whatever language was contained in its depositary agreements, the Bank made "***no representations, warranties or guarantees*** as to whether the price or the pricing methodology [it] used to price a [ADR FX conversion] yields a ***fair market price***."  *Id.*  BNYM stated that it consistently priced ADR FX conversions to take advantage of the range of market rates available during a particular 24-hour (or in some cases longer) trading session (regardless of when, during that session, the trade was actually priced), with the spreads on such trades accruing to the Bank as "revenue." ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

## Legal Standard

To obtain summary judgment, BNYM must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As this Court has explained, "a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party."  *Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303, 304-05 (S.D.N.Y. 2014) (Oetken, J.).  "Any ambiguities and all inferences must be drawn in favor of the non-movant, and the court must view the evidence in the light most favorable to the non-movant."  *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 552 (E.D.N.Y. 2010).  The Bank bears the burden of proving the absence of a material issue of fact.  *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## Argument

### I.    BNYM's Motion, Which Seeks "Judgment" Solely Against Claims of Absent Members of an Uncertified Class, is a Nullity.

Acknowledging that all of the named plaintiffs' claims are timely regardless of fraudulent concealment (Br. at 22-25), BNYM nonetheless requests a judgment "dismissing all claims . . . that accrued prior to the applicable limitations period," *i.e.*, those of certain absent putative class members.  *Id.* at 1.  But the relief the Bank seeks is illusory, because absent members of an *uncertified* class are indisputably not parties to the case, and so judgment cannot be entered against them.  *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (noting "the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation *before the class is certified*") (emphasis in original).  No wonder, then, that the Bank cites no decision granting judgment as to absent class members' claims before class certification.  The Court need go no further to dispense with this meritless—indeed, frivolous—motion.

BNYM cites *Schweizer v. Trans Union Corp.*, 136 F.3d 233 (2d Cir. 1998), for the proposition that summary judgment can precede a ruling on class certification.  That is true with respect to summary judgment *on the named plaintiff's claim*—as was the case in *Schweizer*—not claims of absent class members.  *See id.* at 239 ("'There is nothing in Rule 23 which precludes the court from examining the merits of *plaintiff's claims* on a proper Rule 12 motion to dismiss or Rule 56 motion for summary judgment simply because such a motion' precedes resolution of the issue of class certification.") (quoting *Lorber v. Beebe*, 407 F. Supp. 279, 291 n.11 (S.D.N.Y. 1976)).  Indeed, the court in *Lorber*, which *Schweizer* quotes, made clear that defendants' summary judgment motion was "addressed to the substance of the plaintiff's own claim," not the claims of absent class members.  407 F. Supp. at 291 n.11.

Dismissing absent class members' claims would implicate serious due process concerns, as "one is not bound by a judgment… to which he is not designated as a party or in which he is not been made a party by service of process."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969).  That is why, when a court grants summary judgment against a named plaintiff's claim before a class has been certified, "that decision will not bind putative class members."  *Mendez v. Radec Corp.*, 260 F.R.D. 38, 46 (W.D.N.Y. 2009) (citing cases).  On such motions, "courts view the defendant as deliberately waiving the possibility of a victory against the whole class (which would occur if certification were to precede a defendant's victory at summary judgment)."  *Newberg on Class Actions* § 7.10 (2013).[6]  Indeed, the very point of Rule 23's inquiry is to determine whether the proposed class representatives will properly serve absent class members' interests.  BNYM would have the Court dismiss many of these class members' claims without having yet found that Plaintiffs are adequate to represent them—*and without the*

---

[6] *See also, e.g.*, *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995) ("By obtaining summary judgment before notice had been sent to the class, the defendants waived their right to have such notice given and to obtain a judgment that was binding upon the class.").

*absent class members even having received notice that this case was filed, and that their claims were dismissed.* BNYM's gambit runs headlong into bedrock constitutional principles. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

## II.  **Genuine Issues of Material Fact Exist Concerning the Bank's Deliberate, Explicit, and Continuing Concealment of Its Conduct.**

Even if this issue were properly before the Court at this stage, the record is replete with factual disputes—including remarkable outright admissions by BNYM—that make summary judgment inappropriate as to each of the elements of fraudulent concealment. To toll the statute of limitations under the doctrine of fraudulent concealment, Plaintiffs must show "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within [the applicable limitations period] of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."[7] *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *see also* ECF No. 36 (Op. and Order on Mot. to Dismiss), at 16-17 (listing same elements as *Hendrickson*, and citing to *Hinds Cnty., Miss. v. Wachovia Bank, N.A.*, 700 F. Supp. 2d 378, 399-400 (S.D.N.Y. 2010), which cites *Hendrickson*).[8]

---

[7] California's standard is substantially similar. *See Migliori v. Boeing N. Am., Inc.*, 114 F. Supp. 2d 976, 983 (C.D. Cal. 2000) ("Under [California's] fraudulent concealment doctrine, a defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which *the claim* is undiscovered by plaintiffs or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.") (emphasis in original).

[8] Perhaps in an effort to state a more stringent standard than this Court and the Second Circuit have adopted for fraudulent concealment (such as a reliance element), BNYM's motion conflates fraudulent concealment with other tolling doctrines, such as equitable estoppel. *See* Br. at 14-15. The latter generally involves cases in which the plaintiff knew of the cause of action, but was delayed in filing by a defendant's misconduct. *See, e.g., Marshall v. Hyundai Motor. Am.*, 51 F. Supp. 3d 451, 462-63 (S.D.N.Y. 2014). BNYM's cited authorities, however, also set out

*Footnote continued on next page*

A.    **Plaintiffs' Purported Access to BNYM's Pricing Practices Raises Genuine Issues of Material Fact.**

BNYM's assertion that Plaintiffs "had the information necessary" to investigate BNYM's unlawful conduct and then bring suit (Br. at 15) does not withstand scrutiny.  On the one hand, BNYM's criticisms of the Plaintiffs' make no sense, as BNYM's position is that Plaintiffs assert no time-barred claims, *see* Br. at 22-25, so their diligence cannot be faulted.  Even setting this aside, however, the question of what Plaintiffs could have reasonably discovered about what BNYM was up to, what information was necessary to understand any potential claims, how they could have discovered it, and using what methods and sources, raises a host of fact issues not appropriate for disposition on summary judgment.  BNYM acknowledged and understood that ADR investors would not understand the mechanics of FX trading, and designed a system designed to deter the sustained, expensive, and sophisticated inquiry that BNYM contends that Plaintiffs were required to undertake.  Even in its motion, the nature of the investigation BNYM thinks was reasonable is unclear, and raises additional fact issues.  BNYM's position not only requires the drawing of inferences in its favor (to say the least), it defies common sense.

As an initial matter, the Bank's characterization of what information was "available" to Plaintiffs, at best, raises a fact issue, and at worst is grossly misleading.  As set out above, Plaintiffs' brokerage statements included little information about the ADR FX conversions at issue, simply listing a dollar amount and a settlement date, or simply "date."  *See* ECF No. 76-9,

---

*Footnote continued from previous page*

the straightforward standard for fraudulent concealment that this Court adopted.  *See Jackson* v. *Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523, 533 (E.D.N.Y. 2012) (requiring showing that defendant "wrongfully concealed its actions, such that Plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner"), and *Feritta v. Knoedler Gallery, LLC*, No. 14-cv-2259, 2015 WL 374968, at *8 (S.D.N.Y. Jan. 29, 2015).  *Zumpano v. Quinn*, 849 N.E.2d 926 (N.Y. 2006), cited by the Bank (Br. at 15) and involving equitable tolling, is inapposite.  In that case, which involved sexual abuses by priests, the plaintiffs understood that they had been victimized by the defendant years earlier, and tolling turned on the defendant's actions in preventing the plaintiff from filing a lawsuit.  This case involves the Bank's actions in preventing Plaintiffs from even discovering its pricing scheme.  In any event, Plaintiffs also meet the standard for equitable estoppel because they can show acts of concealment by the Bank.  *See supra* § II(D).

12, and 15. BNYM contends that, even for the modest individual conversions at issue in this case, each Plaintiff should have consulted notices that BNYM filed with the Securities & Exchange Commission, listing a "Gross Dividend Rate," and a distribution (not settlement) date, and/or issuers' filings showing "local payable dates."  Br. at 9-10.  Plaintiffs were then to determine the rate of the ADR FX conversion, and then compare that rate by *purchasing* data from a vendor such as Reuters to compare the rate applied to the rates "surrounding the local payable dates."  *Id.* at 10.

The Bank's decision to attach a declaration from an expert economist, billing at $800 per hour, is revealing, and not in a way that helps the Bank.  That expert describes a complicated process of purchasing and analyzing a large volume of data, to show that Plaintiffs should have caught onto the Bank's scheme.[9]  That complicated process raises a host of fact issues concerning the information actually available to Plaintiffs.  BNYM blithely contends, "All Plaintiffs had to do was compare the FX rates they received with prevailing interbank rates on and around the local payable date."  Br. at 17.  That statement is simply not correct.  Investors would have needed to examine more than their own isolated transactions to detect a "pattern" of unfavorable pricing; this is why BNYM hired an expert to demonstrate BNYM's poor pricing (and confirm Plaintiffs' allegations in the process).  A single dividend conversion, or even several such conversions, at the worst end of the intraday range, would not have been sufficient for an investor to understand BNYM's scheme.

Further, BNYM fudges the date ranges that it contends Plaintiffs should have investigated.  BNYM does not explain what "on and around the local payable date" would mean for an investor trying to compare the rates received with comparable rates and understand

---

[9] There is tension, to say the least, between the Bank's touting the purported convenience of its ADR services for small amounts, *see* ECF No. 81 (BNYM Local Rule 56.1 Statement) ¶ 11, then arguing that the Plaintiffs should have hired an $800 per hour expert to figure out how badly the Bank was treating them.

BNYM's practices.[10]  It is not clear what dates BNYM thinks investors should have been using when it asserts that its scheme "would have been apparent to anyone who reviewed the publicly available data."  Br. at 12.  It would not even be clear to an investor when BNYM actually performed the FX conversion.  As BNYM executive Richard Estes testified, ███████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████[11]  Whether an investor could have even known what intraday trading ranges to consult to compare to the rates received on a given cash distribution is a fact issue.

In any event, while BNYM criticizes Plaintiffs for not conducting a chase for information, its argument is a red herring.  Even if Plaintiffs had (expensively) pieced together the puzzle of BNYM's exploitative rates, that completed puzzle would not have revealed the core breach in this case – BNYM's practice of looking back over a 24-hour or longer period and assigning, risk-free, the worst or close to the worst rate of the day.  That was the key information BNYM held and kept from investors until 2015 and may have revealed the basis for a claim.[12] Even a long-time manager in BNYM's dividends group, Edris Royer, ██████████████████████ ████████████████████████████████████████████████████████████████████

---

[10] BNYM elsewhere states that Plaintiffs should have examined interbank rates "for the 24- to 48-hour period surrounding the local payable date."  Br. at 16.  BNYM's deliberate vagueness is again telling, and again demonstrates why even the question of what the operative date to investigate raises fact issues, as it is not even clear whether BNYM's position is that Plaintiffs should have looked on both sides of the local payable date, let alone how they could have known to do that.

[11] BNYM's own authorities (Br. at 15-16), involving obvious and apparent problems, illustrate the absurdity of its claim that Plaintiffs were on notice of BNYM's wrongdoing.  In *Marshall*, 51 F. Supp. 3d at 463-64, the plaintiff took no steps to investigate a repeatedly occurring braking problem before filing outside of the limitations period. *Jackson*, 845 F. Supp. 2d 523, also involved warranty claims for obvious problems with a motor home.

[12] The Bank wraps its arms around the October 2015 disclosure, contending that it contained the same information that was already publicly available.  *See* Br. at 17.  But the fact of that disclosure – the first of its kind for the Bank – indicates (and raises a fact issue) that its pricing practices were not obvious, as the Bank repeatedly recognized.  *See, e.g.,* Exh. 18 ("Though absolutely true, do we want to state in black & white that Global Markets manages Internal FX positions to maximize[] profits?").

-17-

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

Finally, the Bank's heavy reliance on *Merryman v. J.P. Morgan Chase Bank, N.A.*, No. 15-cv-9188 (VEC), 2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016), a decision on a motion to dismiss involving another depositary bank, is misplaced. As this Court is aware, in ruling on motions to dismiss, this Court and Judge McMahon, in a case against yet another depositary bank (Citigroup), came to different conclusions than did Judge Caproni in the J.P. Morgan case. In refusing Citibank's motion for interlocutory review of her order, Judge McMahon specifically noted that the questions involved "[f]act-based determinations." *Merryman v. Citigroup, Inc.*, No. 15-cv-9185 (CM), 2017 WL 129126, at *3 (S.D.N.Y. Jan. 6, 2017). BNYM made the same arguments concerning the statute of limitations in moving to dismiss here,[13] and by asking this Court to adopt Judge Caproni's reasoning on a separate pleading, it is simply belatedly moving for reconsideration on that issue.

### B.   Plaintiffs Exercised Reasonable Diligence.

BNYM cannot demonstrate an absence of disputed facts on the question of whether Plaintiffs were reasonably diligent in detecting the Bank's breaches. First, the question of what constituted reasonable diligence in these circumstances is a fact-specific determination. Second, the Bank's affirmative concealment of its wrongdoing rendered Plaintiffs incapable of uncovering any basis for believing that BNYM violated their depositary agreements. The discovery conducted to date has revealed as much— the Bank designed its pricing of ADR FX conversions specifically to avoid detection from investors like Plaintiffs.

---

[13] *See* ECF No. 22, at 29 (arguing that Plaintiffs "had access to all the information they needed to discern the rates at which BNYM converted foreign currency to USD.").

"[T]he question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide." *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345 (S.D.N.Y. 1999) (collecting authorities). "The Second Circuit has emphasized that reasonable diligence does not require 'extreme' or 'exceptional' diligence." *Jordan v. City of New York*, No. 08-cv-1041 (DLI) (LB), 2009 WL 701108, at *3 (E.D.N.Y. Mar. 15, 2009) (applying tolling and quoting *Baldayaque v. United States,* 338 F.3d 145, 153 (2d Cir. 2003)).

Contrary to the Bank's characterizations, Plaintiffs (whose claims, again, the Bank concedes are timely) exercised diligence with respect to their investments in ADRs. Plaintiffs hired investment managers to make decisions with respect to their investments and generally monitored their accounts. Exh. 34 (Carofano Tr.) at 94:8-95:15; Exh. 35 (Feige Tr.), at 156:13-21; Exh. 36 (Local 138 Tr.), at 103:4-8. Such diligence was "reasonable"—especially in light of the relatively small sums at issue for each individual Plaintiff for each individual dividend. *See* Exh. 34 at 160:7-12; 162:12-18; 224:22-225:5; Exh. 35 at 173:13-18; ECF No. 76-9, at 14-16 (Local 138 dividend statements).[14] Further, as Mr. Feige explained, it was reasonable to assume that the Bank would be "guided by some semblance of fair play…" *Id.* at 150:19-21.

No reasonable investor would investigate the precise manner and timing of conversions of modest size, or go through the process that the Bank describes in its brief (*see* 9-10), from the scouring of notices of distribution to the SEC, to the *purchase* of data from Reuters or another service, to the calculation of an FX rate applied, to the comparison of the intraday range. BNYM's proposed detective work does not remotely resemble the "reasonable" diligence that

---

[14] The Bank selectively quotes testimony from Plaintiff Feige, that, "At the time, did I look at it and wonder, 'Gee, I wonder precisely when they did it and what the spread was?' No, of course not." Exh. 35 (Feige Tr.), at 173. Mr. Feige was referring to a dividend conversion of $26.66, which the Bank's counsel correctly acknowledged, in the very next question, "isn't very much money, fair to say?" Mr. Feige pointed out that the difference between the rate at which the Bank priced that conversion and a more favorable rate, in a "specific instance… would have been negligible; in the aggregate, obviously not." *Id.* at 174.

the Second Circuit requires, and that takes into account what could be expected "*under the circumstances*." *See Baldayaque*, 338 F.3d at 153 (emphasis in original). These facts alone are sufficient to deny summary judgment. *See New York ex rel. Spitzer v. Feldman*, No. 01-6691, 2003 WL 21576518, at *5 (S.D.N.Y. July 10, 2003) (denying motion for summary judgment and holding that existence of "reasonable diligence" was "for the jury to decide").

Further, the record in this case belies the Bank's claim that Plaintiffs should have discovered its practice, making summary judgment inappropriate. BNYM's own "Bible" announced the Bank's pricing practices were specifically designed to avoid detection from "***any outside party***." *See* Exh. 6. The Bank was acutely aware that its practice needed to be hidden from the public. *See* Exh. 18 ("Though absolutely true, do we want to state in black & white that Global Markets manages Internal FX positions to maximize[] profits? …. One legal challenge regards [sic] how we manage Internal FX could shut us down if we wish to put our actions into words.").

The Bank cites several inquiries related to FX rates as purported evidence that Plaintiffs were not diligent. Br. at 19. The Bank, however, has ignored evidence that ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████ ████████████████████████████████████████ ████████████████████████████████████

### C. "Reasonable Reliance" on BNYM's Concealment Is Not Required.

BNYM's assertion that Plaintiffs must establish "reasonable reliance" on BNYM's deception or misrepresentations (Br. at 20) is misplaced. In denying BNYM's motion to dismiss, this Court, in line with the Second Circuit, did not identify reliance, or "reasonable reliance" for

that matter, to be an element required to establish fraudulent concealment.  *See* ECF No. 36 at 16-17; *see also Hendrickson*, 840 F.2d 1065 at 1083 (listing elements of fraudulent concealment with no mention of reliance; *see also supra*).[15]  This Court held that "[t]o toll the statute of limitations under the fraudulent concealment doctrine, Plaintiffs must allege (1) BNYM intentionally concealed the causes of action; and (2) Plaintiffs were unable to discover the causes of action with reasonable diligence."  ECF No. 36 at 16-17.[16]  This standard makes good sense for situations like this one, where Plaintiffs were not aware (and could not have discovered with reasonable diligence) that a wrong was occurring, and not distinct situations where a plaintiff understood a wrong had occurred but withheld filing based on a defendant's actions. Accordingly, whether Plaintiffs "reasonably relied" on BNYM's concealment has no bearing on the availability of tolling.  However, even if reliance were required, Plaintiffs testified that they had no reason to believe that BNYM was improperly pricing ADR FX conversions.  *See* Exh. 34 (Carofano Tr.) at 169:11-171:21, 177:21-179:4, 206:3-207:2; Exh. 35 (Feige Tr.), at 150:20-21; 188:8-190:20.

### D.   Genuine Issues of Fact Exist as to BNYM's Acts of Concealment.

BNYM contends that its acts of concealment raise no fact issues, because it amounts to a mere "failure to disclose" its pricing scheme.  To make this rather remarkable assertion, BNYM must misstate what Plaintiffs' burden to show disputed fact issues concerning fraudulent

---

[15] In its order on the motion to dismiss, this Court cited *Hinds Cnty.*, 700 F. Supp. 2d at 400, which cites to *Hendrickson* and also makes no mention of reliance in discussing fraudulent concealment.

[16] The Bank relies on authorities predominantly concerning equitable tolling—rather than fraudulent concealment—for the proposition that plaintiffs must "reasonably rely" on defendants' misrepresentations to toll the statute of limitations.  *See* Br. at 20.  But those decisions are inapposite, the Bank is again conflating tolling doctrines. Plaintiffs do not seek to prove that the Bank misled them in preventing them from filing claims of which they were aware (as required to establish equitable tolling); Plaintiffs instead put forth evidence demonstrating that BNYM worked behind-the-scenes to prevent them from discovering their claims in the first place (as required to establish fraudulent concealment).  *See also supra* n.7.

concealment, and then mischaracterize the record, which plainly involves more than BNYM's omissions.

First, the Bank again ignores this Court's holding on fraudulent concealment's elements: 1) BNYM's intentional concealment, and 2) Plaintiffs' inability to discover the causes of action with reasonable diligence.  ECF No. 36, at 16-17.  BNYM's attempt to create a higher standard is contrary to established case law, which requires concealment, broadly defined, and not exclusively affirmative misrepresentations.  BNYM's own authority (Br. at 21) recognizes this. *See Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, No. 13 Civ. 3921 (CM), 2014 WL 3739322, at *14 (S.D.N.Y. July 29, 2014) (referring to requirement to show "affirmative acts of misrepresentation ***or concealment***").  *See also, e.g.*, *Golden v. Scalise*, 87 A.D.2d 959, 959-60 (App. Div. 3d Dep't 1982) ("[It cannot be said that defendants, by their own affirmative actions ***or failure to disclose***, induced plaintiffs to refrain from commencing suit by fraud, misrepresentation or concealment").

Under any standard, however, Plaintiffs have shown that BNYM engaged in affirmative acts of deception and concealment.  In its "Bible," BNYM announced its intention to deceive investors, devising a strategy to "keep any outside party from detecting a pricing pattern."  Exh. 6. ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████    Even the fact that the Bank finally disclosed its pricing

practices in 2015 (only after settling related litigation) (Exh. 5), raises a fact issue about whether

BNYM had been concealing its practices.  Only by ignoring all of this evidence could the Bank

characterize its behavior as a mere "failure to disclose."[17]

## III.    BNYM Improperly Seeks Reconsideration of This Court's Preliminary Ruling on Class Standing and to Preempt This Court's Class Certification Inquiry.

BNYM ends its brief by arguing that Plaintiffs cannot invoke equitable tolling if they did

not hold ADRs during the pre-limitations period.  *See* Br. at 22-25.[18]  BNYM has simply dressed

up a previously rejected argument in slightly different clothes; what it actually seeks is

reconsideration of the Court's ruling on its unsuccessful motion to dismiss Plaintiffs' contract

claims.

In moving to dismiss, the Bank argued, among other things, Plaintiffs lacked class

standing to represent holders of ADRs in which Plaintiffs themselves did not invest.  ECF No.

22, at 25-27.  The Court held that dismissal on that ground would be inappropriate, as Plaintiffs'

allegations satisfied the prerequisites for class standing articulated in *NECA-IBEW Health &*

*Welfare Fund v. Goldman Sachs & Co.* ("*NECA*"): (1) they "suffered some actual . . . injury as

the result of the putatively illegal conduct of the defendant," and (2) "such conduct implicates the

---

[17] The Bank even tries to excuse this years-long failure to disclose by asserting that the contracts at issue do not direct a manner of conversion for ADR cash dividends.  *See* Br. at 22.  But that only raises another fact issue, and simply skips over the language of the contracts that Plaintiffs allege is at issue, which directs BNYM to execute ADR FX conversions promptly and in good faith.  *See* Compl. ¶ 6.

[18] The factual premise of BNYM's argument on class standing – that BNYM converted no relevant ADR FX conversions for a plaintiff outside of the limitations – may be wrong.  *See* Pls.' Resp. to BNYM L.R. 56.1 Statement ¶ 46 (concerning 2011 conversion). This would moot its class standing argument.  But if BNYM has carried its burden concerning pre-limitations period conversions, then the motion is procedurally improper for the reasons stated in Section I above.

same set of concerns as the conduct alleged to have caused injury to other members of the

putative class by the same defendants."  693 F.3d 145, 162 (2d Cir. 2012) (internal quotations

and citations omitted).  The Court determined Plaintiffs "alleged the existence of a common

contractual obligation and common conduct with respect to each ADR," which was "enough to

survive a motion to dismiss."  ECF No. 36, at 15.  The Court further explained, "As long as the

terms of the ADRs and their corresponding Deposit Agreements are as alleged, the proof

necessary for each class member will be substantially the same, and Plaintiffs can adequately

represent the interest of the entire purported class."  *Id.* at 15-16.  Full consideration of those

issues, the Court concluded, "is thus deferred until class certification, when the objection may be

renewed as to the adequacy of Plaintiffs' representing so broad a group."  *Id.* at 16.[19]

        Perhaps seeing the writing on the wall for class certification—the evidence clearly shows

the terms of the ADRs and Deposit Agreements "are as alleged," and that BNYM's pricing

practices were systematic and uniform throughout the Class Period (Br. at 9-12)—the Bank

attempts to prematurely litigate class standing.  BNYM should not be permitted to circumvent

the Court's clear directive and preempt its class certification inquiry.

        In any event, that the timeliness of Plaintiffs' claims does not turn on BNYM's fraudulent

concealment does not deprive them of standing to represent absent class members whose claims

accrued before the governing limitations periods.  In suggesting otherwise, the Bank

misconstrues what is required for class standing.[20]  The issues involved in demonstrating the

Bank's fraudulent concealment do not raise "fundamentally different concerns" as compared

---

[19] *See also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 333 (S.D.N.Y. 2012) (Oetken, J.) ("A named plaintiff must show that it is a part of th[e] class by showing that it has the same interest in redressing the same injurious conduct by the same defendant.  But once it has established that, questions of adequacy, typicality and the like should be resolved at the class certification stage.") (alteration in original).
[20] The Bank does not expressly make a class standing argument, likely to avoid the appearance of seeking to revisit the Court's prior ruling and its directive that it would further consider this issue at class certification.

with Plaintiffs' claims. *NECA*, 693 F.3d at 162. This is particularly so because, regardless of statute-of-limitations questions, Plaintiffs will rely on the same evidence bearing on fraudulent concealment to show that BNYM breached the Deposit Agreements—an issue critical to *all* class members' claims. Specifically, Plaintiffs will use the Bible and other documents demonstrating the Bank's "policy" of concealing its pricing practices from "any outside party" to establish that the Bank did not regard those practices as complying with the terms of the Deposit Agreements. Else why the need to conceal them? The claims of Plaintiffs and absent class members thus will not "turn on very different proof," and they will have "the same necessary stake in litigating" whether the Bank purposefully concealed its conduct. *Id.* at 163, 164.

For similar reasons, "[a]lthough affirmative defenses such as the statute of limitations defense may be considered as one factor in the class certification calculus, the existence of even a meritorious statute of limitations defense does not necessarily defeat class certification." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303 (S.D.N.Y. 2003). As the First Circuit has explained, "[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).[21] The existence of potential differences in statute of limitations issues among Plaintiffs' and class members' claims simply does not preclude Plaintiffs from pursuing claims on behalf of those class members.

## Conclusion

For the foregoing reasons, the Bank's motion should be denied.

---

[21] *See also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 116-17 (S.D.N.Y. 2011) (rejecting defendants' argument that issues regarding "what was known about Defendants' practices at different points in time at which various plaintiffs purchased" defeated predominance).

Dated:  March 7, 2018

KESSLER TOPAZ MELTZER & CHECK
LLP

By: /s/ Sharan Nirmul
      Sharan Nirmul
Joseph H. Meltzer
Sharan Nirmul
Ethan Barlieb
Jonathan F. Neumann
KESSLER TOPAZ MELTZER & CHECK
LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
Email: jmeltzer@ktmc.com
snirmul@ktmc.com
ebarlieb@ktmc.com
jneumann@ktmc.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

Frank R. Schirripa
HACH ROSE SCHIRRIPA & CHEVERIE,
LLP
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile (212) 779-0028
Email:  fschirripa@hrsclaw.com

*Counsel for Plaintiff International Union of
Operating Engineers Local 138 Pension
Trust Fund*

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: /s/ Daniel P. Chiplock
      Daniel P. Chiplock
Daniel P. Chiplock
Daniel E. Seltz
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
E-mail: dchiplock@lchb.com
dseltz@lchb.com
mmiarmi@lchb.com

Elizabeth J. Cabraser
Robert L. Lieff (*of counsel*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
Email:  ecabraser@lchb.com
rlieff@lchb.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*