# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: THE BANK OF NEW YORK MELLON ADR FX LITIGATION | 16-CV-00212-JPO-JLC |
| | ECF Case |
| This Document Relates to: CONTRACT CLASS ACTION | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1558478.1

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 2

FACTS RELEVANT TO CLASS CERTIFICATION ........................................................... 4

    A.    Class Members' Claims Arise from Substantially Similar Provisions
           Throughout the Deposit Agreements. .................................................................... 4

    B.    BNYM's Standardized FX Pricing Practices for ADR Conversions
           Violated All of the Depository Agreements in the Same Way. ............................ 6

    C.    BNYM Employed a Uniform Scheme to Conceal Its Conduct. ......................... 11

    D.    The Damages to Each Class Member as a Result of BNYM's Improper
           Pricing Practices Are Determinable from the Bank's Own Documents. ............. 13

ARGUMENT ....................................................................................................................... 15

I.     PLAINTIFFS HAVE CLASS STANDING TO ASSERT CLAIMS ARISING
      FROM ADRs THEY DID NOT OWN.................................................................... 15

    A.    This Case Is Even *More* Conducive to Class Standing Than *NECA* Was. .......... 15

    B.    *Retirement Board* Is Nowhere Close to This Case. ............................................ 19

    C.    What Judge McMahon Deemed Lacking in *Merryman* Is Present Here. ............. 20

II.    EACH OF RULE 23's PREREQUISITES IS ESTABLISHED BY A
      PREPONDERANCE OF THE EVIDENCE .......................................................... 22

    A.    Rule 23(a)'s Elements Are Satisfied.................................................................... 23

         1.    The Classes are sufficiently numerous. ................................................... 23

         2.    Questions of law and fact are common to Class members. ..................... 23

         3.    The proposed Class representatives' claims are typical of those of
             the Classes. ............................................................................................... 24

         4.    The proposed Class representatives will fairly and adequately
             protect the Classes' interests. ................................................................... 24

    B.    Rule 23(b)(3)'s Predominance Requirement Is Satisfied as to the Damages
           Class. .................................................................................................................... 25

         1.    Common liability questions predominate over any individual ones........ 25

         2.    Common questions regarding damages predominate. ............................. 30

    C.    A Class Action Is Superior to Potentially Thousands of Individual
           Actions. ................................................................................................................ 34

    D.    The Classes Are Ascertainable. .......................................................................... 34

    E.    Rule 23(b)(2) Is Established as to the Injunction Class..................................... 35

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ................................................................ 23, 28

*Boyce v. Soundview Tech. Grp., Inc.*,
  464 F.3d 376 (2d Cir. 2006) ............................................ 34

*Commerzbank AG v. Deutsche Bank Nat'l Trust Co.*,
  234 F. Supp. 3d 462 (S.D.N.Y. 2017) .............................. 28

*Davis v. City of N.Y.*,
  296 F.R.D. 158 (S.D.N.Y. 2013) ...................................... 35

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ............................................ 24

*Dover v. British Airways, PLC (UK)*,
  321 F.R.D. 49 (E.D.N.Y. 2017) ....................................... 27

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) ...................................... 23

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ........................... 23, 25, 30, 33

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ........................................ 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) .............................................. 24

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  286 F.R.D. 226 (S.D.N.Y. 2012) ...................................... 27

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ............................................ 34

*In re U.S. Foodservice Inc. Pricing Litig.*,
  2011 WL 6013551 (D. Conn. Nov. 29, 2011) ................... 30

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ....................................... *passim*

*Merryman v. Citigroup, Inc.*,
  2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) .............. *passim*

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
  2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016) ................... 22

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ....................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Normand v. Bank of N.Y. Mellon*,
    2016 WL 5477783 (S.D.N.Y. Sept. 29, 2016) ................................................................. 15, 28

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*,
    775 F.3d 154 (2d Cir. 2014) ........................................................................ 15, 16, 19, 20

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ..................................................................................... 33

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................................................. 23

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) .................................................................................... 28

**RULES**

Fed. R. Civ. P. 23(a)(1) ............................................................................................. 23

Fed. R. Civ. P. 23(a)(2) ............................................................................................. 23

Fed. R. Civ. P. 23(a)(3) ............................................................................................. 24

Fed. R. Civ. P. 23(a)(4) ............................................................................................. 24

Fed. R. Civ. P. 23(b)(2) ....................................................................................... 22, 35

Fed. R. Civ. P. 23(b)(3) ............................................................................................. 34

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 adv. comm. notes .............................................................................. 34

Plaintiffs David Feige, International Union of Operating Engineers Local 138 Pension Trust Fund, and Diana Carofano (collectively, "Plaintiffs")[1] move for certification under Federal Rule of Civil Procedure 23 of the following classes (the "Classes"):

1) A "Damages Class" consisting of all entities and individuals who are or were holders (registered or beneficially) of the American Depositary Receipts ("ADRs") listed in Appendix A to Plaintiffs' motion (including any predecessor or successor securities) and received cash distributions for which The Bank of New York or The Bank of New York Mellon (collectively, "BNYM" or the "Bank") charged a spread, from January 1, 1997 to the present (the "Class Period"); and

2) An "Injunction Class" seeking injunctive relief for all entities and individuals who currently hold (registered or beneficially) a BNYM-sponsored ADR.[2]

Plaintiffs further request that they, as well as Chester County Employees Retirement Fund ("Chester County"), be appointed representatives of the Classes, and that Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") be appointed Co-Class Counsel.[3]  As detailed below, Plaintiffs satisfy Rule 23's prerequisites with respect to both Classes, and have standing to represent all Class members.[4]  Their motion should be granted.[5]

---

[1] On April 19, 2018, Plaintiffs filed a Suggestion of Death of Plaintiff Don A. Carofano (ECF No. 111), in accordance with Federal Rule of Civil Procedure 25(a).  Plaintiffs intend to move shortly under Rule 25(a) to substitute Mr. Carofano's widow Diana Carofano to serve as a Plaintiff in his place.

[2] The Classes do not include (i) BNYM and its officers, directors, legal representatives, heirs, successors, corporate parents, subsidiaries, and assigns; or (ii) any judge to whom this case is assigned, along with his or her staff and immediate family.

[3] Plaintiffs' motion to add Chester County as a named plaintiff, filed on April 27, 2018 (ECF Nos. 113, 114), is pending.

[4] A chart showing the relevant provisions of the deposit agreements associated with nearly all of the ADRs encompassed by the Damages Class (collectively, the "Deposit Agreements") is attached as Exhibit 1 to the Chiplock Declaration.  Copies of the relevant provisions of the Deposit Agreements are attached as Exhibits 2 - 95 to the Chiplock Declaration.  BNYM has not produced deposit agreements for the following ADRs encompassed by the Damages Class, and has informed Plaintiffs that the Bank has not been able to find them in its records: (i) British Steel; (ii) Corus Group; (iii) Gallaher Group Ltd.; (iv) Mannesmann A.G.; (v) NET Servicos de Comunicacao SA; and (vi) Powergen Ltd.  Given the substantial similarity of the relevant provisions among the Deposit Agreements, Plaintiffs expect the agreements associated with these ADRs contained similar provisions.

[5] Plaintiffs are also submitting, contemporaneously with this brief, the supporting Declarations of Daniel P. Chiplock and Sharan Nirmul, as well as accompanying exhibits.  Unless otherwise indicated, (i) "Ex. __" refers to

## PRELIMINARY STATEMENT

The facts elicited through discovery demonstrate that BNYM has breached its agreements with Plaintiffs and other ADR investors repeatedly, and in the same way, for more than 20 years. The three pillars of Plaintiffs' claims are common to all Class members:

*First*, since 1997 BNYM has applied a uniform pricing practice in converting foreign exchange ("FX") for ADR-related cash distributions—specifically, the Bank sets a rate at which it covers the position it has assumed in taking on the ADR conversion (the "cover rate"), and sets a different, less-favorable rate at which the distribution to ADR holders will be calculated (the "deal rate"), thereby obtaining risk-free margin, or spread, revenue.  That spread revenue is *in addition to* the revenue BNYM obtains through fees authorized under the Deposit Agreements and the revenue generated by BNYM's trading desk when managing the Bank's risk on FX conversions.  Accordingly, BNYM's assertion throughout this case that "Plaintiffs' complaint is that BNYM made money on the FX conversions it performed as an ADR depositary" (ECF No. 22, at 2) is a red herring.  BNYM made plenty of contractually authorized revenue as a depositary, which is not at issue here; the gravamen of Plaintiffs' claims, which is precisely the same for all Class members, is that beyond that revenue, the Bank cheated ADR holders out of money to which *they* were entitled under the Deposit Agreements.

*Second*, BNYM's scheme violated those Agreements, which contain substantially similar provisions governing the Bank's obligations regarding ADR FX conversions and are all governed by New York law, in exactly the same way.  Further, the Bank's ADR FX pricing practices continue to this day, violating its deposit agreements with current ADR holders.

*Third*, until issuing its "Depositary Receipts Foreign Exchange Pricing Disclosure" in

---

exhibits to the Chiplock Declaration; (ii) all emphasis in this brief has been added; and (iii) all internal citations and quotation marks have been omitted.

October 2015 (the "ADR FX Pricing Disclosure" (Ex. 96))—in the wake of its $335 million

settlement of claims arising from BNYM's similar pricing practices with respect to custodial FX

transactions—the Bank fraudulently concealed its improper practices from Class members.  And

while New York's borrowing statute calls for the application of the laws of Class members'

home states regarding fraudulent concealment, those laws are sufficiently similar such that any

variations among them do not overwhelm the predominance of common issues, as the Second

Circuit expressly held in *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 131 (2d Cir.

2013).

Indeed, BNYM essentially concedes that the core liability issue—whether it breached the

relevant contracts—is uniform for all Class members.  In its pending motion for partial summary

judgment, BNYM admits it "was applying FX conversion rates to [Plaintiffs'] ADR cash

distributions that tended to be at or near the 'worst' edges of the relevant interbank range," ECF

No. 77, at 10-11, ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████. All Class

members' claims will thus turn on whether the Bank's admitted pricing practices violated the

substantially uniform terms of the deposit agreements.  Further, as demonstrated by Plaintiffs'

expert, damages are readily determinable on a classwide basis using BNYM's own documents.

The class vehicle is, moreover, plainly superior to potentially thousands of individual trials each

testing the same questions.  In short, while there can be close cases on class certification, this

isn't one of them.

Additionally, given the high degree of cohesiveness among Class members' claims,

Plaintiffs have standing to assert claims on behalf of *all* Class members, including those who

held ADRs that Plaintiffs did not.  What is present here is the very thing Chief Judge McMahon recently determined was missing in *Merryman v. Citigroup, Inc.*, a decision on which the Bank has indicated it will rely heavily.  While granting certification of a damages class in all other respects, Judge McMahon limited the class only to those ADRs the named plaintiffs owned, holding that while the question was "close[]," plaintiffs did not present evidence sufficient to show "Citibank had a spread retention 'policy' applicable to all ADRs it administered," and Citibank made no "concession" on that point.  *Merryman v. Citigroup, Inc.*, 2018 WL 1621495, at *10, *11 (S.D.N.Y. Mar. 22, 2018).  The evidence in this case, on the other hand, overwhelmingly demonstrates BNYM had just such a policy, which was materially consistent throughout the Class Period.

Accordingly, as the Second Circuit held in *U.S. Foodservice*, "[d]espite the size and geographic scope of this class, close inspection of this case reveals that any class heterogeneity is minimal and is dwarfed by common considerations susceptible to generalized proof."  729 F.3d at 131.  Class certification is warranted.

<u>**FACTS RELEVANT TO CLASS CERTIFICATION**</u>

**A.     Class Members' Claims Arise from Substantially Similar Provisions Throughout the Deposit Agreements.**

Class members are current and former holders of ADRs for which BNYM serves (or served) as the depositary bank.  Am. Compl. (ECF No. 39) ¶¶ 4-5.  As the depositary, BNYM holds shares issued by foreign companies on behalf and for the benefit of U.S. investors in the ADRs.  *Id.* ¶ 5.  All of the ADRs encompassed by the Classes relate to "sponsored" ADR programs, meaning they were governed by deposit agreements to which (a) BNYM, (b) the foreign issuer whose shares are deposited with BNYM, and (c) ADR holders (including beneficial owners), i.e., Class members, were parties.  Those agreements govern how BNYM is

to convert into U.S. dollars any cash distributions received from those foreign companies for the benefit of ADR holders.  As BNYM acknowledges, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████); Ex. 99 (Kenneth Lopian Dep. 176) (acknowledging BNYM "had a template for deposit agreements," including with respect to ADR FX conversions); Ex. 100 (PX 37) (David Nichols, Senior Vice President of BNYM's Global Markets division, sending to Global Markets employee Cheryl Sessler "the standard language used in ADR contracts to describe FX related to dividend conversion").  The relevant provisions of the Deposit Agreements are identified in Exhibit 1 to the Chiplock Declaration.

Plaintiffs' claims are based on four key contractual provisions that were substantially similar among the Deposit Agreements.  The September 1999 Deposit Agreement in connection with ADRs issued by Toyota Motor Corporation, for example, stated (similar to the other Deposit Agreements):

- SECTION 4.01    <u>Cash Distributions.</u>

     Whenever [BNYM] shall receive any cash dividend or other cash distribution on any Deposited Securities, [BNYM] shall, as promptly as practicable, subject to the provisions of Section 4.05 [titled "Conversion of Foreign Currency"], convert such dividend or distribution into Dollars and shall, as promptly as practicable, distribute the amount thus received (net of the fees and expenses of [BNYM] as provided in Section 5.09 [titled "Charges of Depositary"]) to the Owners entitled thereto, in proportion to the number of American Depositary Shares representing such Deposited Securities held by them respectively . . . .

- SECTION 4.05    <u>Conversion of Foreign Currency.</u>

     Whenever [BNYM] . . . shall receive foreign currency, by way of dividends or other distributions . . ., and if at the time of the receipt thereof the

foreign currency so received can in the judgment of [BNYM] be converted *on a reasonable basis* into Dollars and the resulting Dollars transferred to the United States, [BNYM] shall convert or cause to be converted, by sale or in any other manner that it may determine, such foreign currency into Dollars, and such Dollars shall be distributed *as promptly as practicable to the Owners entitled thereto* . . . . Such distribution . . . shall be net of any *expenses of conversion* into Dollars incurred by [BNYM] as provided in Section 5.09.

- SECTION 5.09    <u>Charges of Depositary.</u>

*\*\*\**

The following charges shall be incurred by any party depositing or withdrawing Shares . . .: (4) *such expenses as are incurred by [BNYM] in the conversion of foreign currency* pursuant to Section 4.05, (5) a fee of $5.00 or less per 100 American Depositary Shares (or portion thereof) for the execution and delivery of Receipts . . ., (6) a fee of $.02 or less per American Depositary Share (or portion thereof) for any cash distribution made pursuant to the Deposit Agreement . . . .

- SECTION 5.03    <u>Obligations of the Depositary, the Custodian and the Company.</u>

*\*\*\**

[BNYM] . . . agrees to perform its obligations specifically set forth in this Deposit Agreement *without negligence or bad faith*.

Ex. 86; *see generally* Ex. 1.[6]

**B.    BNYM's Standardized FX Pricing Practices for ADR Conversions Violated All of the Depository Agreements in the Same Way.**

BNYM's uniform pricing practices for ADR FX conversions began in early 1997, when

its Global Markets division began a "cooperative effort with the ADR group . . . at BNY,

whereby [Global Markets] . . . ask[ed] [their] colleagues [in the ADR division] to wrest back

control of ADR dividend conversions from many of the subcustodians, and let [the Bank's] FX

desks do it."  Ex. 101 (PX 68).  The Global Markets and ADR divisions aimed to "truly

---

[6] As demonstrated in Exhibit 1 to the Chiplock Declaration, while the language sometimes differs slightly among the Deposit Agreements (and some of the Agreements do not contain all of the provisions referenced above), BNYM's obligations with respect to ADR FX conversions are substantially similar throughout the Agreements.  Additionally, while there was more than one deposit agreement in effect at different times during the Class Period with respect to some of the ADRs, the agreements remained substantially similar.  Plaintiffs therefore do not include every deposit agreement for those ADRs.

capitalize on the profit potential from the currency conversions arising from BNY's ADR programs." Ex. 102 (PX 65). To that end, "[a]fter meeting with Ken Lopian, head of ADRs, and several of his team," the Global Markets and ADR divisions "came to an understanding of what guidelines BNY FX needs to follow when pricing these trades" and "agreed upon procedures for maximizing the profitability of ADR dividend conversions." Ex. 101 (PX 68).

The "profit potential" the Global Markets and ADR divisions endeavored to exploit was ██████████████████████████████████████████████████████████ ███████████████████████████████        ████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████. Spread revenue thus constituted additional, risk-free profit to the Bank.

BNYM took advantage of rate fluctuations during a 24-hour range stretching from the start of trading in Wellington (New Zealand) time—that is, the prior day in New York time— until the close of trading New York time, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████

[7] ██████████████████████████████████████████████████████████ ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████.[9]  BNYM's spread revenue was therefore not an expense "incurred" in the conversion or a fee authorized under the Deposit Agreements.  Nor did the Bank convert and distribute dollars to ADR holders "as promptly as practicable," or perform the conversions in good faith.

BNYM memorialized its scheme in what was later referred to internally as the "Bible" for pricing ADR FX conversions.  Authored in April 1997 by Richard Estes (who now serves as Managing Director of Foreign Exchange Markets at the Bank), the document, titled "Procedures for ADR Dividend Conversions," records the Global Markets and DR divisions' "understanding of what guidelines BNY FX needs to follow when pricing these trades," and their "agreed upon procedures for maximizing the profitability of ADR dividend conversions."  Ex. 101 (PX 68).  Those "Procedures" were intended as a "rule set," or "standardized approach," for handling ADR FX trades.  Ex. 106 (Estes Dep. 90, 161).  To that end, they were widely circulated within the Bank, including to high-ranking executives such as Head of Global Markets Richard Mahoney, Head of FX Trading John Cipriani, Head of Global FX Sales Jorge Rodriguez, and head of the New York sales desk Robert Ryan.  *See, e.g.*, Ex. 101 (PX 68); Ex. 107 (PX 69).  Indeed, shortly following its initial circulation in April 1997, Richard Mahoney praised it as "well done" and

---

[8] The "execution" desk was also referred to as the "transaction" or "contracted services" desk at BNYM, as distinguished from the "trading" desk (where actual "risk traders" were stationed).  Ex. 104A (Cipriani 30(b)(6) Dep. 45).

[9] Indeed, Eva Wirth, who works on BNYM's transaction desk, testified that ████████████████████████████████
████████████████████████████████████████████     *see also* Ex. 104A (Cipriani 30(b)(6) Dep. 62).

"cop[ied] some others, so the senior management team is aware."  Ex. 108 (PX 70).

The "Bible" explains that while BNYM must price its FX trades based on a rate that falls within the interbank range of the day, "defining the 'day's range' is not cut and dry," adding: "In fact, since the outside world does not know at what time during the 24-hour trading day we do our ADR dividend trades, or out of which center, we decided that the 'day's range' qualifies as the high and low for GBP/USD from start of trading Wellington at GMT 22.00 to end of day New York at GMT 21.59."  Ex. 101 (PX 68); *see also* Ex. 106 (Estes Dep. 86) ("unless you work in the foreign exchange markets, you would not actually understand when a trading day started and when it ended").  The Bible further explains, "As a result, it is in BNY FX's interest to price ADR trades as late in the global trading day as possible, *i.e.*, late afternoon in New York, as waiting allows us to determine what the widest range possible could be."  Ex. 101 (PX 68).[10]

███████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  BNYM Summ. Judg. Br. (ECF No. 77) at 2 (acknowledging "BNYM priced FX rates towards the 'worst' end of the interbank session range more often than not, just as alleged in the Complaint").

While Estes never consulted any deposit agreements to determine whether the procedures

---

[10] The Bible further instructs traders:  "Just because you decide to wait until 4PM to price the ADR trade does not mean you have to keep the position until that time.  If for some reason the range has been rather tight through the London close, you may want to pass the trade on to New York after you have gone home (details on this to be worked out as needed)."  *Id.*

set forth in the Bible complied with BNYM's contractual obligations, *see* Ex. 106 (Estes Dep. 273-74), the Bank's repeated, and explicit, desire to conceal those procedures from "the outside world" suggests they did not in fact comply with the Deposit Agreements.  Indeed, the Bible instructs that "[w]hile we want to maximize the day's range when pricing ADR trades, we cannot consistently price them at or near the day's high/low every time"; instead, "to keep any outside party from detecting a pricing pattern, we should purposely price some trades at the middle of the day's range so that there appears to be no deliberateness in our activity."  Ex. 101 (PX 68).  It further states that "to maximize profitability, it probably behooves us to price the occasional small trade near the day's midpoint, and save the outer range rates for the larger trades."  *Id.*

The Bank's own documents make clear that the procedures and guidelines set forth in the Bible, which were repeated and incorporated by reference into numerous documents in subsequent years, were closely and consistently followed.[11]  Months after the Bible was initially circulated, Estes recounted that "*the policy we have followed* is to price some deals in the middle of the day's range so that there is no pattern of BNY FX always pricing ADR trades at the high of the day."  Ex. 113 (PX 73).  A presentation from 2004, generated after a specific request for the Bible, stated "Global Markets *rigidly adheres* to the ADR dividend conversion guidelines established seven years ago with input from ADR Division management."  Ex. 100 (PX 37), at 7.  And in 2004, Richard Estes boasted that the Bible had been used by the Bank's "well-versed traders on pricing ADR dividends . . . ever so smoothly without incident for over seven years."  Ex. 101 (PX 68). ██████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

---

[11] *See, e.g.*, Ex. 110 (PX 36) ("Procedure for ADR Dividend Conversion" dated January 21, 1999); Ex. 111 (PX 75) (2005 presentation); Ex. 112 (PX 41) (2007 document).

Baudouin De Guchteneere, who ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████ Vincent Passalacqua, who ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ And BNYM's October 2015 ADR FX

Pricing Disclosure—which Rule 30(b)(6) witness ████████████████████

███████████████████████████████████████████████████████

██████████████████████ likewise described how BNYM uses a 24-hour range of the day

and assigned a rate to ADR holders that differs from the rate at which the Bank covers its

position, thus generating additional profit for the Bank.  Ex. 96 (PX 33); Ex. 98 (Cahill 30(b)(6)

Dep. 185-86).

     **C.**     **BNYM Employed a Uniform Scheme to Conceal Its Conduct.**

As the Bible's direction to price some trades in a manner that would prevent ADR

investors from "detecting a pricing pattern" reflects, the Bank was aware that if investors knew

about its pricing practices, they would object.  To that end, ███████████████████

███████████████████████████████████████████████████████

---

[12] ████████████████████████████████████████, as the Bank occasionally priced
trades at or near the middle of the day's range, *see* Alexander "Sasha" Aganin Decl. Ex. B (ECF No. 80-2); Aganin
Reply Decl. Ex. A (ECF No. 97-1), or, similarly, priced deals at the cover rate.  Ex. 104A (Cipriani Dep. 180); ███
██████████████████████  Those practices were consistent with the Bible's direction to conceal the Bank's
pricing policy from investors.



A 2002 email similarly acknowledged "intentional obfuscation on our side is one of the revenue drivers."  Ex. 119 (BNYM-ADR-02762398).[13]

Given the importance of this "revenue driver," BNYM at times affirmatively misled investors regarding its FX practices.  In response to an investor inquiry in 2009, for instance, John Cipriani instructed another Bank employee, "if they ask about spreads or execution fees, I would say: The bank provides conversion executions as part of its Global Markets services and *does not charge a fee*."  Ex. 120 (PX 40); *see also* Ex. 121 (PX 42) (repeating the same to an investor in 2010).[14]  In 2012, when an investor complained about a rate provided for a dividend conversion, the Bank deflected, blaming the poor rate on "liquidity issues."  Ex. 123 (PX 44).  Similarly, when an investor asked if a rate that "was (nearly) at the very high end of the day's range was exclusively a function of coincidental unfortunate timing of your execution (*i.e.*, you purchased nearly all the Euros for the day sometime around 3PM, and not anything else,"

---

[13] Although that email specifically references custodial FX (i.e., non-negotiated standing instructions), "Internal FX" included both ADRs and standing instructions trades, which were managed the same way.

[14] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

1558478.1

transaction desk employee John Bundy responded, "Your understanding is correct." Ex. 124 (BNYM-ADR-01629199).

It was not until October 1, 2015—just one week after Judge Kaplan granted final approval of the $335 million settlement of litigation arising from BNYM's improper pricing with respect to similarly non-transparent "standing instruction" FX transactions—that the Bank published its ADR FX Pricing Disclosure. The Bank publicly stated there for the first time that, notwithstanding whatever language was contained in its deposit agreements, it made "*no representations, warranties or guarantees* as to whether the price or the pricing methodology [it] used to price a [ADR FX conversion] yields a *fair market price*." Ex. 96 (PX 33). BNYM further stated it consistently priced ADR FX conversions to take advantage of the range of market rates available during a particular 24-hour (or in some cases longer) trading session (regardless of when during that session the trade was actually priced), with the spreads on such trades accruing to the Bank as "revenue." *Id.* BNYM admits that prior to its October 2015 ADR FX Pricing Disclosure, the Bank never publicly disclosed how it priced ADR FX conversions.
███████████████████████████████████ Ex. 104A (Cipriani 30(b)(6) Dep. 353). Further, notwithstanding the Bank's (much-belated) disclosure of its practices with respect to ADR FX conversions, those practices continue to violate the deposit agreements to which Class members are parties. *See* Ex. 125 (ADR FX pricing disclosure dated April 5, 2016, currently posted on the BNYM Depositary Receipts website).[15]

> ### D.    The Damages to Each Class Member as a Result of BNYM's Improper Pricing Practices Are Determinable from the Bank's Own Documents.

BNYM rigorously, and in standardized fashion, tracked the profits generated from ADR FX conversions. ███████████████████████████████████████████████████████

---

[15] Available at https://www.adrbnymellon.com/fees-and-disclosures/drs_foreign_exchange_pricing_disclosure.pdf.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Indeed, as a condition of allowing Global Markets to take over ADR FX conversions (as opposed to continuing to have outside banks handle them), Ken Lopian, head of the ADR division in New York, "want[ed] assurances that whatever revenue earned from his dividend conversions [wa]s reported to his business unit accurately and properly."  Ex. 129 (PX 128).

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

█████████████████ *see also* Ex. 101 (PX 68) (Bible describing the process for roll P&L).

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████

██████████████████████████████

Classwide damages consist of (1) the sales margin, over and above the fees permitted under the Deposit Agreements and the profit generated by risk traders' management of risk, that was

recorded in connection with the Bank's ADR FX conversions for the ADRs included in

Appendix A to Plaintiffs' motion; and (2) interest, calculated using a simple annual interest rate

of 9%, as prescribed under New York law.  *Id.* ¶¶ 40-44.

## ARGUMENT

## I.   PLAINTIFFS HAVE CLASS STANDING TO ASSERT CLAIMS ARISING FROM ADRs THEY DID NOT OWN

In rejecting BNYM's challenge to class standing at the pleading stage, the Court held that

Plaintiffs "allege the existence of a common contractual obligation and common conduct with

respect to each ADR," further explaining that "[a]s long as the terms of the ADRs and their

corresponding Deposit Agreements are as alleged, the proof necessary for each class member

will be substantially the same, and Plaintiffs can adequately represent the interest of the entire

purported class."  *Normand v. Bank of N.Y. Mellon*, 2016 WL 5477783, at *8 (S.D.N.Y. Sept. 29,

2016).  As the Court recognized, resolution of this question turns on whether the facts adduced

through discovery render this case more akin to *NECA-IBEW Health & Welfare Fund v.

Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("*NECA*"), or to *Ret. Bd, of the Policemen's

Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014)

("*Retirement Board*").  *See Normand*, 2016 WL 5477783, at *7-8.  With fact discovery now

complete, the answer is clear: this case well surpasses *NECA*'s threshold for class standing, and

is far removed from *Retirement Board*.

### A.   This Case Is Even *More* Conducive to Class Standing Than *NECA* Was.

The facts demonstrate that Plaintiffs readily satisfy *NECA*'s two-pronged standard for

class standing.

*First*, Plaintiffs have "suffered some injury" as the result of BNYM's alleged breaches of

the Deposit Agreements for the ADRs Plaintiffs owned.  *NECA*, 693 F.3d at 162; ███████████

1558478.1

███████████████████████████████████

███████████████████████████████████

████████████████████████

*Second*, BNYM's conduct with respect to the ADRs Plaintiffs owned "implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendant[]." *NECA*, 693 F.3d at 162. To that end, the "proof contemplated for all of the claims would be sufficiently similar," *Ret. Bd.*, 775 F.3d at 161, because (1) throughout the Class Period BNYM applied a consistent pricing practice for the ADR FX conversions it performed—i.e., it assigned a rate to ADR holders that was different (and worse for those investors) than the cover rate at which BNYM managed its risk on the conversion, thereby generating a profit to the Bank in excess of the fees permitted under the Deposit Agreements and the revenues generated by the Bank's risk traders; and (2) the relevant provisions of the Deposit Agreements, which Plaintiffs allege the Bank breached by pricing ADR FX conversions in that manner, are substantially similar. Accordingly, the evidence Plaintiffs will use to demonstrate BNYM's liability with respect to the ADRs they owned will be "sufficiently similar" to—if not exactly the same as—the evidence used to demonstrate the Bank's liability as to ADRs owned only by absent class members. Plaintiffs' litigation incentives are therefore "sufficiently aligned with those of the absent class members that [Plaintiffs] may properly assert claims on their behalf." *Id.*

Indeed, the similarity of proof in this case *exceeds* that of *NECA*, where the Second Circuit deemed class standing appropriate as to a number of securities plaintiff (NECA) did not purchase. NECA asserted federal securities claims on behalf of a putative class consisting of all

---

16 ████████████████████████████████████████████████

persons who acquired certain mortgage-backed certificates underwritten by defendant Goldman

Sachs & Co. and issued by defendant GS Mortgage Securities Corp.  693 F.3d at 149.  The

certificates were backed by pools of residential real estate loans acquired by Goldman Sachs

Mortgage Company "from a variety of sources, including banks, savings-and-loans associations,

and mortgage brokers."  *Id.* at 149-50.  The certificates "were sold in 17 separate Offerings

through 17 separate Trusts pursuant to the same Shelf Registration Statement, but using 17

separate Prospectus Supplements."  *Id.* at 149.  NECA purchased certificates issued from only

two of the offerings, but asserted claims on behalf of all purchasers of certificates from each

tranche of all 17 offerings, alleging the shelf registration statement "contained false and

misleading statements that were essentially repeated in the Prospectus Supplements" for each

offering, regarding "the underwriting guidelines of the mortgage loan originators, the property

appraisals of the loans backing the Trusts, and the risks associated with the Certificates."  *Id.* at

149, 151.

        Goldman contended class standing did not lie because "the Shelf Registration Statement

common to all the Certificates contained no information about the loan originators or mortgage

collateral underlying them"; rather, that information appeared "in the Prospectus Supplements

unique to each Offering," which "contained unique representations focused on the specific loans

underlying each offering and the specific underwriting standards and origination practices in

effect at the time those specific loans were originated."  *Id.* at 157-58.  Further, Goldman argued

that even though the certificates in every tranche of a particular offering were registered pursuant

to the same registration statement, "different [C]ertificates have different investment

characteristics and may suffer different harm based on the non- or under-performance of

sometimes differing underlying loans."  *Id.* at 158 (alteration in original).

17

The Second Circuit rejected Goldman's cramped view of standing, holding the district court's "requirement that NECA show[] that [its] injuries . . . are *the same* . . . as those allegedly suffered by purchasers of [Certificates from] outlying [T]rusts backed by distinct sets of loans" was "error." *Id.* at 162 (alterations, emphasis, and ellipsis in original).  The court then emphasized that NECA was "suing the three Goldman Sachs entities that issued, underwrote, and sponsored every Certificate from all 17 Trusts," and "the same three defendants [we]re alleged to have inserted nearly identical misrepresentations into the Offering Documents associated with *all* of the Certificates," whose purchasers the named plaintiff sought to represent. *Id.* (emphasis in original).  And despite the differences among the offerings, the court determined that "to the extent certain Offerings were backed by loans originated by originators common to those backing the . . . Offerings [NECA purchased], NECA's claims raise a sufficiently similar set of concerns to permit it to purport to represent Certificate-holders from those Offerings." *Id.* at 164.

The facts bearing on class standing in this case are even stronger.  Whereas the claims against Goldman in *NECA* arose from underlying alleged misconduct by others (i.e., the loan originators), Class members' claims here arise solely from BNYM's undisputed practice of obtaining unauthorized margin revenue by assigning a rate for ADR FX conversions that differed from the better rate the Bank assigned to itself.  The sole question bearing on liability—whether that practice violated the substantially similar provisions of each of the subject Deposit Agreements—is the same for each Class member, and does not depend on the identity of the ADR issuer or any other entity.[17]

---

[17] That is so regardless whether the Court grants Plaintiffs' pending motion to add Chester County as a named plaintiff and permits Chester County to serve as a class representative.  Plaintiffs filed that motion as a protective measure in the event the Court determines they do not have sufficient class standing, as Chester County owned numerous ADRs that Plaintiffs did not.  *See* ECF No. 114, at 2 n.2, 8 & n.5.

### B.    *Retirement Board* **Is Nowhere Close to This Case.**

By contrast, this case is easily distinguishable from *Retirement Board*.  Plaintiffs there

sought to assert claims against BNYM on behalf of purchasers of certificates from any one of

530 residential-mortgage-backed securities trusts for which the Bank served as trustee.  775 F.3d

at 156.  As in *NECA*, plaintiffs' claims were, at their core, based on misconduct by the originator

of the loans underlying the securities (there, Countrywide).  *Id.*  Plaintiffs alleged "defects

among the loans sold to the trusts were 'systemic and pervasive' as a result of Countrywide's

failure to adhere to prudent underwriting standards, leading to widespread breaches of its

representations and warranties," which caused losses to investors when the loans defaulted at

unexpectedly high rates.  *Id.*  Plaintiffs accordingly sought "to hold BNYM responsible for the

losses allegedly caused by Countrywide's breaches of its representations and warranties," based

on the Bank's alleged knowledge of the defects among the loans.  *Id.* at 156-57.

The Second Circuit determined plaintiffs' claims were "very different" from those in

*NECA*.  *Id.* at 162.  Because plaintiffs alleged BNYM "failed to notify certificateholders of

Countrywide's breaches of the governing agreements, failed to force Countrywide to repurchase

defaulted mortgage loans, and failed to ensure that the mortgage loans held by the trusts were

correctly documented," BNYM's alleged misconduct would accordingly need to be "proved

loan-by-loan and trust-by-trust."  *Id.*  The court thus saw "no way in which answering these

questions for the trusts in which Plaintiffs invested will answer the same questions for the

numerous trusts in which they did not invest."  *Id.*

The facts and legal theory in this case could hardly be more different from those in

*Retirement Board*.  *First*, unlike in that case, Class members' claims here turn entirely on

*BNYM's* pricing practices, not the distinct underlying misconduct of a different entity.  *Second*,

whether BNYM's undisputed practice of obtaining a spread on ADR FX conversions violated

19

the Deposit Agreements does not, as in *Retirement Board*, turn on the specifics of each ADR

issuance; ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████. Plaintiffs allege that uniform practice violated the Deposit

Agreements associated with all ADRs encompassed by the Damages Class in the same way.

And with respect to the Injunction Class, all Class members seek the same, uniform, remedy: that

BNYM be precluded from continuing its improper pricing practices. Class standing is therefore

appropriate with respect to both Classes.

> **C.    What Judge McMahon Deemed Lacking in *Merryman* Is Present Here.**

While the court's rulings on Rule 23's prerequisites in *Merryman* support certification

here in all respects (*see infra* pp. 22-35), its determination that class standing did not lie with

respect to ADRs the named plaintiffs did not own is readily distinguishable. Plaintiffs there

asserted contract claims against Citibank based on a similar theory of liability as in this case, i.e.,

that Citibank breached the relevant deposit agreements relating to ADR issuances, which

contained provisions similar to those in the Deposit Agreements at issue here, by "convert[ing]

cash distributions received from foreign issuers at one foreign exchange ('FX') rate and then

us[ing] a less favorable rate when remitting the proceeds to ADR holders, while retaining the

difference." 2018 WL 1621495, at *1; *see also id.* at *1-5 (describing relevant contract

provisions). Plaintiffs owned three ADRs as to which Citibank (mostly through third-party FX

providers) performed ADR FX conversions, and sought certification of a class consisting of

holders of numerous other ADRs.

The court determined the case was similar to *NECA* "in two critically important

respects," *id.* at *9: *First*, "the rights-creating language in the three Deposit Agreements to

which named Plaintiffs are party is substantially similar to the language used in all but one of the

Deposit Agreements." *Id.  Second*, plaintiffs "allege that Citibank injured each of the stakeholders in exactly the same way"—specifically, "in every instance it has interpreted the Deposit Agreements to permit it to deduct the spread between the exchange rate at which Citibank converted cash distributions and the rate at which Citibank remitted those distributions to ADR holders," and thus "the issue to be litigated as to each of the thirty-four contracts is identical." *Id.*  So much so "that, were Citibank to lose in a lawsuit that was limited to the three ADRs in which the named plaintiffs held investments, the investors in the remaining thirty-one ADRs would likely be entitled to immediate judgment on their own claims under the doctrine of offensive collateral estoppel." *Id.*

But the court determined the case differed from *NECA* in certain respects.  Most significant, the court held plaintiffs did not demonstrate that "Citibank had a spread retention 'policy' applicable to all ADRs it administered." *Id.*  Absent "a concession on this point by Citibank," plaintiffs would have to prove that such a policy existed and that Citibank consistently adhered to it. *Id.*  The court therefore concluded the case was "far more similar to the situation in *Retirement Board*." *Id.*

Here, by contrast, BNYM *has conceded* that it consistently priced ADR FX conversions to exact a spread. *See, e.g.*, Ex. 96 (PX 33) (ADR FX Pricing Disclosure); ████████████████████  ████████████████████████████████  Indeed, the Bible alone, setting forth "*Procedures* for ADR Dividend Conversions" (Ex. 101 (PX 68)) to which Global Markets "rigidly adheres" (Ex. 100 (PX 37), at 7), answers the concern expressed in *Merryman*.  That those procedures were memorialized in numerous other documents during the Class Period, *see supra* p. 10, further confirms that Global Markets consistently priced ADR FX conversions in accordance with those procedures.  Indeed, BNYM repeated in those other, later documents not

1558478.1

only the substance of the Bible's instructions, but that they constituted "procedures." *See, e.g.*, Ex. 110 (PX 36) ("Procedure for ADR Dividend Conversion" dated January 21, 1999, incorporating the Bible). ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████   This case, in short, contains precisely what Judge McMahon deemed lacking in *Merryman*.[18]

## II.   EACH OF RULE 23's PREREQUISITES IS ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE

To obtain certification of the Damages Class, Plaintiffs must establish by a preponderance of the evidence that (1) Rule 23(a)'s prerequisites—numerosity, commonality, typicality, and adequacy—are satisfied; and (2) as prescribed by Rule 23(b)(3), common questions of law or fact predominate over any questions affecting only individual Class members, and a class action is superior to any alternative method of litigating these claims. *U.S. Foodservice*, 729 F.3d at 117. And to obtain certification of the Injunction Class, Plaintiffs must establish (in addition to Rule 23(a)'s prerequisites) that BNYM "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

While the Court's assessment of those elements "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim[s]," merits questions "may be considered to the extent—but only to the extent—that they are relevant to determining whether

---

[18] BNYM has also indicated it intends to rely on Judge Caproni's rejection of class standing in *Merryman v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776, at *13-15 (S.D.N.Y. Sept. 29, 2016). But that decision, rendered at the pleading stage, is irrelevant here, and in any event is at odds with this Court's decision on BNYM's motion to dismiss.

22

the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  The evidence elicited through discovery demonstrates that each of Rule 23's elements is subject to common proof.

### A.      Rule 23(a)'s Elements Are Satisfied.

#### 1.      The Classes are sufficiently numerous.

While a proposed class must be "so numerous that joinder of each member is impracticable," Fed. R. Civ. P. 23(a)(1), "[c]ourts do not require evidence of exact class size to satisfy the numerosity requirement." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 98 (S.D.N.Y. 2016).  Courts in this Circuit "presume that the numerosity requirement is met if a putative class has forty or more members." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 131 (S.D.N.Y. 2014) (Oetken, J.) ("*J.P. Morgan*").  ███████████████████

████████████████████████████████████████████

██  A finding of numerosity is warranted.

#### 2.      Questions of law and fact are common to Class members.

To establish commonality under Rule 23(a)(2), Plaintiffs need only demonstrate at least one question of law or fact common to the Classes.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("[e]ven a single [common] question will do") (alterations in original).  As this Court has observed, the commonality requirement imposes a "low hurdle." *J.P. Morgan*, 301 F.R.D. at 131.  Commonality can be shown "where the individual circumstances of class members differ but their injuries derive from a unity course of conduct by a single system." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014).

That is precisely the case here.  As discussed with respect to class standing, Plaintiffs "have identified a question of law and fact that is common to the claims of all class members: whether [BNYM]'s retention of a spread when assigning FX rates to ADR holders' cash

distributions breached the Deposit Agreement between it and the holders of the ADRs."

*Merryman*, 2018 WL 1621495, at *14. Because Plaintiffs "have produced more than sufficient

evidence to establish by a preponderance that [BNYM] ha[s] (or at relevant times had) retained

spreads from cash distributions, which affected the proposed class members," commonality is

established. *Id.*

### 3. The proposed Class representatives' claims are typical of those of the Classes.

Demonstrating typicality under Rule 23(a)(3) requires only that "each class member's

claim arises from the same course of events and each class member makes similar legal

arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574

F.3d 29, 35 (2d Cir. 2009). As discussed above regarding commonality, "Plaintiffs' claims and

the class claims arise from the same set of events—namely, [BNYM]'s retention of a spread

from cash distributions." *Merryman*, 2018 WL 1621495, at *14. Typicality is established.

### 4. The proposed Class representatives will fairly and adequately protect the Classes' interests.

Adequacy under Rule 23(a)(4) turns on "whether 1) plaintiff's interests are antagonistic

to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced

and able to conduct the litigation." *Flag Telecom*, 574 F.3d at 35. The inquiry focuses on

"uncovering conflicts of interest between named parties and the class they seek to represent," *id.*

, though only a "fundamental" conflict can defeat class certification. *Denney v. Deutsche Bank*

*AG*, 443 F.3d 253, 268 (2d Cir. 2006). No such conflicts exist here; to the contrary, "[a]ll

members of the putative class, including the class representatives, share a collective interest in

recouping the funds that they allege [BNYM] withheld in connection with payment of cash

distributions." *Merryman*, 2018 WL 1621495, at *14.

Additionally, Lieff Cabraser and Kessler Topaz satisfy Rule 23(g)'s requirements for

appointment as Class Counsel.  They have prosecuted this case vigorously, having largely

prevailed on BNYM's motion to dismiss, reviewed millions of pages of documents, conducted

15 depositions, and moved to add Chester County as a plaintiff in the event the Court holds the

current Plaintiffs lack sufficient class standing.  Further, these firms have extensive experience

litigating complex civil cases, including in the multidistrict litigation in this District that resulted

in a $335 million settlement involving similar FX pricing practices by BNYM.  *See* Ex. 132

(Lieff Cabraser résumé); Nirmul Decl. Ex. 1 (Kessler Topaz résumé).  Counsel have thus

demonstrated they are well able to serve the Classes' interests.

> **B.      Rule 23(b)(3)'s Predominance Requirement Is Satisfied as to the Damages Class.**

Rule 23(b)(3)'s predominance requirement "is satisfied if resolution of *some* of the legal

or factual questions that qualify each class member's case as a genuine controversy can be

achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof."  *U.S. Foodservice*, 729 F.3d at 118.  Importantly,

"predominance does not require a plaintiff to show that there are *no* individual issues."  *J.P.*

*Morgan*, 301 F.R.D. at 136 (emphasis in original).  The inquiry "is directed primarily toward

whether the issue of liability is common to members of the class, taking into account both

affirmative claims and potential defenses."  *Id.*   The facts in this case well surpass that threshold.

> **1.      Common liability questions predominate over any individual ones.**

As in *Merryman*, the issues at trial in this case will include:

> (1) whether [BNYM] retained a spread when assigning FX rates to ADR holders'
> cash distributions in violation of the Deposit Agreements or, as [BNYM] insists,
> spreads are a permissible fee, expense, or charge under the terms of the Deposit
> Agreements; (2) whether [BNYM] fraudulently concealed this practice; and (3)
> the extent of class members' injuries, if any.

*Merryman*, 2018 WL 1621495, at *16.  Each of those issues turns on generalized proof.

The Second Circuit's decision in *U.S. Foodservice*, affirming then-District Judge Droney's certification of a nationwide breach-of-contract (and RICO) class consisting of approximately 75,000 "cost-plus" customers of food distributor U.S. Foodservice ("USF"), 729 F.3d at 112, compels certification here.  Plaintiffs' claims there arose from USF's "cost-plus" pricing model, whereby "the final cost to the customer is computed based on the 'cost' . . ., meaning the price at which USF purchases the goods from its supplier, and the 'plus,' or additional surcharge that USF charges on top of the cost." *Id.*   Plaintiffs alleged that beginning as early as 1998, USF "engaged in a fraudulent scheme by which it artificially inflated the cost component of its cost-plus billing and then disguised the proceeds of its own inflated billing," through the use of Value Added Service Providers ("VASPs").  *Id.* at 112-13.

In affirming the district court's grant of class certification, the Second Circuit rejected USF's argument that "the variations among" the subject contracts "defeat[ed] plaintiffs' attempt to establish predominance."  *Id.* at 123.  The court further observed that while USF proffered expert testimony opining "that it is common knowledge that food distributors employ VASP-like arrangements," that evidence was "appropriately considered on a class-wide basis."  *Id.* at 125.

As in *U.S. Foodservice*, "the uniform nature of [BNYM]'s alleged [breach of contract] and [BNYM]'s concerted effort to shield its scheme from scrutiny place each [investor] in the same position as to these issues and ensure the cohesiveness of the class."  *Id.* at 131.  ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

But the modifications BNYM identifies are immaterial, because what did not change—and what is central to, and unifies, all Class members' claims—is that the Bank consistently obtained spreads on its ADR FX conversions throughout the Class Period, which Plaintiffs allege violated

the Deposit Agreements.  Nor is BNYM's contention that "[t]he manner in which the Cover Rate

was set . . . depended on a variety of factors," *id.* ¶ 73, relevant for purposes of class certification

(or on the merits), as Plaintiffs' claim is based on the impropriety of the Bank taking *any* spread

on top of the profit it generated through risk trading and the fees authorized under the Deposit

Agreements.  The very fact that BNYM consistently set a cover rate that was different than the

deal rate, which the Bank admits, is all that matters.  *See U.S. Foodservice*, 729 F.3d at 118

("While each invoice obviously concerned different bills of goods with different mark-ups, the

material misrepresentation—concealment of the fact of a mark-up . . .—was the same in each.");

*Dover v. British Airways, PLC (UK)*, 321 F.R.D. 49, 57-58 (E.D.N.Y. 2017) (finding

predominance in contract action notwithstanding defendant's assertions that the charges at issue

"were set based on a variety of different factors and affected class members differently" and that

their structure "varied throughout the class period," because plaintiffs' contention that the

charges did not constitute a true "fuel surcharge" authorized under the contract was "central to

the validity of Plaintiffs' claims and capable of resolution in one stroke").  Indeed, the court in

*Merryman* held predominance was established because "there [wa]s evidence that Citibank had a

practice of deducting a spread from cash distributions."  2018 WL 1621495, at *17.  As detailed

above, there is no question BNYM engaged in that practice.

Further, BNYM's assertion 

, raises an inherently classwide question.  *See In re IndyMac Mortg.-

Backed Sec. Litig.*, 286 F.R.D. 226, 239 (S.D.N.Y. 2012) (lawsuits that defendants contended

gave plaintiffs knowledge or notice of the alleged misconduct "all were publically available and

therefore raise[d] issues—if any—principally of knowledge, actual or constructive, subject to generalized proof"). BNYM's statute-of-limitations defense therefore does not defeat predominance, because it rests on generalized proof regarding what a reasonable ADR investor should have known—an inherently objective standard. *See Amgen*, 568 U.S. at 459 ("Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class [plaintiff] would represent.").

Nor will the application of New York's borrowing statute undermine predominance.[19] That Class members' claims are subject to limitations periods of varying length, depending on where they reside, raises only a minor individualized issue. *See Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)."). So, too, regarding fraudulent concealment. As this Court has observed, to demonstrate fraudulent concealment, Plaintiffs must show "(1) BNYM intentionally concealed the causes of action; and (2) Plaintiffs were unable to discover the causes of action with reasonable diligence." *Normand*, 2016 WL 5477783, at *8. While that standard varies somewhat among the states, those differences neither individually nor collectively defeat predominance.

*U.S. Foodservice* is once again instructive. In addition to determining that variations in state contract law did not defeat predominance (an issue not present here, as all of the Deposit

---

[19] As this Court's subject matter jurisdiction rests on diversity, it "applies the forum state's statute of limitations provisions as well as any provisions that govern the tolling of the statute of limitations." *Commerzbank AG v. Deutsche Bank Nat'l Trust Co.*, 234 F. Supp. 3d 462, 467 (S.D.N.Y. 2017). In diversity cases in New York, "federal courts apply New York's borrowing statute, N.Y. C.P.L.R. § 202," which "requires a non-resident plaintiff to file a claim within the shorter of either: 1) the New York statute of limitations"—here, six years—"or 2) the statute of limitations in the jurisdiction in which the claim accrued." *Id.* Absent unusual circumstances, "when the injury of a nonresident plaintiff is purely economic, the cause of action accrues where the plaintiff resides and sustains the economic impact of the loss." *Id.* at 469.

Agreements call for the application of New York substantive law), the Second Circuit rejected USF's argument that variations in states' standards for fraudulent concealment as a means to toll the governing statutes of limitations precluded certification.  729 F.3d at 127.  In so ruling, the court explained that "fraudulent concealment can be demonstrated via class-wide, generalized evidence," and rejected USF's assertion that individual issues predominated in light of several variations among state law.  *Id.* at 128-29 & n.11.  Noting USF's argument that 14 states "provide that a statute of limitations is tolled for fraudulent concealment only if the plaintiff relied on a misrepresentation by the defendant," and five states "require that plaintiffs demonstrate fraudulent concealment by clear and convincing evidence," the court explained that "payment of inflated invoices . . . may . . . be used to establish reliance for fraudulent concealment purposes," and further concluded:

> the mere fact that five states impose a heightened standard of proof for fraudulent concealment does not draw into question the district court's conclusion as to predominance, but instead suggests simply the possibility that the district court, in a case in which generalized proof will resolve many issues, may choose to handle other less numerous and less substantial issues through the creation of a limited number of homogeneous subclasses.

*Id.* at 128-29.  The court also rejected USF's assertion that other variations in state law—regarding "(1) whether an affirmative act of concealment by defendants is required as opposed to simple silence; (2) whether intent/knowledge on behalf of the defendant is required; and (3) whether the statute of limitations begins to run on actual discovery or constructive discovery"—defeated predominance.  *Id.* at 128 n.11.  Finding "no error . . . in the district court's conclusion that these differences are immaterial," the court of appeals reasoned "[p]laintiffs allege an affirmative act by defendants who acted with an intent to deceive, and 'the point at which plaintiffs should have discovered the breach is the same point at which they did discover the breach.'"  *Id.*  (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *19 (D.

29

Conn. Nov. 29, 2011) (Droney, J.)).

Consistent with that precedent, Plaintiffs' analysis—which is similar to the analysis

submitted in *U.S. Foodservice*—demonstrates that the law among 49 states (other than Ohio) and

the District of Columbia regarding fraudulent concealment is sufficiently uniform to support

predominance.  *See* Ex. 133 (state survey).  And as the Second Circuit has instructed, to the

extent this Court determines any differences must be addressed at this stage, it can address those

relatively minor issues "through the creation of a limited number of homogeneous subclasses."

*U.S. Foodservice*, 729 F.3d at 129.

**2.      Common questions regarding damages predominate.**

At this stage, the Court "should examine the proposed damages methodology . . . to

ensure that it is consistent with the classwide theory of liability and capable of measurement on a

classwide basis."  *Id.* at 123 n.8.  The proposed damages calculation "does not need to be purely

mechanical, and can survive notwithstanding the feasibility-related issue of the potential need for

manual input of certain limited information."  *J.P. Morgan*, 301 F.R.D. at 141.  As discussed

above, *supra* pp. 13-15, Plaintiffs have presented a well-supported methodology for calculating

classwide damages based on BNYM's own documents, which is directly tied to Plaintiffs' theory

of liability.  That is, damages consist of the amount of additional margin revenue the Bank itself

recorded on ADR FX conversions, over and above the profit generated by the Bank's risk traders

and the revenues generated from fees authorized under the Deposit Agreements—the very thing

Plaintiffs allege breached the Deposit Agreements.  Plaintiffs satisfy their burden under Rule 23.

1558478.1

███████████████████████████████   Neither argument is persuasive.

That the cover rate may not "always" reflect the actual interbank rate BNYM received does not undermine the classwide nature of Plaintiffs' damages methodology, for several reasons.

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

Am. Compl. ¶ 7 (alleging BNYM "charge[d] ADR Holders exchange rates that, while within the Session Range [i.e., the range of the day], allowed BNYM to capture a substantial and unauthorized spread between the FX rates charged and the actual rates *available to BNYM* at the time of the transactions"); ██████████████████████████████████

Critically, the cover rate BNYM obtained was, as the Bank admits, a "market rate" available to the Bank at the time it sought to cover the risk it had assumed for an ADR FX conversion.  Ex. 104A (Cipriani 30(b)(6) Dep. 89); ███████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████[20]   Risk traders reported cover rates that were intended to protect, i.e., "cover," the

Bank against any loss on ADR FX conversions.  BNYM cites to no evidence supporting its

speculation that the actual rate at which the risk trader ultimately transacted in the subject foreign

currency (whether it be the same day as the cover rate was set, or weeks or months later) may

have been less favorable to the Bank than the cover rate—██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████

*Second*, BNYM itself used the cover rate to record "P&L" on each ADR FX conversion.

*See, e.g.*, Ex. 104A (Cipriani 30(b)(6) Dep. 89-90); Ex. 105 (Wirth Dep. 61) ("Q. And that

difference between the deal rate and the cover rate, is that recorded as profit to the bank?  A.

Yes."); Ex. 130 (PX 79).  For the Bank now to say it is improper for Plaintiffs to do the same

thing to measure that profit is brazen to say the least.

*Third*, BNYM's "actual rate" theory fails even on its own terms.  The Bank offers no

analysis of how often the cover rate purportedly differed from the actual rate the Bank received;

that the two rates may not "always" have correlated does not cause individualized issues to

---

[20] ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████   Further, Plaintiffs' Complaint refers to "unreasonable"
rates in the context of asserting that BNYM unreasonably (in violation of the deposit agreements) charged ADR
holders an unauthorized spread above the revenues the Bank generated from fees and profits from risk trading.  *See,
e.g.*, Am. Compl. ¶ 71 ("BNYM's failure to apply *the prevailing FX rates at a practicably prompt time after the
Bank's receipt of the foreign currency distributed by ADR depositors in connection with the Class ADRs* was
commercially unreasonable and breached the terms of the Contract Documents.").

predominate over the numerous common ones Plaintiffs identify.

*Fourth*, in any event, "damages calculations need not be exact on the basis of the model presented at the class certification stage." *J.P. Morgan*, 301 F.R.D. at 141.

Accordingly, Mr. Brown's model "measure[s] damages that result from the class's asserted theory of injury"—all that is required at this stage. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015). And any individualized damages determinations necessary under that model "alone cannot preclude certification under Rule 23(b)(3)." *Id.* at 409.[21]

Additionally, regarding the purported costs relating to BNYM's ADR FX conversions,

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████ Whether such expenses are appropriately factored into the damages calculation is thus a generalized, classwide question.

Further, even assuming for argument's sake any costs of adding unauthorized spreads were not built into the authorized fees BNYM charged under the Deposit Agreements or the cover rates at which risk traders managed the Bank's risk on ADR FX conversions, such costs were the product of BNYM's improper activity, which cannot be deducted from Plaintiffs'

---

[21] This Court held in *J.P. Morgan* that plaintiffs did not satisfy their burden as to damages (and so certified the class for liability purposes only) because while their expert noted three potential methods for calculating damages, he failed to provide "more specificity as to the methodology that will be used." 301 F.R.D. at 141. That is plainly not the case here.

damages.  *See Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) ("where the existence of damage is certain, and the only uncertainty is as to its amount, . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer") (ellipsis in original).

C.      **A Class Action Is Superior to Potentially Thousands of Individual Actions.**

Rule 23(b)(3) class actions "can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery."  *U.S. Foodservice*, 729 U.S. at 130.  There can be no credible argument that Damages Class members' claims arising from BNYM's undisputed practice of obtaining spreads on ADR FX conversions are best addressed in potentially thousands of virtually identical cases rather than in a single collective action.  The lack of a single individual action by any Class member asserting these claims further demonstrates that these claims are appropriately brought collectively.  *See* Fed. R. Civ. P. 23(b)(3) ("the extent and nature of any litigation concerning the controversy already begun by or against class members" bears on the superiority inquiry).  It is "perfectly obvious that the costs of bringing individual actions for tiny amounts of money outweigh any expected individual recovery."  *Merryman*, 2018 WL 1621495, at *18 n.2.

Further, to the extent BNYM asserts that differences in state law regarding statutes of limitations or fraudulent concealment render this case unmanageable, the Bank is—as detailed above (*supra* pp. 28-30)—incorrect.  In short, the class vehicle "will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'"  *U.S. Foodservice*, 729 F.3d at 130 (quoting Fed. R. Civ. P. 23 adv. comm. notes).

D.      **The Classes Are Ascertainable.**

Rule 23's implied ascertainability element "requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).  As it is defined to encompass investors who held an identified

34

set of ADRs during the Class Period and received cash distributions on which BNYM charged a spread, the Damages Class is readily ascertainable.

Further, while it is unclear whether the ascertainability requirement even applies to proposed injunctive-relief classes, *see Davis v. City of N.Y.*, 296 F.R.D. 158, 164-65 (S.D.N.Y. 2013), the Injunction Class is nonetheless ascertainable, as it encompasses current holders of ADRs for which BNYM serves as depositary—information that is readily determinable.

### E.  Rule 23(b)(2) Is Established as to the Injunction Class.

The evidence in this case strongly demonstrates BNYM "acted or refused to act on grounds that apply generally to the class," so that final injunctive relief "is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Bank indisputably continues to obtain a spread in conducting ADR FX conversions. *See, e.g.*, Ex. 125 (current ADR FX pricing disclosure). As BNYM acknowledges, it has maintained that practice for more than 20 years. If the trier of fact determines that practice violates the deposit agreements relating to ADRs for which the Bank currently serves as the depositary, the same injunctive relief—precluding the Bank from deducting a spread on ADR FX conversions—will be appropriate for each member of the Injunction Class. Rule 23(b)(2) is accordingly satisfied.

Finally, the court in *Merryman* denied certification of an injunction class only because none of the named plaintiffs owned any of their previously held ADRs. 2018 WL 1621495, at *15-16. But the court said "there can be no doubt that *current* ADR holders could assert classwide claims for injunctive relief." *Id.* at *16 (emphasis in original). The deficiency in *Merryman* does not exist here, as proposed Class representatives Diana Carofano and Chester County currently own ADRs for which BNYM serves as the depositary. Nirmul Decl. ¶¶ 3-4.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be granted.

Dated:  May 15, 2018

KESSLER TOPAZ MELTZER & CHECK
LLP

By:  /s/ *Sharan Nirmul*
      Sharan Nirmul

Joseph H. Meltzer
Sharan Nirmul
Ethan Barlieb
Jonathan F. Neumann
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:   (610) 667-7056
jmeltzer@ktmc.com
snirmul@ktmc.com
ebarlieb@ktmc.com
jneumann@ktmc.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

Frank R. Schirripa
HACH ROSE SCHIRRIPA &
CHEVERIE, LLP
185 Madison Avenue, 14th Floor
New York, NY 10016
Telephone: (212) 213-8311
Facsimile (212) 779-0028
fs@hachroselaw.com

*Counsel for Plaintiff International Union of
Operating Engineers Local 138 Pension
Trust Fund*

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By:  /s/ *Daniel P. Chiplock*
      Daniel P. Chiplock

Daniel P. Chiplock
Daniel E. Seltz
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592
dchiplock@lchb.com
dseltz@lchb.com
mmiarmi@lchb.com

Elizabeth J. Cabraser
Robert L. Lieff (*of counsel*)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008
ecabraser@lchb.com
rlieff@lchb.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

36