**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: THE BANK OF NEW YORK MELLON ADR FX LITIGATION | 16-CV-00212-JPO-JLC |
| | ECF Case |
| This Document Relates to: | |
| ALL ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION**
**FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT**
**<u>AND PLAN OF ALLOCATION</u>**

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................................... 1

II.  ARGUMENT ........................................................................................................... 5

A.   The Settlement Meets the Standards for Final Approval under Rule 23(e)........... 5

B.   Lead Plaintiffs and Lead Plaintiffs' Counsel Have Adequately
Represented the Settlement Class .................................................................. 7

C.   The Settlement Was Negotiated at Arm's-Length Negotiations with the
Assistance of an Experienced Mediator......................................................... 9

D.   The Relief that the Settlement Provides for the Settlement Class Is
Adequate, Taking into Account the Costs, Risks, and Delay of Further
Litigation and Other Relevant Factors .......................................................... 10

1.   The Complexity, Expense, and Likely Duration of the Litigation .......... 10

2.   The Risks of Continued Litigation............................................................. 12

(a)   Risks to Establishing Fraudulent Concealment .......................... 12

(b)   Risks to Establishing Liability .................................................... 13

(c)   Risks to Establishing Damages .................................................. 13

(d)   Risks to Maintaining the Class Action through Trial ................. 14

3.   The Reaction of the Settlement Class to Date ......................................... 15

4.   Stage of the Proceedings and Amount of Discovery Completed............ 16

5.   Ability of Defendant to Withstand a Greater Judgment ......................... 17

6.   The Range of Reasonableness of Settlement Amount in Light of
the Best Possible Recovery and the Risks of Litigation ......................... 18

E.   The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of
the Settlement................................................................................................. 19

F.   The Settlement Treats Settlement Class Members Equitably Relative to
Each Other ...................................................................................................... 20

III. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD
BE APPROVED ..................................................................................................... 21

IV.  THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS
REQUIREMENTS AND IS REASONABLE ................................................................ 22

V.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS .............................. 24

VI.  CONCLUSION....................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Amgen Inc. Sec. Litig.*,
  2016 WL 10571773 (C.D. Cal. Oct. 25, 2016)......................................................................11

*Annunziato v. Collecto, Inc.*,
  293 F.R.D. 329 (E.D.N.Y. 2013) ............................................................................................15

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................................................8

*In re Bear Stearns Cos., Inc. Sec., Derivative and ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012)..............................................................................14, 15

*Cavalieri v. Gen. Elec. Co.*,
  2009 WL 2426001 (N.D.N.Y. Aug. 6, 2009) .........................................................................17

*In re Citigroup Inc. Bond Litig.*,
  296 F.R.D. 147 (S.D.N.Y. Aug. 20, 2013) ....................................................................... 10-11

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448, 463 (2d Cir. 1974)..................................................................................... *passim*

*City of Providence v. Aéropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) .............................................................................6

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) ............................................................................................10

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)........................................................................................................4

*Daubert v. Merrell Dow Pharma, Inc.*,
  509 U.S. 579 (1993)................................................................................................................14

*Dornberger v. Metro. Life Ins. Co.*,
  203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................................................24

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)....................................................................4, 7, 17, 21

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)..........................................................................16

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) .............................................................................9

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...............................................................7, 12, 17

*Hefler v. Wells Fargo & Co.*,
  2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ........................................................20

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ...........................................................................21

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ...........................................................................11

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ...........................................................................10

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................................................................15

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) .................................................................14, 21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  246 F.R.D. 156 (S.D.N.Y. 2007) ....................................................................... 22-23

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) .............................................................18

*Merryman* v. *Citigroup, Inc.*,
  2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) ..........................................................2

*Merryman* v. *J.P. Morgan Chase Bank, N.A.*,
  2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016) ........................................................13

*In re NASDAQ Litig.*,
  2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) .............................................................21

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .............................................................................9

## TABLE OF AUTHORITIES
### (continued)

Page

*Newman v. Stein,*
    464 F.2d 689 (2d Cir. 1972)................................................................18

*Normand v. Bank of N.Y. Mellon,*
    2016 WL 5477783 (S.D.N.Y. Sept. 29, 2016)....................................12

*In re PaineWebber Ltd. P'ships Litig.,*
    171 F.R.D. 104 (S.D.N.Y. 1997)........................................................18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
    2019 WL 359981 (E.D.N.Y. Jan. 28, 2019).........................................7

*In re Platinum & Palladium Commodities Litig.,*
    2014 WL 3500655 (S.D.N.Y. July 15, 2014)......................................24

*In re Polaroid ERISA Litig.,*
    240 F.R.D. 65 (S.D.N.Y. 2006)............................................................8

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
    163 F.R.D. 200 (S.D.N.Y. 2005)..........................................................6

*Shapiro v. JPMorgan Chase & Co.,*
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014)............................ *passim*

*In re Sinus Buster Prods. Consumer Litig.,*
    2014 WL 5819921 (E.D.N.Y. Nov. 10, 2014)....................................15

*Spann v. J.C. Penney Corp.,*
    314 F.R.D. 312 (C.D. Cal. 2016)........................................................24

*State of N.Y. v. Hendrickson Bros.,*
    840 F.2d 1065 (2d Cir. 1988).............................................................12

*In re Sumitomo Copper Litig.,*
    189 F.R.D. 274 (S.D.N.Y. 1999)........................................................11

*In re Telik, Inc. Sec. Litig.,*
    576 F. Supp. 2d 570 (S.D.N.Y. 2008).................................................22

*In re Virtus Inv. Ptnrs., Inc. Sec. Litig.,*
    2018 WL 6333657 (S.D.N.Y. Dec. 4, 2018).........................................5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d. Cir. 2005) ............................................................................ 5-6, 22

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d. Cir. 1982) ................................................................................... 5

*Yang v. Focus Media Holding Ltd.*,
   2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ......................................................... 9

**Other Authorities**

Fed. R. Civ. P. 23 ..................................................................................... *passim*

*Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*,
   available at https://www.nera.com/content/dam/nera/publications/2019/
   PUB_Year_End_Trends_ ........................................................................................ 2

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, David Feige, International Union of Operating Engineers Local 138 Annuity Fund, Annie L. Normand, and Diana Carofano, on behalf of her deceased husband, Don A. Carofano (collectively, "Named Plaintiffs" or "Plaintiffs") as well as Chester County Employees Retirement Fund (together with Named Plaintiffs, "Lead Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum of law in support of their motion for: (1) final approval of the proposed settlement of the above-captioned class action ("Settlement"), (2) approval of the proposed plan for allocating the net proceeds of the Settlement ("Plan of Allocation"), and (3) certification of the Settlement Class for purposes of effectuating the Settlement.[1]

## I.    PRELIMINARY STATEMENT

Subject to this Court's final approval, Lead Plaintiffs, through their counsel, have obtained a Settlement for $72,500,000 in exchange for the dismissal of all claims brought in this Action and a full release of claims against The Bank of New York Mellon ("Defendant" or "BNYM") and the other related Releasees.[2] Lead Plaintiffs respectfully submit that the Settlement is an excellent result for the Settlement Class, providing a significant and certain recovery in a case that presented numerous hurdles and risks. Notably, the Settlement represents nearly 24% of the total margin amount attributable to the Settlement Class (i.e., approximately $304 million)—an amount agreed

---

[1]    Unless otherwise noted, capitalized terms used herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated January 15, 2019 (ECF No. 147-2) ("Stipulation") or in the Joint Declaration of Sharan Nirmul and Daniel P. Chiplock in Support of (1) Lead Plaintiffs' Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation; and (2) Lead Plaintiffs' Counsel's Application for Attorneys' Fees and Reimbursement of Litigation Expenses, Including Service Awards to Lead Plaintiffs ("Joint Declaration" or "Joint Decl."), filed herewith. Citations to "¶ __" herein refer to paragraphs in the Joint Declaration and citations to "Ex. __" refer to exhibits to the Joint Declaration.

[2]    In accordance with the Stipulation, the Settlement Amount was deposited into an interest-bearing escrow account on January 22, 2019.

to by the Parties for purposes of the Settlement and which is consistent with Lead Plaintiffs' damages expert's calculation during the litigation. This recovery far exceeds the median recovery of investor losses as a percentage of damages in recent, comparably sized securities cases.[3]

The Settlement is also impressive when considered in light of the considerable challenges Lead Plaintiffs faced in this Action. While Lead Plaintiffs and their counsel believe that the claims against BNYM are meritorious, they also recognize that in the absence of a settlement, there were substantial risks to obtaining any recovery—let alone a recovery greater than the Settlement Amount. Underscoring such risk was the pendency of two key motions at the time of settlement— BNYM's motion for partial summary judgment based on the applicability of the statute of limitations and standing, and Named Plaintiffs' motion for class certification. In particular, certification of a class here—especially a class including investors who held ADRs that the Named Plaintiffs did not—was far from certain. Indeed, the court in the substantially similar ADR-related litigation, *Merryman v. Citigroup, Inc., et al.*, limited certification to *only* those ADRs the class representative actually held—a decision upon which BNYM heavily relied in opposing Named Plaintiffs' motion.[4] Clearly, an adverse ruling for Lead Plaintiffs on either of these pending motions would have drastically changed the landscape of this litigation.

As detailed in the Joint Declaration and summarized herein, the decision to settle the Action was well-informed by an extensive investigation, hard-fought litigation, and protracted settlement

---

[3]   *See, e.g., Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, available at https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819 Final.pdf, at 35 (finding median settlement between 1996 and 2018 in securities cases with investor losses between $200 million and $399 million recovered 2.6% of investor losses).

[4]   *See Merryman* v. *Citigroup, Inc.*, 2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) (ECF No. 111).

discussions conducted with the assistance of a nationally known mediator.[5] Prior to reaching the Settlement, Lead Plaintiffs, through their counsel, had *inter alia*: (i) conducted a significant legal and factual investigation into BNYM's foreign exchange ("FX") conversions in connection with ADR-related distributions; (ii) successfully opposed, in large part, BNYM's motion to dismiss the initial complaint, which required navigation of numerous complex arguments; (iii) drafted the detailed Consolidated Complaint; (iv) engaged in extensive discovery efforts, including reviewing and analyzing more than 2.7 million pages of documents and 136,000 Excel documents produced by BNYM, participating in numerous meet and confers with BNYM's counsel in an effort to resolve discovery disputes, deposing 14 fact witnesses, and defending the depositions of three Lead Plaintiffs; (v) consulted with an expert to develop a class-wide damages methodology and took and defended expert depositions; (vi) opposed BNYM's motion for partial summary judgment; and (vii) fully briefed a motion for class certification. ¶¶ 6-7, 20-148.

The Settlement itself is also the result of extensive and hard-fought efforts, including three formal mediation sessions facilitated by a former federal judge and experienced mediator, Layn R. Phillips ("Judge Phillips") and his colleague David Murphy, Esq., a fourth in-person meeting between the Parties, and numerous telephone calls and e-mail correspondence. ¶¶ 166-172. The Parties' settlement discussions began in March 2018, with the first formal mediation with Judge Phillips, and culminated six months later in August 2018, with the Parties' acceptance of a mediator's proposal on the Settlement Amount. ¶¶ 166-170. The Parties' agreement-in-principle was followed by several additional months of negotiations over the terms of the Settlement,

---

[5]     The Joint Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the nature of the claims asserted, the procedural history of the Action, the negotiations leading to the Settlement, the terms of the Plan of Allocation, and the notice program.

including, with the assistance of experts, the ADRs to be covered by the Settlement. ¶¶ 171-172.

Here, the settlement process supports a strong presumption of fairness and approval of the Settlement. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408 (S.D.N.Y. 2018) ("When a settlement is the product of arms-length negotiations between experienced, capable counsel after meaningful discovery, it is afforded a presumption of fairness, adequacy, and reasonableness.").[6]

By Order entered January 17, 2019 (ECF No. 149), the Court approved the process by which Settlement Class Members would receive notice of the Settlement and submit claims, objections, or requests for exclusion. In accordance with the Notice Order, the Court-authorized Claims Administrator, Kurtzman Carson Consultants LLC ("KCC") mailed Post-Card Notices to over 460,500 Registered Holder Settlement Class Members and the Court-authorized Publication Notice Plan Administrator, HF Media, LLC ("HF Media") effected a modern, comprehensive multimedia notice program—comprised of publications in various magazines, newspapers, and investment e-newsletters as well as banner ads over a variety of business, news, and investment websites, and social media platforms—to specifically target the Settlement Class (particularly Non-Registered Holder Settlement Class Members) in this Action.[7] The long-form Notice, Claim

---

[6]    Unless otherwise noted, all internal quotation marks and citations are omitted. *See also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (presumption of fairness found where settlement was product of "arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests" and that "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

[7]    *See* Declaration of Lance Cavallo Regarding (A) Receipt and Processing of Registered Holder Data; (B) Mailing of the Post-Card Notice; (C) Establishment of the Telephone Hotline; (D) Establishment of the Settlement Websites; and (E) Report on Requests for Exclusion Received to Date ("Cavallo Declaration" or "Cavallo Decl.") attached to the Joint Declaration as Exhibit 1, at ¶¶ 4-6 and Declaration of Jeanne C. Finegan, APR Concerning Implementation of Notice to Settlement Class Members Through Multi-Media Notice Program ("Finegan Declaration" or "Finegan Decl.") attached to the Joint Declaration as Exhibit 2.

Form, and other important documents have also been made available on a dedicated website maintained for the Settlement by KCC. Ex. 1, ¶ 8. While the deadline to submit objections and requests for exclusion from the Settlement Class has not yet passed, to date no Settlement Class Member has objected to the Settlement or Plan of Allocation (¶¶ 11, 179) and only six requests for exclusion from the Settlement Class have been received. Ex. 1, ¶ 13.

For these reasons, Lead Plaintiffs submit that the Settlement readily meets the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and is a fair, reasonable, and adequate result for the Settlement Class. Accordingly, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement. In addition, the Plan of Allocation, which was developed with the assistance of Lead Plaintiffs' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund and should also be approved by the Court. Finally, Lead Plaintiffs respectfully request that the Court certify the Settlement Class for purposes of effectuating the Settlement.

## II.    ARGUMENT

### A.    The Settlement Meets the Standards for Final Approval under Rule 23(e)

Rule 23(e) requires judicial approval for any compromise or settlement of class action claims. When a settlement is binding on class members (as this one is), the Court may approve it "only after a hearing and only on finding that it is fair, reasonable, and adequate[.]" Fed. R. Civ. P. 23(e)(2). This determination entails scrutiny of both the procedural and substantive aspects of the proposed settlement. *See In re Virtus Inv. Ptnrs., Inc. Sec. Litig.*, 2018 WL 6333657, at *1 (S.D.N.Y. Dec. 4, 2018) ("[T]he settlement must be both procedurally and substantively fair.").

As a matter of public policy, courts strongly favor the settlement of lawsuits. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d. Cir. 1982). This is particularly true for complex class action litigation. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d. Cir. 2005) ("*Visa*")

("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 2005) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions."). Moreover, absent fraud or collusion, the Court "should be hesitant to substitute its judgment for that of the parties who negotiated the settlement." *City of Providence v. Aéropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014), *aff'd sub nom., Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

    (i)    the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Consistent with these factors, courts in the Second Circuit have long considered the following factors set forth in *City of Detroit v. Grinnell Corp.* in evaluating a class action settlement:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]

6

(9) the range of reasonableness of the settlement fund to a possible recovery in light
of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res.,*

*Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Facebook*, 343 F. Supp. 3d at 409 (conducting *Grinnell*

analysis in approving settlement).[8]

The Advisory Committee Notes to the 2018 amendments to Rule 23 indicate that the four

factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by

the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of

procedure and substance that should guide the decision whether to approve the proposal."

Advisory Committee Notes to 2018 Amendments. *See also In re Payment Card Interchange Fee*

*& Merch. Disc. Antitrust Litig.*, 2019 WL 359981, at *13 (E.D.N.Y. Jan. 28, 2019) ("The Court

understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors.").

Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the

Settlement principally in relation to the four factors set forth in Rule 23(e)(2), and will also discuss

the application of the non-duplicative *Grinnell* factors.

As demonstrated herein, the Settlement readily satisfies each of the Rule 23(e)(2) and

Second Circuit *Grinnell* factors, meets the favored public policy goal of resolving class action

claims, and warrants this Court's final approval.

**B.    Lead Plaintiffs and Lead Plaintiffs' Counsel Have Adequately Represented
        the Settlement Class**

In determining whether to approve a class action settlement, the court should consider

whether "the class representatives and class counsel have adequately represented the class." Fed.

---

[8]    "[N]ot every factor must weigh in favor of the settlement, rather the court should consider
the totality of these factors in light of the particular circumstances." *In re Global Crossing Sec.
and ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

R. Civ. P. 23(e)(2)(A); *see generally In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (noting that "the adequacy requirement 'entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

Here, Lead Plaintiffs have adequately represented the Settlement Class. Lead Plaintiffs have monitored and engaged in the prosecution and resolution of the Action—communicating with Plaintiffs' Counsel on litigation strategy and case developments, reviewing significant Court filings, engaging in discovery efforts, and conferring with Lead Plaintiffs' Counsel prior to the mediations and throughout the Parties' settlement discussions. ¶¶ 149-150. In addition, David Feige, International Union of Operating Engineers Local 138 Annuity Fund, and Don Carofano[9] prepared for and sat for depositions in connection with class certification. Further, Lead Plaintiffs—investors who received cash distributions as a result of their holdings in certain of the eligible ADRs and suffered damages as a result of the fees BNYM deducted for conducting FX from such distributions—have claims that are typical of and coexistent with those of other Settlement Class Members, and have no interests antagonistic to the interests of other Settlement Class Members. On the contrary, Lead Plaintiffs, like other Settlement Class Members, have an interest in obtaining the largest possible recovery from Defendant. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

---

[9]      Following the unexpected death of Mr. Carofano, Lead Plaintiffs filed a motion on May 23, 2018 pursuant to Rule 25(a)(1) to substitute Diana Carofano, Mr. Carofano's widow, as a Party Plaintiff. ECF No. 124.

Lead Plaintiffs' Counsel likewise have "adequately represented the class" throughout the litigation. Lead Plaintiffs' Counsel are highly qualified and experienced in complex litigation, as set forth in their firm resumes (*see* Exs. 3-A and 4-A to the Joint Declaration), and were able to successfully conduct the litigation against skilled opposing counsel. And, armed with the knowledge gleaned from nearly three years of extensive litigation efforts (*see* ¶¶ 6-7, 20-148), Lead Plaintiffs' Counsel carefully considered the strengths and weaknesses of the claims asserted and the risks of further litigation when agreeing to resolve the Action, and firmly believe the Settlement represents an excellent result in the best interests of the Settlement Class.[10]

### C.    The Settlement Was Negotiated at Arm's-Length Negotiations with the Assistance of an Experienced Mediator

Rule 23(e)(2)(B) supports final approval because the Settlement was reached only after protracted, arm's-length negotiations facilitated by an experienced and well-respected neutral. Here, the Parties worked for six months to negotiate a resolution of the Action, including three formal mediations with Judge Phillips or his colleague David Murphy, one in-person meeting without the mediator, and extensive telephone and email communications. ¶¶ 166-169.  These negotiations were hard-fought and culminated with the Parties' acceptance of a mediator's proposal on the Settlement Amount. ¶ 170. *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011)

---

[10]    The judgment of Lead Plaintiffs' Counsel that the Settlement is in the best interests of the Settlement Class is entitled to "great weight." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts have consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

(the fact that "settlement was the product of prolonged, arms-length negotiation, including as facilitated by a respected mediator" established that it was "procedurally fair"). Even after agreeing to the Settlement Amount, it took the Parties four additional months, and the assistance of two damages experts, to negotiate the specific terms of the Stipulation. ¶¶ 171-172. Where, as here, a settlement agreement is the product of non-collusive, arms-length negotiations, courts have afforded a presumption of fairness. *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009).

In short, "[t]he hard-fought and arduous settlement negotiations demonstrate that the Settlement is the result of fair and honest negotiations," and Lead Plaintiffs' Counsel, "who have extensive experience in the prosecution of complex class action litigation, with particular expertise in commercial and financial litigation, have made a considered judgment that the Settlement is not only fair, reasonable and adequate, but an excellent result for the Settlement Class." *See Shapiro*, 2014 WL 1224666, at *8. The Court can thus take comfort that the Settlement Class's interests were protected throughout the negotiations that produced this resolution.

> **D.    The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs, Risks, and Delay of Further Litigation and Other Relevant Factors**

> **1.    The Complexity, Expense, and Likely Duration of the Litigation**

Rule 23(e)(2)(C)(i) and the first *Grinnell* factor further support final approval of the Settlement, as courts consistently recognize that the expense, complexity, and possible duration of the litigation are key factors in evaluating the reasonableness of a settlement. *See In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) ("Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."); *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 155 (S.D.N.Y. Aug. 20, 2013) ("[T]he more complex, expensive, and time consuming the future

litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court."). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

Class action litigation is inherently complex. *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (noting class action suits generally "have a well-deserved reputation for being most complex"). This Action—involving FX conversions in connection with ADR-related distributions for thousands of ADR issuers—is no exception. As discussed below and in the Joint Declaration, this Action settled after nearly three years of vigorous litigation and just before summary judgment motions were to be filed. In addition to the risks posed by the critical motions pending when the Settlement was reached, summary judgment posed significant risks to the survival of Lead Plaintiffs' claims and could have resulted in the case being dismissed outright or a material reduction in potential damages. ¶¶ 159-165.

If Lead Plaintiffs' claims survived summary judgment, litigating this Action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor. *See In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016) ("A trial of a complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). Any potential recovery, moreover, "would occur years from now, substantially delaying payment . . . to the Settlement Class." *Shapiro*, 2014 WL 1224666, at *8. In contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class—nearly 24% of losses—without exposing the Settlement Class to the risk, expense, and delay of continued litigation.

### 2.      The Risks of Continued Litigation

*Grinnell* holds that in assessing the fairness, reasonableness, and adequacy of a settlement, courts should also consider the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." 495 F.2d at 463. In so doing, the Court is not called on to adjudicate disputed issues or decide unsettled questions, but instead should "assess the risks of litigation against the certainty of recovery under the proposed settlement." *Global Crossing*, 225 F.R.D. 459 at 459 ("Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case."). While Lead Plaintiffs believed their claims had merit, there were significant risks that Lead Plaintiffs would have faced in attempting to achieve a better result through continued litigation.[11]

### (a)      Risks to Establishing Fraudulent Concealment

Had the Action proceeded, Lead Plaintiffs would have faced significant risks to ultimately proving fraudulent concealment. To toll the statute of limitations under the doctrine of fraudulent concealment, Lead Plaintiffs would have needed to show: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within [the applicable limitations period] of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Throughout the Action, BNYM vigorously asserted that Lead Plaintiffs would be unable to meet this standard. In its motions to dismiss and for partial summary judgment, as well as in

---

[11]      While Lead Plaintiffs largely prevailed on the challenges raised in BNYM's motion to dismiss, the Court deemed the class standing question "premature," determining it was best resolved on a motion for class certification, and rejected BNYM's statute-of-limitations arguments "without prejudice to renewal, either on summary judgment after discovery, or at trial." *Normand v. Bank of N.Y. Mellon*, 2016 WL 5477783, at *7-8, 9 (S.D.N.Y. Sept. 29, 2016).

connection with settlement discussions, BNYM argued that all of the information Lead Plaintiffs needed to discern the rates at which BNYM converted foreign currency to U.S. dollars was publicly available (i.e., that nothing was concealed). Notably, the court in a case raising substantially similar claims, *Merryman v. J.P. Morgan Chase Bank, N.A.*, accepted a similar argument in connection with the motion to dismiss—a decision relied on by BNYM.[12] Had the Bank prevailed on this argument, the applicable statute of limitations would have been dramatically reduced—from more than 20 years to no more than six. ¶¶ 159-160.

### (b)    Risks to Establishing Liability

Lead Plaintiffs also faced serious risks to establishing BNYM's liability. Although this Court sustained Lead Plaintiffs' breach of contract claims, it also noted in its ruling on the motion to dismiss that "significant unresolved issues of interpretation" existed with respect to the Deposit Agreements. ¶ 161. Throughout the Action, BNYM maintained that the Deposit Agreements did not obligate it to price FX in any particular way, and that the spread it retained was a perfectly acceptable (and commercially reasonable) means of compensating it for the risks it took on in executing ADR FX conversions. *Id.* Apart from the risk from contractual interpretation of the Deposit Agreements, BNYM also asserted that it was insulated from liability in cases where a third party (and not the Bank) performed FX on the Bank's behalf. ¶ 162.

### (c)    Risks to Establishing Damages

Even if Lead Plaintiffs prevailed in establishing liability, they would have faced substantial challenges to establishing damages. Unlike the "commonly accepted" analyses and event studies used in a typical securities case, there was no template for measuring damages in this Action.

---

[12]    *Merryman* v. *J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016).

Indeed, in its opposition to class certification, BNYM had already sought to undermine Lead Plaintiffs' expert, G. William Brown of 8 Rivers Capital, and his class-wide damages methodology, arguing that Professor Brown's methodology: (i) did not adequately take account of available data; (ii) had no relationship to Lead Plaintiffs' theory of liability; and (iii) failed to satisfy the standard set forth by the Supreme Court in *Daubert v. Merrell Dow Pharma, Inc.*, 509 U.S. 579 (1993). ¶¶ 163-165. If the Action continued, BNYM would have continued to attack Lead Plaintiffs' damages theory.

Moreover, even if the Court permitted Lead Plaintiffs' expert's damages opinion, the issue of damages would have come down to a battle of the experts at trial. As Courts have long recognized, the substantial uncertainty as to which side's experts' view might be credited by the jury presents a substantial litigation risk. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("On the issue of damages, a trial would likely have turned heavily on a 'battle of the experts' between the parties' respective economists.  It is impossible to predict which party's model of damages—if either—the jury would credit."); *In re Bear Stearns Cos., Inc. Sec., Derivative and ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012) ("When the success of a party's case turns on winning a so-called 'battle of experts,' victory is by no means assured.").

### (d)    Risks to Maintaining the Class Action through Trial

As noted above, Named Plaintiffs' motion for class certification was pending when the Settlement was reached. Although Lead Plaintiffs believe they would have succeeded in obtaining certification of the *fully*-pled class, that result was far from certain, as the Bank had mounted strong challenges with respect to class standing. BNYM had also advanced viable arguments in connection with Rule 23, including with respect to the uniformity of the Deposit Agreements and the adequacy and typicality of Lead Plaintiffs.

Here, the Settlement removes any uncertainty with respect to certification. It also removes any risk that the class, if certified, might have been amended or decertified either before or during trial. *See* Fed. R. Civ. P. 23(c)(1)(C); *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 340 (E.D.N.Y. 2013) ("[U]nder rule 23, district courts have the power to amend class definitions or decertify classes as necessary….").[13]

### 3.  The Reaction of the Settlement Class to Date

The reaction of the class to a proposed settlement is an important factor to be weighed in considering its fairness and adequacy. *See, e.g., Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *Bear Stearns*, 909 F. Supp. 2d at 266; *Grinnell*, 495 F.2d at 462-63. This factor also weighs in favor of final approval.

In accordance with the Notice Order, KCC has mailed over 460,500 Post-Card Notices to Registered Holder Settlement Class Members, and HF Media has conducted an extensive media campaign specifically targeted to reach the Settlement Class. Ex. 1, ¶¶ 5-6 & Ex. 2. In addition, information regarding the Settlement is available on the Settlement website, www.BNYMADRFXSettlement.com, as well as the general informational website www.ADRFXSettlement.com. Ex. 1, ¶¶ 8-11. The deadline for Settlement Class Members to object to any aspect of the Settlement, or to request exclusion from the Settlement Class, is May 13, 2019. Ex. 1, ¶ 12 & Ex. B. To date, there have been no objections (¶ 11), and only six

---

[13]  *See, e.g., Shapiro*, 2014 WL 1224666, at *11 ("The possibility of decertification . . . favors settlement."); *In re Sinus Buster Prods. Consumer Litig.*, 2014 WL 5819921, at *10 (E.D.N.Y. Nov. 10, 2014) ("Were the Court to reject the settlement, the parties would likely contest certification, which would present a possibility of decertification. A settlement therefore avoids the risk of decertification and thus weighs in favor of approval.").

individuals have requested exclusion from the Settlement Class. Ex. 1, ¶ 13.[14] Any objections or additional requests for exclusion received after this submission will be addressed in Lead Plaintiffs' reply papers to be filed with the Court on June 10, 2019.

### 4.   Stage of the Proceedings and Amount of Discovery Completed

The third *Grinnell* factor considers "the stage of the proceedings and the amount of discovery completed" in determining the fairness, reasonableness, and adequacy of a settlement. *Grinnell*, 495 F.2d at 463. For this factor, "the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *4 (S.D.N.Y. Nov. 9, 2015).

After nearly three years of litigating this Action, the Parties have gained a thorough understanding of the strengths and weaknesses of the claims and the obstacles to success. As detailed in the Joint Declaration, the Settlement was reached only after a significant amount of work was done by Lead Plaintiffs and their counsel, including: (i) conducting a significant legal and factual investigation into the claims asserted; (ii) opposing BNYM's motion to dismiss the initial complaint; (iii) drafting the detailed Consolidated Complaint; (iv) engaging in extensive discovery efforts, including the review and analysis of more than 2.7 million pages of documents and 136,000 Excel documents produced by BNYM, participation in numerous meet and confers with BNYM's counsel in an effort to resolve various discovery disputes, and depositions of 14 fact witnesses and three Lead Plaintiffs; (v) consulting with an expert to develop a class-wide damages

---

[14]   *See, e.g., Shapiro*, 2014 WL 1224666, at *9 (support for settlement was "overwhelming" where nearly 2,800 notices were mailed to class members, resulting in nine valid opt-out requests and one objection).

methodology and participating in expert depositions; (vi) opposing BNYM's motion for partial summary judgment; (vii) briefing a motion for class certification; and (viii) engaging in protracted settlement negotiations with Defendant's Counsel, including a formal mediation process facilitated by Judge Phillips. ¶¶ 6-7, 20-148, 166-172.

Thus, the Settlement was only achieved after the Parties had sufficient familiarity with the issues in the case, and were able to evaluate its merits and agree on a settlement amount that was acceptable to BNYM and reasonable, fair, and adequate to the Settlement Class. Lead Plaintiffs and Lead Plaintiffs' Counsel therefore had the requisite information to make an informed decision about the relative benefits of litigating or settling the Action and "developed an informed basis from which to negotiate a reasonable compromise." *Global Crossing*, 225 F.R.D. at 459; *see also Facebook*, 343 F. Supp. 3d at 412 (finding support for settlement where plaintiffs and their counsel had a "sufficient understanding of the case to gauge the strengths and weaknesses of their claims" as well as the "adequacy of the settlement").

### 5.    Ability of Defendant to Withstand a Greater Judgment

BNYM's ability to withstand a greater judgment does not counsel against final approval. BNYM no doubt could withstand a greater judgment than the amount it will pay for this Settlement, but "a defendant is not required to empty its coffers before a settlement can be found adequate." *Shapiro*, 2014 WL 1224666, at *11. Further, BNYM's financial wherewithal "do[es] not ameliorate the force of the other *Grinnell* factors, which lead to the conclusion that the settlement is fair, reasonable and adequate." *Id.*[15]

---

[15]    *See also Cavalieri v. Gen. Elec. Co.*, 2009 WL 2426001, at *2 (N.D.N.Y. Aug. 6, 2009) ("The court also notes that although neither party contends that defendants are incapable of withstanding greater judgment, that does not indicate that the settlement is unreasonable or inadequate.").

6.   **The Range of Reasonableness of Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation**

The final two *Grinnell* factors—the reasonableness of the settlement in light of the best possible recovery and the risks of litigation—also weigh in favor of approval of the Settlement. As the Second Circuit has explained, there is "a range of reasonableness with respect to a settlement" that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Shapiro*, 2014 WL 1224666, at *11-12 (recognizing "that the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes"). A fairness determination turns not on a "mathematical equation yielding a particularized sum ... but rather ... [on] the strengths and weaknesses of the plaintiffs' case." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997). Indeed, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2.

This $72.5 million Settlement falls well above that threshold. Settlement Class Members stand to recover, on a gross basis, nearly 24% of the total margin amount attributable to the Settlement Class (i.e., approximately $304 million) as agreed to by the Parties for purposes of the Settlement. As noted above, this result far exceeds the median securities class action recovery as a percentage of damages, which was 2.6% for years 1996 through 2018. *See supra* n.3. *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving settlement representing approximately 6.25% of estimated damages and noting recovery was at the "higher end of the range of reasonableness of recovery in class actions securities litigations"). In comparison, if the Action had continued, Lead Plaintiffs and the

Settlement Class would have faced numerous risks to obtaining a recovery in an amount greater than the Settlement Amount, or any recovery at all.

### E.     The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of the Settlement

Rule 23(e)(2), as amended, also considers (i) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (ii) the terms of any proposed award of attorney's fees, including timing of payment; (iii) any agreement made in connection with the proposed settlement; and (iv) the equitable treatment of class members. *See* Rule 23(e)(2)(C)(ii), (iii), and (iv); Rule 23(e)(2)(D). Each of these additional considerations also supports final approval of the Settlement.

First, the Settlement proceeds will be allocated to (i) Registered Holder Settlement Class Members and (ii) Non-Registered Holder Settlement Class Members who submit valid Claim Forms. KCC will review and process all claims received, provide claimants with an opportunity to cure any deficiency in their claim or request judicial review of the denial of their claim, and will ultimately mail or wire claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plan of Allocation, upon approval of the Court.[16] This type of claims processing and method for distributing settlement proceeds is standard in securities and other class actions and is routinely found to be effective. Further, given the data negotiated for by Lead Plaintiffs' Counsel and provided by BNYM's transfer agent, Registered Holder Settlement Class Members do not need to file a claim in order to be eligible to receive a distribution from the Settlement—an additional benefit of the Settlement. None of the settlement funds will revert to BNYM.

---

[16]     The Settlement is not a claims-made settlement. If the Settlement is approved, BNYM will have no right to the return of any portion of the Settlement based on the number or value of Claims submitted. *See* Stipulation ¶ 11.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorneys' fees are taken into account. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 30% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Plaintiffs' Counsel and the risks in the litigation. Most importantly, with respect to the Court's consideration of the Settlement's fairness, is the fact that approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiffs nor Lead Plaintiffs' Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 34.

Lastly, the amended Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth certain conditions under which BNYM may terminate the Settlement if potential Settlement Class Members who meet certain criteria exclude themselves from the Settlement Class. *See* Stipulation ¶ 33. This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement.[17]

## F.     The Settlement Treats Settlement Class Members Equitably Relative to Each Other

The proposed Settlement treats members of the Settlement Class equitably relative to one another. As discussed below in § III, pursuant to the Plan of Allocation, all Authorized Recipients

---

[17]     *See, e.g., Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

will receive their *pro rata* share of the recovery based on the eligible ADRs they held and the cash

distributions they received in connection with such holdings during the relevant time period.

## III.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

To merit approval, a plan of allocation "must also meet the standards by which the

settlement was scrutinized—namely, it must be fair and adequate." *Meredith Corp.*, 87 F. Supp.

3d at 667; *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012). A plan of allocation "need

not be perfect"; rather, an allocation formula "need only have a reasonable, rational basis,

particularly if recommended by experienced and competent class counsel." *Meredith Corp.*, 87 F.

Supp. 3d at 667. Accordingly, in determining whether a plan of allocation is fair, courts look

largely to the opinion of counsel. *Facebook*, 343 F. Supp. 3d at 414; *In re NASDAQ Litig.*, 2000

WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000).

Here, the Plan of Allocation ("Plan") is designed to achieve an equitable distribution of the

Net Settlement Fund among as many Settlement Class Members as possible.[18] In developing the

Plan, Lead Plaintiffs' Counsel worked closely with Lead Plaintiffs' damages expert to calculate

the average margin for each of the eligible ADRs for which BNYM acted as the depositary

sponsored by an issuer (as identified in the Appendix to the Notice), utilizing data produced by

BNYM concerning the amount (if any) it retained for cash distributions issued for the ADRs during

the relevant period. ¶ 174.

The Plan will calculate a "Recognized Loss Amount Per ADR" for each eligible ADR that

was held by a Settlement Class Member during the relevant time period (January 1, 1997 through

---

[18]    As noted above, Registered Holder Settlement Class Members do not need to file a Claim Form in order to be eligible to receive a distribution from the Settlement. KCC will use the holding and distribution information provided by BNYM's transfer agent to calculate their claims.

January 17, 2019, inclusive) and for which they received a Cash Distribution. This calculation will be done by multiplying the gross amount of the Cash Distribution received by the Settlement Class Member for the eligible ADR by the Average Margin for ADR set forth in Table 1 of the Plan. The sum of each Settlement Class Member's Recognized Loss Amounts Per ADR will be their "Recognized Claim," and the Net Settlement Fund will be distributed to Authorized Recipients on a *pro rata* basis based on the size of their Recognized Claim in comparison to the total Recognized Claims. ¶ 176. *See generally In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 581 (S.D.N.Y. 2008) ("Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach."). Once KCC has processed all claims for this matter and provided Non-Registered Settlement Class Members with an opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, Lead Plaintiffs' Counsel will move the Court for authorization to distribute the Net Settlement Fund to Authorized Recipients. ¶ 177.

Here, the Plan has a "reasonable, rational basis," and is the product of careful consideration by Lead Plaintiffs' Counsel, who are experienced and sophisticated in managing and resolving complex class actions, and their expert. Thus, the Plan should be approved.

## IV.   THE NOTICE OF SETTLEMENT SATISFIES DUE PROCESS REQUIREMENTS AND IS REASONABLE

Lead Plaintiffs have provided the Settlement Class with notice of the proposed Settlement that satisfies all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—i.e., it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114 (noting "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements"); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 166 (S.D.N.Y. 2007)

("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members."). Both the substance of the Notice and the method of its dissemination to the Settlement Class satisfied these standards.

Here, Lead Plaintiffs' Counsel retained two administrators to ensure that notice of the Settlement was sufficiently provided to Settlement Class Members in this Action. In accordance with the Notice Order, KCC mailed Post-Card Notices via first-class mail to all Registered Holder Settlement Class Members who were identified by Computershare. KCC also posted the long-form Notice, Claim Form, and other relevant documents on a website developed for the Settlement (wwwBNYMADRFXSettlement.com), and manages a call center to respond to Settlement Class Member inquiries. Ex. 1, ¶¶ 7-8. Likewise, HF Media coordinated an extensive media and Internet-based notice campaign in which, over a 79 day duration, the Summary Notice was published in eight magazines, three newspapers, and investment e-newsletters, as well as transmittal over *PRNewswire*, and banner ads were served over a variety of business, news and investment websites, and across social media platforms. Ex. 2, ¶ 14.

The Post-Card Notice, Summary Notice, and banner ads directed recipients to the websites and the long-form Notice for additional information. These various methods of notice, in combination with the long-form Notice, provide all of the necessary information for Settlement Class Members to make an informed decision regarding the Settlement. Specifically, the Notice informs Settlement Class Members of, among other things: (1) the nature of the Action; (2) the definition of the Settlement Class; (3) the claims and defenses asserted; (4) the right of a Settlement Class Member to enter an appearance through an attorney if it so desires; (5) the right of a Settlement Class Member to be excluded from the Settlement Class; (6) the right of a Settlement

Class Member to object to any aspect of the Settlement; (7) the time and manner for requesting exclusion or objecting; (8) a description of the terms of the Settlement; (9) the binding effect of the Settlement on Settlement Class Members that do not elect to be excluded; and (10) the date and time of the Final Approval Hearing. *See* Fed. R. Civ. P. 23(c)(2)(B). The Notice also advises that Lead Plaintiffs' Counsel will apply to the Court for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund as well as reimbursement of Litigation Expenses, including Service Awards to Lead Plaintiffs.

This combination of individual first-class mail to those Settlement Class Members who could be identified with reasonable effort (i.e., the Registered Holder Settlement Class Member) combined with an extensive media and Internet-based campaign was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g., Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123–24 (S.D.N.Y. 2001) (approving notice plan and concluding that "reasonable efforts were taken to notify all members of the class" where part of the class received direct mail notice and part of the class was covered by publication notice).[19]

## V.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

In connection with preliminary approval, Lead Plaintiffs requested that the Court find, in accordance with Rule 23(e)(1)(B)(ii), that it "w[ould] likely be able to...certify the class for purposes of judgment on the proposal" so that notice of the Settlement could be issued. In its

---

[19]    *See also Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal. 2016) (approving notice program that "utilizes a combination of individual notice to known class members in the form of Email Notices and Post–Card Notices and a schedule of publication notices in English and Spanish in magazines, on certain internet networks, on Facebook, and in a press release" and for which, according to notice expert, "the notices will reach 75% of targeted potential class members, on average, 2.3 times"); *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *14 (S.D.N.Y. July 15, 2014) (approving publication notice as "best practicable notice plan under the circumstances" where a "direct notice program is not feasible" for part of the settlement class).

Notice Order, the Court found, solely for purposes of effectuating the Settlement, "that the prerequisites for class action certification under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure are likely to be found to be satisfied." ECF No. 149, ¶ 6 (analyzing how the Action satisfies each element for class certification). Nothing has changed to alter the Court's findings in its Notice Order and, for all the reasons stated in the Memorandum in Support of Lead Plaintiffs Unopposed Motion for Approval of the Proposed Forms and Manner of Notice to be Disseminated in Connection with the Proposed Settlement (ECF No. 147), incorporated herein by reference, Lead Plaintiffs respectfully request that the Court finally certify the Settlement Class for purposes of settlement.

## VI.    CONCLUSION

For the reasons stated herein and in the Joint Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement, approve the Plan of Allocation, and certify the Settlement Class for purposes of effectuating the Settlement.

Dated:  April 29, 2019                                Respectfully submitted,

**KESSLER TOPAZ MELTZER**                    **LIEFF CABRASER HEIMANN**
**& CHECK, LLP**                                          **& BERNSTEIN, LLP**

By:  /s/ Sharan Nirmul                              By:  /s/ Daniel P. Chiplock

Joseph H. Meltzer                                      Daniel P. Chiplock
Sharan Nirmul                                            Daniel E. Seltz
Ethan Barlieb                                              Michael J. Miarmi
Jonathan F. Neumann                                250 Hudson Street, 8th Floor
280 King of Prussia Road                           New York, NY 10013
Radnor, PA 19087                                       Telephone: (212) 355-9500
Telephone: (610) 667-7706                         Facsimile: (212) 355-9592
Facsimile: (610) 667-7056                          dchiplock@lchb.com
jmeltzer@ktmc.com                                    dseltz@lchb.com
snirmul@ktmc.com                                     mmiarmi@lchb.com
ebarlieb@ktmc.com
jneumann@ktmc.com                                 Elizabeth J. Cabraser
                                                              Robert L. Lieff (*of counsel*)
                                                              275 Battery Street, 29th Floor

*Interim Lead Counsel for Lead Plaintiffs and the Settlement Class*

**HACH ROSE SCHIRRIPA & CHEVERIE, LLP**

By:   /s/ Frank R. Schirripa
      Frank R. Schirripa
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
fschirripa@hrsclaw.com

*Counsel for Plaintiff International Union of Operating Engineers Local 138 Annuity Fund*

San Francisco, CA  94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
ecabraser@lchb.com
rlieff@lchb.com

*Interim Lead Counsel for Lead Plaintiffs and the Settlement Class*