**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: THE BANK OF NEW YORK MELLON ADR FX LITIGATION | 16-CV-00212-JPO-JLC |
| | ECF Case |
| This Document Relates to: | |
| ALL ACTIONS | |

**MEMORANDUM IN SUPPORT OF LEAD PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION <u>EXPENSES, INCLUDING SERVICE AWARDS TO LEAD PLAINTIFFS</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 5

I. THE REQUESTED FEE IS REASONABLE AND SHOULD BE APPROVED ............ 5

    A. A "Baseline Fee" of 30% of the Settlement Fund Class Fund Compares Favorably to Fees Awarded in Settlements of Similar Size and Complexity, Given the Circumstances of This Case. ........................................... 6

    B. The Other *Goldberger* Factors Likewise Support the Requested Fee. ................ 11

        1. Plaintiffs' Counsel, working entirely on a contingent basis, faced the very real prospect of no recovery due to the significant factual and legal hurdles in the case. ................................................. 11

        2. Plaintiffs' Counsel provided exemplary representation of the Class. ....... 16

        3. Public policy considerations support the proposed fee. ........................... 18

    C. The Requested Fee Reflects a Modest Multiplier that Falls Toward the Low End of Those Regularly Approved in This Circuit. .................................... 18

II. LEAD PLAINTIFFS' COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES, INCLUDING SERVICE AWARDS, SHOULD BE GRANTED .......................................................................................................... 23

    A. Plaintiffs' Counsel's Expenditures on the Class's Behalf Were Reasonable. ..................................................................................................... 23

    B. Service Awards to Lead Plaintiffs Are Warranted Given Their Devotion to the Class, Which Helped Achieve This Extraordinary Result. ........................... 23

CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Allapattah Servs., Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................................... 10

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)............................................................................................... 9

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   2012 WL 2064907 (S.D.N.Y. June 7, 2012) ............................................ 19, 22, 25

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
   2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)........................................................ 24

*Blum v. Stenson*,
   465 U.S. 886 (1984)............................................................................................. 21

*Bodnar v. Bank of Am., N.A.*,
   2016 WL 4582084 (E.D. Pa. Aug. 4, 2016) ........................................................ 20

*City of Providence v. Aeropostale, Inc.*,
   2014 WL 1883494 (S.D.N.Y. May 9, 2014) .................................................. 17, 22

*Farbotko v. Clinton Cnty.*,
   433 F.3d 204 (2d Cir. 2005) ................................................................................ 21

*Fleisher v. Phoenix Life Ins. Co.*,
   2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)................................................*passim*

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ............................................................................*passim*

*Grandalski v. Quest Diagnostics Inc.*,
   767 F.3d 175 (3d Cir. 2014) ................................................................................ 14

*Grice v. Pepsi Beverages Co.*,
   363 F. Supp. 3d 401 (S.D.N.Y. 2019) ......................................................... 5, 10, 16

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006)...................................................... 19

*In re Amaranth Natural Gas Commodities Litig.*,
   2012 WL 2149094 (S.D.N.Y. June 11, 2012) ................................................. 6, 20

*In re Bisys Sec. Litig.*,
   2007 WL 2049726 (S.D.N.Y. July 16, 2007) ............................................ 7, 18, 19

*In re Chambers Dev. Sec. Litig.*,
   912 F. Supp. 822 (W.D. Pa. 1995)....................................................................... 17

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Checking Account Overdraft Litig.*,
  830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................................................................. 10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)......................................................... 24

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004)............................................................................ 19

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................... 10, 17

*In re Lloyd's Am. Trust Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)...................................................... 19

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ....................................................................... 17, 24

*In re Michael Milken & Assocs. Sec. Litig.*,
  150 F.R.D. 57 (S.D.N.Y. 1993) .............................................................................. 14

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  252 F.R.D. 83 (D. Mass. 2008)............................................................................... 14

*In re Priceline.com, Inc. Sec. Litig.*,
  2007 WL 2115592 (D. Conn. July 20, 2007). .......................................................... 9

*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................................... 8

*In re Vitamins Antitrust Litig.*,
  2001 WL 34312839 (D.D.C. July 16, 2001) .......................................................... 10

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) ................................................................................... 14

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) .............................................................................. 14

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ............................................................... 18, 19

*McGreevy v. Life Alert Emergency Response, Inc.*,
  258 F. Supp. 3d 380 (S.D.N.Y. 2017) ...................................................................... 5

*Meredith Corp. v. SESAC, LLC*,
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) ...................................................................... 15

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
  2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016)....................................................... 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Normand v. Bank of N.Y. Mellon*,
  2016 WL 5477783 (S.D.N.Y. Sept. 29, 2016) ........................................................ 12

*Ret. Bd. of Policemen's Annuity & Pension Fund of Chi. v. Bank of N.Y. Mellon*,
  775 F.3d 154 (2d Cir. 2014) ................................................................................... 13

*Velez v. Novartis Pharm. Corp.*,
  2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .................................................... 6, 19

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
  2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) .................................................. 20, 22

## TREATISES

Alba Conte, *Attorney Fee Awards* § 2:8 (3d ed. 2004) ................................................ 8

## OTHER AUTHORITIES

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
  7 J. EMPIRICAL LEGAL STUD. 811 (Dec. 2010) ...................................................... 10

Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*,
  1 J. EMPIRICAL LEGAL STUDIES 27 (2004) .............................................................. 10

NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation:*
  *2018 Full-Year Review*, .................................................................................... 8, 16

Theodore Eisenberg & Geoffrey Miller, *A New Look at Judicial Impact: Attorneys' Fees in*
  *Securities Class Actions After Goldberger v. Integrated Resources, Inc.*,
  29 Wash. U. J.L. & POL'Y 5 (2009) ......................................................................... 6

Theodore Eisenberg, Geoffrey Miller, & Roy Germano, *Attorneys' Fees in Class Actions:*
  *2009-2013*, 92 N.Y.U. L. REV. 937 (2017) ......................................................... 10, 19

Lead Plaintiffs' Counsel Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") and Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") respectfully submit this brief in support of their application under Federal Rule of Civil Procedure 23(h) for an award of attorneys' fees to Plaintiffs' Counsel and reimbursement of Litigation Expenses, including Service Awards to Lead Plaintiffs.[1] These requests are further supported by (1) the accompanying Joint Declaration of Sharan Nirmul and Daniel P. Chiplock ("Joint Declaration"), which details the extensive efforts that led to the successful prosecution of this Action and the pending Settlement, including Lead Plaintiffs' contributions to the case; and (2) declarations from Lieff Cabraser, Kessler Topaz, and Hach Rose detailing their lodestar and expenses.[2]

## PRELIMINARY STATEMENT

Lead Plaintiffs' Counsel seek an award of $21.75 million in attorneys' fees (plus interest) to be allocated among Plaintiffs' Counsel, which amounts to 30% of the $72.5 million achieved in this hard-fought, well-developed litigation. The requested fee also corresponds to a blended 1.50 multiplier of the lodestar (number of hours x customary hourly rates) Plaintiffs' Counsel committed to this litigation on a contingent basis since its commencement in January 2016. This request is justified by Plaintiffs' Counsel's commitment of time and resources in the face of the very real risk of receiving no remuneration, as well as the extraordinary recovery they achieved for Settlement Class Members.

---

[1] Plaintiffs' Counsel consist of Lieff Cabraser; Kessler Topaz; and Hach Rose Schirripa & Cheverrie LLP ("Hach Rose").

[2] Unless otherwise indicated, capitalized terms and abbreviations have the same meaning as in the Stipulation and Agreement of Settlement ("Stipulation") attached as Exhibit 1 to the Declaration of Daniel P. Chiplock ("Chiplock Decl.") (ECF No. 147-2) in support of Lead Plaintiffs' Unopposed Motion for Approval of the Proposed Forms and Manner of Notice to Be Disseminated in Connection with the Proposed Settlement ("Notice Motion"), or as used in the Notice Motion. Additionally, Lead Plaintiffs' Counsel use "Settlement Class Members" and "Class Members" interchangeably in this brief. Finally, unless otherwise indicated, all internal citations and quotation marks have been omitted from this brief, and all emphasis has been added.

This Settlement is commendable by any measure.  The $72.5 million Settlement Amount represents nearly 24% of the approximately $303.6 million total margin amount attributable to the Settlement Class, as agreed to by the parties for purposes of the Settlement ("Agreed Margin Amount"), and which is consistent with Lead Plaintiffs' damages expert's calculation during litigation.  This far surpasses the typical percentage recoveries in cases alleging financial misconduct.  Further, none of the Net Settlement Fund will revert to BNYM.

Nor was this success preordained.  Plaintiffs' Counsel fought for more than three years—in the face of vigorous opposition by a well-funded adversary and sophisticated, able defense counsel—to meet numerous challenges.  *See* Joint Decl. ¶¶ 20-148, 166-72, 180-85.  Among other things, Plaintiffs' Counsel:

- Analyzed deposit agreements and articulated a cogent theory of liability relating to BNYM's foreign exchange ("FX") conversions in connection with ADR-related distributions, a complex and opaque area of the Bank's business;

- Largely prevailed on BNYM's motion to dismiss, which involved numerous complex issues, including whether plaintiffs' claims were precluded by the Securities Litigation Uniform Standards Act ("SLUSA"); whether the subject provisions of the deposit agreements prohibited BNYM from obtaining a spread (i.e., margin) on FX transactions in connection with ADR distributions (above the fees permitted by the deposit agreements and the spread BNYM traders secured in managing risk); and whether Class Members' claims, which go back to 1997, were mostly time-barred;

- Reviewed more than 2.7 million pages of documents, as well as 136,000 Excel documents, produced by BNYM;

- Produced more than 23,000 pages of documents to BNYM;

- Worked with an expert to develop a Classwide damages methodology, which entailed analyzing internal BNYM information regarding FX trading and determination of margins on FX transactions, as well as addressing issues with the Bank's data;

- Took or defended 20 depositions;

- Opposed BNYM's motion for partial summary judgment based on statutes of limitations;

- Fully briefed a motion for class certification, including providing a detailed analysis of the relevant provisions in more than 100 deposit agreements and an analysis of the laws of 50 states and the District of Columbia regarding fraudulent concealment;

- Worked for nearly 10 months to negotiate and formalize this Settlement, including in-person mediation sessions with the Honorable Layn Phillips (Ret.) and his colleagues at Phillips ADR as well as numerous phone calls and e-mails, in addition to significant coordination with BNYM and Lead Plaintiffs' Counsel's damages expert to determine the ADR issuances that would be covered by the Settlement and the Agreed Margin Amount associated with those issuances;

- Coordinated with BNYM's transfer agent Computershare, Inc. to identify Registered Holder Settlement Class Members, and developed the Plan of Allocation to provide for disbursement of the Net Settlement Fund among Registered Holder Settlement Class Members and Non-Registered Holder Settlement Class Members;[3] and

- Developed the Notice Program, including working with Publication Notice Plan Administrator HF Media, LLC to address how to reach potential Non-Registered Holder Settlement Class Members through electronic and print media.

Plaintiffs' Counsel thus devoted significant time and money to prosecute claims that were far from "cookie-cutter," requiring creativity and perseverance. The requested fee reflects that extraordinary work.

This case also entailed significant risk both with respect to establishing BNYM's liability and obtaining (and maintaining) certification of a class:

*First*, Lead Plaintiffs' claims covered more than two decades of conduct and arose from BNYM's representations and practices about a complex area of its business: ADR FX conversions. Further, BNYM's representations in the relevant deposit agreements, though materially similar, were not identical among all Class Members. Lead Plaintiffs thus had to

---

[3] For purposes of the Settlement, (i) a Registered Holder Settlement Class Member is "a Settlement Class Member who holds (or held) eligible securities directly, who is listed in the records of BNYM's transfer agent [Computershare] with respect to such holdings, and whose contact, holding, and distribution information has been provided by BNYM's transfer agent," Stip. ¶ 1(kk); and (ii) a Non-Registered Holder Settlement Class Member is "a Settlement Class Member who is not a Registered Holder Settlement Class Member, including a Settlement Class Member who holds (or held) eligible securities through a bank, broker, or other nominee rather than directly," *id.* ¶ 1(z).

develop a coherent narrative, and theory of liability, from information gathered through more than a dozen BNYM witnesses and hundreds of documents selected from the millions of pages produced.

*Second*, unlike a typical securities fraud action, the ability to achieve a meaningful recovery in this case turned significantly on demonstrating Lead Plaintiffs' standing to represent a Class consisting of investors who held ADRs issued by hundreds of different issuers over a more than 20-year period.  Indeed, the prospect of recovering nothing for a substantial portion of the proposed Class was far more tangible in this case than most, as a March 2018 decision in similar litigation against Citibank held plaintiffs failed to demonstrate standing to pursue claims of absent class members who owned ADRs not owned by any named plaintiff.  *See Merryman v. Citigroup, Inc.*, 2018 WL 1621495, at *8-11 (S.D.N.Y. Mar. 22, 2018).  That ruling became a linchpin of BNYM's arguments against class certification in this case, and while Lead Plaintiffs presented record evidence to distinguish *Merryman*, they faced a significant risk this Court would ultimately rule in the Bank's favor.

*Third*, given the extraordinarily long proposed Class Period, which reflected the duration of the wrongful conduct alleged, Lead Plaintiffs faced a serious possibility the Court would agree with BNYM that most of the Class's claims were time-barred.  The Bank's motion for partial summary judgment on that ground was pending when the parties reached this Settlement.  Accordingly, even if the Court ultimately certified a litigation class, it might have held only claims encompassing FX transactions within only a few years of the case's commencement could proceed, which would have vastly reduced Classwide damages.

The requested fee is, in short, commensurate with Plaintiffs' Counsel's vigorous efforts as well as the end result.  Lead Plaintiffs' Counsel also respectfully submit that the expenses

incurred by Plaintiffs' Counsel in prosecuting this Action, totaling $1,377,383.93, were

reasonable and necessary, and that modest Service Awards to Lead Plaintiffs of $35,000 in the

aggregate are appropriate given their dedication on behalf of all Class Members.  This

application should therefore be granted in full.

## ARGUMENT

### I.    THE REQUESTED FEE IS REASONABLE AND SHOULD BE APPROVED

The law regarding fee applications in this Circuit demonstrates there is no one-size-fits-

all approach to determining the appropriate fee in a class case.  The assessment is far more art

than science.  Within that context, this Court "applies the percentage of the fund method" and

considers the factors articulated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d

Cir. 2000), "in three steps."  *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401 (S.D.N.Y. 2019)

(Oetken, J.):

> First, the Court determines a reasonable baseline fee by comparing
> the requested rate to that awarded in "other common fund
> settlements of similar size and complexity, taking into account the
> requested fee in relation to the settlement, the magnitude and
> complexity of the instant case and the policy consideration of using
> a sliding scale based on the amount of the settlement to avoid a
> windfall to class counsel."  Next, the Court considers some of the
> remaining *Goldberger* factors, such as the risk Class Counsel faced
> in litigating this case, the quality of representation provided by
> Class Counsel, and any remaining public policy concerns that
> render further adjustments to the baseline fee necessary.  Finally,
> the Court will apply the lodestar method as a cross-check, in order
> to compare the resulting awarded percentage with the time and
> labor actually expended by Class Counsel.

*Id.* (quoting *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385

(S.D.N.Y. 2017)).  Each of those factors supports the fee requested here.

**A.     A "Baseline Fee" of 30% of the Settlement Fund Class Fund Compares
        Favorably to Fees Awarded in Settlements of Similar Size and Complexity,
        Given the Circumstances of This Case.**

All the hallmarks of a challenging case—complex facts, nettlesome legal issues, a well-

funded defendant, and sophisticated opposing counsel—were present here.  Courts both within

and outside the Second Circuit have, in similar circumstances, awarded percentages at and above

30% of funds comparable to (and even larger than) this one.  Indeed, as Judge McMahon has

observed, "[t]he federal courts have established that a standard fee in complex class action cases

. . . where plaintiffs counsel have achieved a good recovery for the class, ranges from 20 to 50

percent of the gross settlement benefit," and "[d]istrict courts in the Second Circuit routinely

award attorneys' fees that are 30 percent or greater."  *Velez v. Novartis Pharm. Corp.*, 2010 WL

4877852, at *21 (S.D.N.Y. Nov. 30, 2010).

In *In re Amaranth Natural Gas Commodities Litigation*, for example, Judge Scheindlin

awarded a fee consisting of 30% of the $77.1 million settlement amount, which was "close to the

standard range for fee awards given under *Goldberger*."  2012 WL 2149094, at *2 (S.D.N.Y.

June 11, 2012); *see also id.* at n.12 (citing Theodore Eisenberg & Geoffrey Miller, *A New Look

at Judicial Impact: Attorneys' Fees in Securities Class Actions After Goldberger v. Integrated

Resources, Inc.*, 29 WASH. U. J.L. & POL'Y 5, 18 (2009) (noting mean and median fee awards

under *Goldberger* were 26.03% and 27.25%, respectively)).  The court highlighted, among other

things, plaintiffs' counsel's successes on threshold motions, the complex and time-consuming

nature of the case, and the reasonableness of the fee in relation to the settlement amount, as it

"compensate[d] plaintiffs' counsel for their efforts, but . . . also ensure[d] that class members

receive[d] an adequate recovery."  *Id.* at *2.  So too, here.

Indeed, the considerations supporting a 30% fee in this case are stronger than those in

*Amaranth*, where "plaintiffs followed in the footsteps of investigations by NYMEX and the

Commodity Futures Trading Commission," and "[c]ertain defendants . . . were also defendants in an action brought by the CFTC that related to the same underlying facts," resulting "in a consent order in which Amaranth settled for $7.5 million and was enjoined from further violations of the relevant provisions of the Commodity Exchange Act." *Id.*  Plaintiffs' Counsel, by contrast, did not have the benefit of government investigations and resolutions providing private litigants with a blueprint for success on their claims against BNYM.

Similarly, in *In re Bisys Securities Litigation*, Judge Rakoff awarded 30% of a $65.87 million settlement fund, observing that as a general matter, "[a] 30% fee [would be] consistent with fees awarded in . . . class action settlements in the Second Circuit."  2007 WL 2049726, at *2 (S.D.N.Y. July 16, 2007) (alterations and ellipsis in original).  And while noting "most such case[s] have involved smaller settlement funds and therefore have not bestowed so large a sum, in absolute terms, on class counsel," the court noted the extraordinarily "high level of risk," the "extensive discovery," and the "positive . . . final result for class members" obtained by counsel. *Id.* at *2, *3.

With respect to the effort involved in pursuing class members' claims, lead counsel in *Bisys* noted their work "over the course of more than two (2) years" included (1) "[i]nvestigating the circumstances surrounding the Company's restatement announcement, including interviews of former Company employees"; (2) "[r]esearching and drafting the operative 94-page Complaint"; (3) "[l]itigating a complicated array of motions to dismiss, which challenged all aspects of the Complaint"; (4) "[m]astering the information, data and documents through the creation of an electronic data base"; (5) "[c]onsulting with the Class's experts with respect to accounting, damages and liability issues"; (6) "[r]eviewing, analyzing and mastering both the [PricewaterhouseCoopers] audit workpapers and more than 2.0 million pages of documents

produced by Defendants and third-parties"; (7) "[c]onducting numerous depositions of parties, Company employees, and third parties"; and (8) "[e]ngaging in multiple rounds of adversarial settlement discussions, including several mediation sessions with The Honorable Nicolas H. Politan." Case No. 1:04-cv-03840-JSR-GWG, ECF No. 143, at 7-8. As discussed at pages 2-4 above and detailed in the Joint Declaration, Plaintiffs' Counsel's efforts here were at least as extensive.

Further, the $72.5 million Settlement Amount represents nearly 24% of the Agreed Margin Amount, i.e., the measure of damages the parties attribute (for purposes of the Settlement) to the issuances encompassed by the Settlement—far in excess of the typical recovery rate in class settlements of this size.[4] According to one study, for example, the median settlement between 1996 and 2018 in securities class cases of between $50 million and $99 million reflected 4.7% of investor losses.[5] And assuming a 30% fee and reimbursement of $1,412,383.93 in Litigation Expenses (including $35,000 in Service Awards)—totaling $23,162,383.93 of the Settlement Amount—Class Members will receive 16.25% of the Agreed Margin Amount—several times the typical recovery rate in class settlements of this size. Plaintiffs' Counsel have, in short, achieved a recovery for Class Members far beyond the norm, and should be compensated accordingly.[6]

---

[4] The precise Agreed Margin Amount, as stated in the parties' confidential Supplemental Agreement in connection with the Settlement, is $303,588,299.

[5] See NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, available at https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Final.pdf ("*Recent Trends 2018*"), at 35.

[6] Courts routinely base fee awards on the percentage of the total (or gross) settlement amount, not a net amount after reimbursement of expenses. *See, e.g.*, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 n.34 (E.D.N.Y. 2003) (citing *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000), for the proposition that "it makes no difference whether attorneys' fees are based on the net or gross recovery, so long as the fee is reasonable"); Alba Conte, 1 *Attorney Fee Awards* § 2:8 (3d ed. 2004) ("The prevailing view is that expenses are awarded in addition to the fee percentage.").

Finally, in *In re Priceline.com, Inc. Securities Litigation*, Judge Covello awarded lead counsel a fee consisting of 30% of the $80 million settlement amount.  As here, counsel in that case "investigated publicly available materials, reviewed millions of pages of documents, consulted with experts, conducted ongoing research and drafted court documents for an extensive motions practice, formulated litigation strategy, prepared for and participated in multiple mediation sessions, and negotiated and administered the . . . settlement."  2007 WL 2115592, at *5 (D. Conn. July 20, 2007).  The court further highlighted that plaintiffs "developed their own theory of liability and damages, as there was not a government prosecution in this case," and "[p]roving the elements of this case would be a necessary and formidable task."  *Id.*  The "effort by counsel," as well as "the result obtained and similar awards in comparable cases in this circuit," all "weigh[ed] in favor of the requested fee."  *Id.*

Plaintiffs' Counsel similarly expended significant effort in researching and prosecuting Class Members' claims, as well as negotiating and administering this extraordinary Settlement.  Further, unlike securities (or commodities) cases like *Priceline.com*, *Bisys*, and *Amaranth*— where "[p]redominance is a test readily met," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)—Plaintiffs' Counsel faced a higher prospect that the class would not be certified, given questions as to class standing as well as the potential need to apply the laws of various states.  The requested fee is thus well-supported.

While Lead Plaintiffs' Counsel appreciate that a non-random sample of fee awards does not establish a definitive benchmark, it illustrates courts' willingness to award substantial percentages of settlement funds where the particular circumstances of those cases warranted it, including accounting for "the policy consideration of using a sliding scale based on the amount

of the settlement to avoid a windfall to class counsel." *Grice*, 363 F. Supp. 3d at 406.[7]  The

percentage requested here reflects the extensive work and extraordinary risk Plaintiffs' Counsel

undertook to prosecute this case; there is no "windfall."  Rather, Lead Plaintiffs' Counsel are

confident a 30% fee strikes the appropriate balance between rewarding counsel for their

successful efforts and the Court's (as well as Lead Plaintiffs' Counsel's) duty to protect Class

Members' interests.

        Several studies of recent class settlements also support the proposed fee.  A 2010 study

surveying all class settlements during 2006-2007, for example, found the mean and median

percentages awarded for settlements between $30 million and $72.5 million were 22.3% and

24.9%, respectively, with a standard deviation of 8.4%.  *See* Brian T. Fitzpatrick, *An Empirical*

*Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 839

(at Table 10) (2010) ("Fitzpatrick Study"); *Grice*, 363 F. Supp. 3d at 406-07 (relying on

Fitzpatrick Study and other studies).  Similarly, in their most-recent survey of attorneys' fees and

class recoveries, prominent commentators Theodore Eisenberg and Geoffrey Miller observe the

mean and median percentage fees in class cases in this District from 2009 to 2013 were 27% and

31%, respectively.  Theodore Eisenberg, Geoffrey Miller, & Roy Germano, *Attorneys' Fees in*

*Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 950 (2017).  Eisenberg and Miller have

opined, moreover, that "fee requests falling within one standard deviation above or below the

mean should be viewed as generally reasonable and approved by the court unless reasons are

shown to question the fee."  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class*

*Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUDIES 27, 74 (2004).  The 30%

---

[7] *See also, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) ("*IPO*") (awarding
fee representing one-third of $510 million); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367
(S.D. Fla. 2011) (30% of approximately $410 million); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185,
1240 (S.D. Fla. 2006) (31.33% of $1.038 billion); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10
(D.D.C. July 16, 2001) (34.06% of $359.4 million).

fee requested here falls within one standard deviation of the mean reported in the Fitzpatrick Study.

The above caselaw and studies demonstrate a 30% fee is reasonable for this case. Particularly so given its extraordinary complexity and higher risk—relative to, for example, federal securities cases—that a class would not be certified (or could not be maintained through trial) and that Lead Plaintiffs' or other Class Members' claims would be dismissed on summary judgment or fail at trial.

**B.    The Other *Goldberger* Factors Likewise Support the Requested Fee.**

The remaining *Goldberger* factors—the risks confronting Plaintiffs' Counsel, the quality of representation they have provided, and public policies favoring private remediation of financial misconduct and providing incentives to counsel to pursue important cases on a contingent basis—all support a 30% fee.

> **1.    Plaintiffs' Counsel, working entirely on a contingent basis, faced the very real prospect of no recovery due to the significant factual and legal hurdles in the case.**

Plaintiffs' Counsel faced substantial risk at every stage of this Action.  Indeed, even having survived BNYM's motion to dismiss, most of the issues the Bank raised were tested again on summary judgment and at the class certification stage, and would have continued to pose hurdles at trial (assuming the claims survived until then).

In moving to dismiss Named Plaintiffs' claims, BNYM asserted (1) the claims were entirely precluded by SLUSA's mandate that claims in "covered class actions" based on misrepresentations in connection with the purchase or sale of a security must be brought under the federal securities laws; (2) because they arose from alleged conduct beginning in 1997, many Class Members' claims were barred by the governing statutes of limitations; (3) Named Plaintiffs lacked standing to assert claims based on ADRs they did not own; (4) because they

were beneficial, not record, holders of the subject ADRs, Named Plaintiffs lacked standing to sue under the deposit agreements; and (5) Named Plaintiffs failed to plausibly allege BNYM breached the agreements.  While Named Plaintiffs prevailed on those issues at the pleading stage, the Court expressly deemed the class standing question "premature," determining it was best resolved on a motion for class certification.  *Normand v. Bank of N.Y. Mellon*, 2016 WL 5477783, at *7-8 (S.D.N.Y. Sept. 29, 2016).  Additionally, the Court rejected BNYM's statute-of-limitations arguments "without prejudice to renewal, either on summary judgment after discovery, or at trial."  *Id.* at *9.  Accordingly, while Named Plaintiffs' breach-of-contract claims survived dismissal, some of those same questions continued to loom over the case.  And indeed, BNYM later moved for partial summary judgment on statute-of-limitations grounds, and pressed its challenge to class standing in opposing Lead Plaintiffs' motion for class certification.

In particular, certification of a class—especially a class including investors who held ADRs Named Plaintiffs did not—was far from certain.  BNYM's challenge to class standing, moreover, drew force from Judge McMahon's ruling in substantially similar ADR-related litigation against Citibank (which, coincidentally, was issued as the parties in this case began their first mediation session).  The court there certified a class, but limited it to issuances the class representatives held, significantly narrowing the case.  *Merryman*, 2018 WL 1621495, at *5-11.  In addition to noting the evidentiary "burden" of having to introduce 34 deposit agreements at trial (far fewer than the number of agreements at issue here), the court held that while plaintiffs "contend[ed] that Citibank had a spread retention 'policy' applicable to all ADRs it administered," absent "a concession on this point by Citibank," plaintiffs would "nonetheless be required to prove, not only the existence of such a policy, but the fact that Citibank adhered to that policy in each and every instance."  *Id.* at *10.  The court further explained:

> Proving that Citibank impermissibly deducted the spread between
> the rate at which it actually converted a cash distribution into USD
> and the rate it used to determine how much cash it would actually
> distribute would require Plaintiffs to offer evidence of (1) the
> actual FX rate used when converting a particular cash distribution
> into dollars, and (2) the actual FX rate used when remitting the
> proceeds of that cash distribution to Plaintiffs.

*Id.* The court analogized that burden to the obstacles in *Retirement Board of Policemen's Annuity & Pension Fund of Chicago v. Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014), "where the court anticipated that the trier of fact would have to undertake a 'case-by-case' examination of each mortgage loan that was alleged to have been improperly underwritten," which the named plaintiffs "had an incentive to do when their own investments were concerned, but far less incentive to do when they had no prospect of personal recovery." *Merryman*, 2018 WL 1621495, at *10 (quoting *Ret. Bd.*, 775 F.3d at 167).

While Plaintiffs' Counsel believed the evidence adduced during discovery distinguished *Merryman*,[8] BNYM—armed with Judge McMahon's ruling—vigorously contested standing in challenging certification of a litigation class.[9] Plaintiffs thus faced the serious prospect that even if the Court certified a class, it would have consisted only of issuances Named Plaintiffs held, which would have significantly lowered the potential damages. Further, while Named Plaintiffs attempted to partially obviate that outcome by putting forth Chester County Employees Retirement Fund ("Chester County") (which held a number of additional relevant issuances) as an additional named plaintiff and class representative, BNYM challenged Chester County's proposed inclusion, asserting Named Plaintiffs could not show "good cause" under Federal Rule

---

[8] *See* Pls.' Br. in Supp. of Mot. for Class Certification (ECF No. 122) at 15-22.

[9] *See* BNYM's Opp. to Mot. for Class Certification (ECF No. 130) ("Class Cert. Opp.") at 15-23. The Bank also highlighted Judge Caproni's ruling rejecting class standing at the pleading stage in an ADR-FX case against JPMorgan. *See Merryman v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 5477776, at *15 (S.D.N.Y. Sept. 29, 2016) ("Because Plaintiffs' claims do not present the same set of concerns as the claims of the absent claims [sic] members who held the other 107 ADRs sponsored by JPM, Plaintiffs lack class standing to represent them.").

of Civil Procedure 16 for seeking to add Chester County after the Court-imposed deadline for adding parties.[10]  The Court ultimately might have agreed.

Additionally, not all of the deposit agreements for the subject ADRs contained the same language regarding BNYM's obligations with respect to FX pricing for ADR distributions.  And because of New York's borrowing statute, the statutes of limitations of numerous states as well as their legal standards regarding fraudulent concealment—a critical issue given the length of the Class Period—likely would have governed Class Members' claims.  While Plaintiffs' Counsel believed neither of those issues precluded class certification, the Court might have determined that common issues did not predominate or that a trial involving the laws of numerous states would be unmanageable.  *See, e.g.*, *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 148 (2d Cir. 2015) ("Although the specter of having to apply different substantive laws does not necessarily warrant refusing to certify a class, where . . . the variations in state law present insuperable obstacles to determining liability based on common proof, such variations defeat the predominance of common issues and the superiority of trying the case as a class action.").  At the very least, the applicability of multiple states' laws would have posed a challenge to Lead Plaintiffs in presenting a workable trial plan.[11]  And a favorable determination on any of those issues might have been overturned on appeal.  *See, e.g.*, *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 65 (S.D.N.Y. 1993) (noting "[i]t must also be recognized that victory even

---

[10] *See* BNYM's Br. in Opp. to Pls.' Mot. to Add Chester Cnty. as a Named Pl. (ECF No.117) at 6-17.

[11] *See, e.g.*, *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183 (3d Cir. 2014) ("plaintiffs face a significant burden to demonstrate that grouping [of similar state laws] is a workable solution"); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("The burden of showing uniformity or the existence of only a small number of applicable standards (that is, 'groupability') among the laws of the fifty states rests squarely with the plaintiffs"), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) ("In proposing to certify a class requiring the application of the laws of numerous jurisdictions, plaintiffs must . . . conduct[] an extensive review of state law variances to demonstrate how grouping would work.").

at the trial stage is not a guarantee of ultimate success," and citing case where multimillion-dollar judgment was reversed).

Nor was Lead Plaintiffs' damages methodology immune from risk.  Unlike a typical securities case, for example, where damages are assessed using commonly accepted regression analyses and event studies (though the parties often contest the *application* of those analyses), there was no template for measuring damages here.  Under Lead Plaintiffs' proposed methodology, Classwide damages primarily consisted of the sales margin, over and above the fees permitted under the deposit agreements and the profit generated by risk traders' management of risk, that was recorded in connection with BNYM's FX conversions for the subject ADRs (as well as interest, calculated using a simple annual interest rate of 9%, as prescribed under New York law).  While Plaintiffs' Counsel believed internal BNYM documents supported that measure of damages, the Bank disputed that interpretation,[12] and the matter likely would have come down to a battle of experts at trial—an inherently risky proposition.  *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *9 (S.D.N.Y. Sept. 9, 2015) (noting defendants "vigorously contested," *inter alia*, plaintiffs' damages expert's "conclusions in quantifying the alleged overcharges," and explaining "[t]he prospect of a battle at trial and establishing recovery for all Class members without decertification add[ed] substantial risk to Plaintiffs' claims").[13]  Plaintiffs' Counsel thus faced the prospect that even if they were to prevail on liability, their proffered damages methodology would be partially or entirely rejected.

---

[12] *See, e.g.*, Class Cert. Opp. at 14-15 (arguing "Plaintiffs' effort to contrive a methodology for determining classwide damages using common proof . . . requires them to calculate damages based on an internal accounting number (the Cover Rate) that has no consistent meaning and bears no relationship either to the theories of liability alleged in their Complaint or to the provisions of the Deposit Agreement on which they purport to rely").

[13] *See also Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 665 (S.D.N.Y. 2015) ("On the issue of damages, a trial would likely have turned heavily on a 'battle of the experts' between the parties' respective economists.  It is impossible to predict which party's model of damages—if either—the jury would credit.").

In sum, victory was far from assured at any stage, with meaningful hurdles to overcome to certify a class, overcome motions for summary judgment, win at trial, and preserve a favorable judgment on appeal.  The requested fee reflects the extraordinary risks Plaintiffs' Counsel undertook in pursuing this case on a contingency basis for more than three years.[14]

## 2.    Plaintiffs' Counsel provided exemplary representation of the Class.

"[T]he quality of representation is best measured by results," which "may be calculated by comparing the extent of possible recovery with the amount of actual verdict or settlement." *Goldberger*, 209 F.3d at 55.  The result Plaintiffs' Counsel achieved substantially compensates Class Members for their losses.  Further, the damages methodology used in connection with this Settlement was not constructed solely for settlement purposes but rather was offered by Lead Plaintiffs in support of class certification, and was disputed by BNYM.

This recovery compares exceptionally well to other cases.  A recent study of securities class settlements by NERA Economic Consulting, for example, shows the median ratio of settlement value to investor losses was 2.6% in 2018 (the same as 2017).[15]  The $72.5 million Settlement Amount, which represents nearly 24% of the Agreed Margin Amount, is thus more than *nine times* the ratio in securities class settlements over the past two years.  Even after the requested fee and Litigation Expenses (including Service Awards) are accounted for, Class Members stand to recover 16.25% of the Agreed Margin Amount—more than *six times* the ratio of settlement value to investor losses in those securities cases, and nearly *3.5 times* the ratio of

---

[14] This case is thus a far cry from *Grice*, where this Court reduced the requested one-third fee to 22%.  That case, brought under the Fair Credit Reporting Act, was "not very complex," involving "a single claim involving a single statutory provision and a single form."  363 F. Supp. 3d at 407.  Further, plaintiff's liability case against defendant "was never vigorously contested, as the parties settled early in the litigation before engaging in any extensive discovery."  *Id.*  Indeed, defendant "never filed any dispositive motions throughout the proceedings."  *Id.* at 408.  Additionally, the Court determined "the reversionary nature of the settlement fund . . . merit[ed] a reduction to the baseline percentage."  *Id.* at 409.  None of those circumstances are present here.

[15] *See Recent Trends 2018*, supra n.5, at 36.

settlement value to investor losses in securities class cases from 1996 to 2018 involving settlements between $50 million and $99 million.[16]  Plaintiffs' Counsel's fee should reflect the exceptional result they have achieved for the Class.  *See, e.g.*, *IPO*, 671 F. Supp. 2d at 515 (awarding fee of one-third of $510 million where investors stood to recover an estimated *two percent* of losses).

Any assessment of the percentage recovery this Settlement represents must, moreover, account not only for the litigation uncertainties detailed above—including with respect to class certification, summary judgment, trial, and any appeal—but also the *certainty* of *delay* as Lead Plaintiffs would attempt to clear each of those hurdles.  In other words, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes."  *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).  Plaintiffs' Counsel should be rewarded for achieving this excellent recovery for Class Members without imposing on them the cost of potentially years of additional litigation toward an uncertain outcome.

"The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work."  *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *17 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) (summary order).  Plaintiffs' Counsel faced top-flight defense attorneys, who were also able to draw on BNYM's vast resources.  The high quality of the lawyers opposing Lead Plaintiffs' efforts "further proves the caliber of representation that was necessary to achieve the Settlement."  *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010).  And no Class Member has (thus far) objected to the Settlement or fee request.[17]  This "overwhelmingly positive response by the

---

[16] *Id.* at 35.

[17] Under the Notice Order, the deadline for Class Members to object is May 13, 2019, and Lead Settlement Counsel will respond by June 10, 2019 to any objections.

Class," which includes sophisticated entities that regularly participate in litigation and negotiate fees, "attests to the approval of the Class with respect to the Settlement and the fee and expense application." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002).

### 3.   Public policy considerations support the proposed fee.

The requested fee furthers the policy goal of "providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209 F.3d at 51.  The public interest is well served by this Action, which sought to hold BNYM accountable for violating its agreements with investors and fraudulently concealing those violations.  "Public policy considerations strongly favor incentivizing skilled private attorneys to undertake this type of litigation, especially since the action is on behalf of small claimants who lack the financial incentive to obtain a recovery on their own behalf." *Fleisher*, 2015 WL 10847814, at *22.

A 30% fee would, moreover, compensate Plaintiffs' Counsel at a level commensurate with the benefits they have conferred on the Class, the substantial investment of time and money they devoted to litigating this case and bringing about the Settlement, as well as the contingent nature of their representation.  Public policy favors this fee request.

### C.   The Requested Fee Reflects a Modest Multiplier that Falls Toward the Low End of Those Regularly Approved in This Circuit.

The degree of a multiplier should reflect "the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Bisys*, 2007 WL 2049726, at *3.  The requested $21.75 million fee would result in a blended multiplier of 1.50 of the total lodestar contributed by Plaintiffs' Counsel ($14,473,549.25), based on 32,535.45 total hours devoted to this Action.  That is well justified by the risks Plaintiffs' Counsel faced, the complexity of this non-typical litigation, and the creativity and diligence

Plaintiffs' Counsel demonstrated in pursuing the Action to this outstanding conclusion for the Class.

The multiplier is, moreover, modest in light of awards from other large recoveries within this Circuit. *See, e.g.*, *Fleisher*, 2015 WL 10847814, at *18 ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar in this Circuit, and have been known to award lodestar multipliers significantly greater than the 4.87 multiplier sought here."); *Bisys*, 2007 WL 2049726, at *3 (2.99 multiplier fell "well within the parameters set in this district and elsewhere").[18]  Indeed, it resides at the low end of comparable settlements, as the mean and median multiplier for class settlements of more than $67.5 million between 2009 and 2013 were 2.72 and 1.5, respectively, with a standard deviation of 3.59.  *See* Eisenberg, et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. at 967.  Even if Plaintiffs' Counsel's lodestar were three-quarters of the recorded amount, the fee request would correlate to a blended multiplier of 2.00, still comfortably within the acceptable range.  *See, e.g.*, *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) ("*AFTRA*") (2.86 multiplier was "adequate, but not excessive, in light of the *Goldberger* factors"); *Velez*, 2010 WL 4877852, at *21 (2.4 multiplier fell "well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit").

Because the Court is using lodestar as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized," but rather "the reasonableness of the claimed lodestar can

---

[18] *See also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (upholding award yielding a 3.5 lodestar multiplier); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (awarding 2.89 multiplier, corresponding to 21.4% of $455 million settlement); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("the requested 2.16 multiplier falls comfortably within the range of lodestar multipliers and implied lodestar multipliers used for cross-check purposes in common fund cases in the Southern District of New York"); *Maley*, 186 F. Supp. 2d at 368-69 (awarding 4.65 multiplier); *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26, 2002) (2.09 multiplier was "at the lower end of the range of multipliers awarded by courts within the Second Circuit").

be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *Goldberger*, 209 F.3d at 50.  Lead Plaintiffs' Counsel nonetheless respectfully submit that the hours recorded in this case withstand even close scrutiny, as Plaintiffs' Counsel strove to maximize efficiency, including avoiding duplication, without sacrificing the quality of their representation.

Over more than three years, Plaintiffs' Counsel, consisting of three firms, devoted more than 32,000 hours to prosecuting this case and achieving an outstanding recovery for the Class.[19] Much of that time was spent mustering the necessary proof to prevail, on class certification and at trial, and to defeat BNYM's pretrial motions.  To that end, Plaintiffs' Counsel obtained and analyzed more than 2.7 million pages of documents, as well as 136,000 Excel documents, and prepared for and participated in 20 depositions.  Given the size and complexity of the Action, 32,000 hours over three years is reasonable, and compares favorably to other recent complex cases.  *See, e.g.*, *Woburn Ret. Sys. v. Salix Pharm., Ltd.*, 2017 WL 3579892, at *5 (S.D.N.Y. Aug. 18, 2017) (more than 34,000 hours recorded, where plaintiffs' counsel "investigated the facts, moved to be appointed Lead Plaintiff and Lead Counsel, submitted amended pleadings, successfully defended the Motion to Dismiss, conducted discovery, took ten fact witness depositions, consulted experts, moved for class certification, and ultimately negotiated a favorable settlement for their clients"); *Amaranth*, 2012 WL 2149094, at *2 (49,113 hours recorded, where plaintiffs' counsel "survived a motion to dismiss and successfully moved for class certification").

---

[19] The vast majority of those hours are attributable to Lieff Cabraser and Kessler Topaz.  Mindful of courts' general preference that class counsel handle allocation by agreement, and as set out in the Notice of Motion, Plaintiffs' Counsel have agreed and propose that the requested fee be allocated as follows among the three firms: $10,375,000 each to Lieff Cabraser and Kessler Topaz, and $1 million to Hach Rose.  *See Bodnar v. Bank of Am., N.A.*, 2016 WL 4582084, at *4 (E.D. Pa. Aug. 4, 2016) ("normally, the distribution of attorneys' fees among class counsel is a private matter for the attorneys to resolve amongst themselves").

In particular, document analysis was crucial to the efficient and effective prosecution of this case.  As detailed in the Joint Declaration (at ¶¶ 78-89), attorneys did not mechanically log "duplicates produced by similarly situated defendants . . . as well as nearly identical offering documents and other voluminous materials, relatively few of which contained much if anything that mattered to the case," *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 527 (S.D.N.Y. 2015), *aff'd sub nom. Berman DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016) (summary order).  E-mails, in particular, were key to developing Lead Plaintiffs' allegations that BNYM overcharged investors on ADR FX transactions and fraudulently concealed its pricing practice from investors (necessary to prevailing on claims by Class Members that accrued long before the case was filed).  Plaintiffs' Counsel thus needed to devote significant time to combing through e-mail communications among BNYM personnel to establish the Bank's liability.

Further, Plaintiffs' Counsel's hourly rates reflect "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation," *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)—i.e., the Southern District of New York.  *See Farbotko v. Clinton Cnty.*, 433 F.3d 204, 208 (2d Cir. 2005) (relevant community is "the district in which the court sits"); *see also id.* at 209 (determination of reasonable rate entails "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel," which may include "judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district").  Plaintiffs' Counsel's hourly rates range from $650 to $1,075 for partners/of counsel; $440 to $690 for associates/counsel; $385 to $415 for staff attorneys; $300 to $325 for contract attorneys; and $250 to $495 for

paralegals, clerks, investigators, and other support staff.[20]  These rates are comparable to rates

found reasonable by courts in this District.[21]  *See, e.g.*, *Woburn*, 2017 WL 3579892, at *5

(approving hourly rates up to $995 for partners); *Fleisher*, 2015 WL 10847814, at *18 n.15

(observing "[o]ne source commonly used by courts in this Circuit to assess prevailing rates in

this District is the National Law Journal Survey," and noting "[t]he National Law Journal survey

for 2012 shows that partners at New York firms charge between $330 to $1200 and associates

range between $215 to $760"); *City of Providence*, 2014 WL 1883494, at *13 (approving hourly

rates of $640 to $875 for partners, $550 to $725 for of counsels, and $335 to $665 for other

attorneys).[22]  Further, the blended hourly rate for all attorneys and other firm personnel is

$444.85, a reasonable figure for work by sophisticated counsel in this District.  *See, e.g.*,

*IndyMac*, 94 F. Supp. 3d at 528 (approving "a blended hourly rate of $514.29"); *City of

Providence*, 2014 WL 1883494, at *13 (approving requested fee where plaintiffs' counsel's

reported aggregate lodestar was $7,047,145 for 14,119 hours, representing a blended hourly rate

of $499.12); *AFTRA*, 2012 WL 2064907, at *1 (approving requested fee where plaintiffs'

counsel's reported aggregate lodestar was $13,106,879 for 28,860 hours, representing a blended

hourly rate of $454.15).

---

[20] In granting in full the fee request by Lieff Cabraser and Kessler Topaz in *In re Bank of New York Mellon Corp. Forex Transactions Litigation*, Judge Kaplan approved billing rates of $275 to $425 for attorneys who primarily or entirely performed document analysis similar in depth and significance to the work performed by staff and contract attorneys in this case.  *See* Case No. 12-md-2335 (S.D.N.Y.), ECF No. 619, at 16 (noting rates), ECF No. 642, at 17 (Court: "I accept the lodestar.  I accept as fair, reasonable and accurate everything that went into it.").

[21] Plaintiffs' Counsel's lodestar is calculated using their current hourly rates, "which has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation."  *Fleisher*, 2015 WL 10847814, at *18.

[22] While $1,075 falls at the higher end of rates recently approved in this District, only one attorney (Robert Lieff) bills at that rate, and has approximately 40 years of experience litigating complex class cases.  Further, attorneys billing at more than $900 per hour contributed only 1.11% of the total number of hours billed by Plaintiffs' Counsel.

Plaintiffs' Counsel's fee request is, in short, well justified by the 1.50 blended lodestar multiplier, particularly given the significant amount of work that went into this case and the serious risk of no recovery.  It should be approved.

## II.   LEAD PLAINTIFFS' COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION EXPENSES, INCLUDING SERVICE AWARDS, SHOULD BE GRANTED

### A.   Plaintiffs' Counsel's Expenditures on the Class's Behalf Were Reasonable.

"Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." *Fleisher*, 2015 WL 10847814, at *23.  Lead Plaintiffs' Counsel's request for reimbursement of the expenses Plaintiffs' Counsel devoted to pursuing claims on behalf of Lead Plaintiffs and other Class Members is reasonable.

Plaintiffs' Counsel spent $1,377,383.93 in out-of-pocket costs in prosecuting and resolving this Action.  The Joint Declaration (at ¶¶ 199-205) sets forth the breakdown of those expenses, which "are the type of expenses typically billed by attorneys to paying clients in the marketplace," including "fees paid to experts, mediation fees, notice costs, computerized research, document production and storage, court fees, reporting services, and travel in connection with th[e] litigation." *Fleisher*, 2015 WL 10847814, at *23.  None of those expenditures have yet been reimbursed.  Indeed, "[t]he fact that Class Counsel was willing to expend their own money, where reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable and necessary." *Id.* This request for reimbursement should be granted in full.

### B.   Service Awards to Lead Plaintiffs Are Warranted Given Their Devotion to the Class, Which Helped Achieve This Extraordinary Result.

Courts within this Circuit "have, with some frequency, held that a successful Class action plaintiff, may, in addition to his or her allocable share of the ultimate recovery, apply for and, in

the discretion of the Court, receive an additional award, termed an incentive award." *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *7 (S.D.N.Y. Aug. 6, 2010).  Incentive awards are completely within the discretion of the Court, and have been approved as an important means of "reimbursing class representatives who take on a variety of risks and tasks when they commence representative actions, such as complying with discovery requests and often must appear as witnesses in the action."  *Marsh*, 265 F.R.D. at 150.[23]  Lead Plaintiffs' Counsel request Service Awards of $10,000 each for Lead Plaintiffs David Feige, International Union of Operating Engineers Local 138 Annuity Fund ("IUOE Local 138"), and Diana Carofano, as well as Service Awards of $2,500 each for Lead Plaintiffs Annie Normand and Chester County.

Lead Plaintiffs' Counsel respectfully submit that Service Awards are justified in light of the exceptional circumstances of this case, in which Lead Plaintiffs exemplified what it means to serve as representatives of a class.[24]  David Feige, IUOE Local 138, and Diana Carofano's late husband Don Carofano responded to BNYM's discovery requests and collectively produced more than 23,000 pages to the Bank.  Joint Decl. ¶¶ 62, 111, 113-14.  Additionally, Mr. Feige, Mr. Carofano, and a representative of IUOE Local 138 sat for depositions.  *Id.* ¶¶ 62, 112.  All of the Lead Plaintiffs also communicated regularly with Lead Plaintiffs' Counsel regarding the status of the Action, and approved the proposed Settlement.  *Id.* ¶¶ 149-50.[25]

Further, the Notice informed Class Members that Lead Plaintiffs' Counsel might seek Service Awards of up to $40,000 in the aggregate from the Settlement Fund, and no objection

---

[23] *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *31 (S.D.N.Y. Nov. 8, 2010) (awarding $100,000 to one lead plaintiff and $5,000 to another).

[24] Named Plaintiffs moved on May 23, 2018 to substitute Diana Carofano for her husband Don Carofano, who passed away shortly before.

[25] The lower service awards requested for Chester County and Annie Normand reflect that while both served the Class's interests commendably, Chester County's participation in the case was relatively recent, and Annie Normand ultimately wished to withdraw as a Named Plaintiff due to family issues, and did not sit for a deposition.

has been received.  The $35,000 total award to Lead Plaintiffs represents 0.048% of the $72.5 million Settlement Amount, and is well-justified.  *See, e.g.*, *AFTRA*, 2012 WL 2064907, at *3 (approving *$50,000* service award to each of the named plaintiffs, who "diligently performed the tasks expected of them and reasonably incurred costs and expenses in responding to document requests and interrogatories, producing responsive documents, reviewing filings, attending depositions, and communicating regularly with plaintiffs' counsel").

## **CONCLUSION**

Lead Plaintiffs' Counsel respectfully request that the Court grant their application for (1) attorneys' fees of 30% of the Settlement Fund ($21.75 million plus interest) to Plaintiffs' Counsel; (2) reimbursement of $1,377,383.93 in out-of-pocket costs; and (3) Service Awards of $10,000 each to Lead Plaintiffs David Feige, IUOE Local 138, and Diana Carofano, and $2,500 each to Lead Plaintiffs Annie Normand and Chester County.

Dated:  April 29, 2019                           Respectfully submitted,

**KESSLER TOPAZ MELTZER**             **LIEFF CABRASER HEIMANN**
**& CHECK, LLP**                                 **& BERNSTEIN, LLP**

By:  /s/ Sharan Nirmul                        By:  /s/ Daniel P. Chiplock

Joseph H. Meltzer                               Daniel P. Chiplock
Sharan Nirmul                                   Daniel E. Seltz
Ethan Barlieb                                   Michael J. Miarmi
Jonathan F. Neumann                             250 Hudson Street, 8th Floor
280 King of Prussia Road                        New York, NY 10013
Radnor, PA 19087                                Telephone: (212) 355-9500
Telephone: (610) 667-7706                       Facsimile: (212) 355-9592
Facsimile: (610) 667-7056                       dchiplock@lchb.com
jmeltzer@ktmc.com                               dseltz@lchb.com
snirmul@ktmc.com                                mmiarmi@lchb.com
ebarlieb@ktmc.com
jneumann@ktmc.com                               Elizabeth J. Cabraser
                                                Robert L. Lieff (*of counsel*)
*Interim Lead Counsel for Lead Plaintiffs and*   275 Battery Street, 29th Floor
*the Settlement Class*                           San Francisco, CA 94111

**HACH ROSE SCHIRRIPA**
**& CHEVERIE, LLP**

By:   /s/ Frank R. Schirripa

Frank R. Schirripa
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028
fschirripa@hrsclaw.com

*Counsel for Plaintiff International Union of*
*Operating Engineers Local 138 Annuity*
*Fund*

Telephone: (415) 956-1000
Facsimile: (415) 956-1008
ecabraser@lchb.com
rlieff@lchb.com

*Interim Lead Counsel for Lead Plaintiffs*
*and the Settlement Class*